2011-MAR-07  15:08   FROM-ABC LEGAL SERVICES        +2132539413        T-077  P.002/002  F-186

COPY

BY FAX

1  BERNSTEIN LITOWITZ BERGER
      & GROSSMANN LLP
2  BLAIR A. NICHOLAS  (Bar No. 178428)
   (blairn@blbglaw.com)
3  TIMOTHY A. DeLANGE (Bar No.190768)
   (timothyd@blbglaw.com)
4  NIKI L. MENDOZA  (Bar No. 214646)
   (nikim@blbglaw.com)
5  PAUL M. JONNA  (Bar No. 265389)
   (paulj@blbglaw.com)
6  12481 High Bluff Drive, Suite 300
   San Diego, CA 92130
7  Tel:   (858) 793-0070
   Fax:  (858) 793-0323
8      -and-
   GERALD H. SILK
9  (jerry@blbglaw.com)
   AVI JOSEFSON
10 (avi@blbglaw.com)
   1285 Avenue of the Americas
11 New York, NY 10019
   Tel:   (212) 554-1400
12 Fax:  (212) 554-1444

13 *Counsel for Lead Plaintiff Jacksonville Police*
   *& Fire Pension Fund and Lead Counsel for the Class*

14

15              UNITED STATES DISTRICT COURT

16             CENTRAL DISTRICT OF CALIFORNIA

17                    WESTERN DIVISION

18 BARRY R. LLOYD, Individually and        CASE NO. CV 10-06256 MMM (PJWx)
   on Behalf of All Others Similarly
19 Situated,                               CLASS ACTION

20              Plaintiff,                 **CONSOLIDATED CLASS
                                           ACTION COMPLAINT FOR
21      v.                                 VIOLATIONS OF THE FEDERAL
                                           SECURITIES LAWS**
22 CVB FINANCIAL CORP., et al.,

23              Defendants.

24                                         DEMAND FOR JURY TRIAL

25

26

27

28
                                    CONSOLIDATED CLASS ACTION COMPLAINT
                                    Case No. 10-cv-06256-MMM (PJWx)

FILED

2011 MAR -7  PM 2: 19
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY _____

# TABLE OF CONTENTS

Page

I.    NATURE AND SUMMARY OF THE ACTION ...................................................1

II.   JURISDICTION AND VENUE .................................................................5

III.  THE PARTIES .............................................................................6

    A.   Lead Plaintiff .......................................................................6

    B.   Defendants ..........................................................................6

IV.   CONFIDENTIAL WITNESSES .............................................................10

V.    DEFENDANTS' FALSE AND MISLEADING
STATEMENTS AND OMISSIONS ...........................................................12

    A.   Defendants' False And Misleading Statements And
Omissions Regarding CVB's Third Quarter 2009
"Record" Financial Results ......................................................13

    B.   Defendants' False And Misleading Statements During
November And December 2009 Presentations .................................18

    C.   Defendants' False And Misleading Statements And
Omissions Regarding CVB's Fiscal Year 2009 "Record"
Financial Results ...............................................................20

    D.   Defendants' False And Misleading Statements And
Omissions During March 2010 Presentations..................................22

    E.   Defendants' False And Misleading Statements And
Omissions Regarding CVB's First Quarter 2010
Financial Results ...............................................................24

    F.   Defendants' False And Misleading Statements And
Omissions During CVB's May 2010 Presentation .........................25

    G.   Defendants' False And Misleading Statements And
Omissions Regarding CVB's Second Quarter 2010
"Record" Financial Results .....................................................26

VI.   SCIENTER ALLEGATIONS ...............................................................27

    A.   Defendants' "Extend And Pretend" Practices.................................27

    B.   Defendants' Use Of False Appraisals ........................................30

    C.   Defendants Knew Or Recklessly Disregarded The Status
Of the Bank's Loans...........................................................31

    D.   Garrett Was The Bank's Largest Borrowing Relationship .................34

    E.   Defendants' GAAP Violations................................................35

1.   CVB Intentionally Misreported Loan Statistics To Conceal Its Fraud ....................................37

2.   CVB Failed To Accurately Report Its Past Due, Restructured, Non-Performing And OREO Assets And Its Realized Losses....................................38

3.   Defendants Failed To Record Timely Loan Loss Provisions As Losses Were Incurred ..................39

4.   Defendants' Failure To Write-Off Loan Losses As They Occurred Inflated CVB's Understated Reserves.............................................43

5.   CVB's Omitted Financial Statement Disclosures In Violation Of GAAP .......................................43

6.   Following Commencement Of The SEC Investigation, CVB Has Now Changed Its Disclosure Practices.....................................46

F.   Insider Trading ...........................................47

VII.   THE TRUTH EMERGES ..............................................49

VIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE....................................57

IX.   NO SAFE HARBOR ................................................59

X.   CLASS ACTION ALLEGATIONS ..................................59

XI.   CLAIMS FOR RELIEF ............................................61

COUNT I  For Violation Of § 10(b) Of The Exchange Act And Rule 10b-5 Against CVB, Myers And Biebrich ................................61

COUNT II  For Violation Of § 20(a) Of The Exchange Act Against Myers And Biebrich................................64

XII.   PRAYER FOR RELIEF ............................................66

XIII.   JURY DEMAND................................................67

The allegations contained herein are based upon information and belief with information obtained through the investigation made by and through Lead Counsel. Lead Counsel's investigation has included, among other things: (i) interviews of former employees of CVB Financial Corp. ("CVB," the "Company," or the "Bank") and certain third-parties with first-hand knowledge of the events alleged herein; (ii) reviews and analyses of CVB's filings with the Securities and Exchange Commission ("SEC"), Company press releases, slide presentations, and other public statements; and (iii) reviews of news, media, web resources, property title searches, tax lien documents, foreclosure records, and analyst research reports.

## I.   NATURE AND SUMMARY OF THE ACTION

1.     This is a securities class action on behalf of common stock purchasers of CVB between October 21, 2009, and August 9, 2010, inclusive (the "Class Period").  Lead Plaintiff asserts claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), against CVB and its top executive officers, the Bank's President and Chief Executive Officer ("CEO"), Christopher D. Myers ("Myers"), and its former Chief Financial Officer ("CFO") and Executive Vice President, Edward J. Biebrich, Jr. ("Biebrich").[1]

2.     CVB reports to be the largest financial institution headquartered in the Inland Empire region of Southern California.  CVB's principal asset is its bank, Citizens Business Bank, a mid-sized lender reporting nearly $7 billion in assets, which primarily services small and medium-sized California-based businesses. CVB's income is derived primarily from interest earned on the Bank's loans and deposits and is highly dependent upon the underlying credit quality of its loan portfolio.  In 2001, when CVB first listed its stock on the NASDAQ National

---

[1] Defendants Myers and Biebrich are referred to herein as the "Individual Defendants."

Market Exchange ("NASDAQ"), it had more than $1 billion in loans; by the end of the third quarter of 2009, loans had grown to more than $3.5 billion, with more than half of them in commercial real estate.

3.     The Bank offers commercial real estate, construction, commercial and industrial, agribusiness, mortgage, consumer, lease and other real estate loans in the Inland Empire and Central Valley regions, and Los Angeles and Orange Counties – areas in which plunging real estate prices and a spike in foreclosures have taken a tremendous toll.

4.     The Bank assured investors throughout the Class Period that its strict underwriting standards had helped it to avoid the fate of many of its peer lenders in California that had been decimated by skyrocketing defaults.  Defendants publicly touted that, unlike its peers, CVB had a "*strong credit culture*," its "*underwriting integrity remain[ed] paramount*" and "*[t]he overall credit quality of [CVB's] loan portfolio is <u>sound</u>*."  This allowed Defendants to maintain CVB's reported profits during the economic downturn and throughout the Class Period.  In addition, the purported strong capital, conservative lending practices, and low loan losses allowed CVB to continue its stated "growth strategy" of transitioning from a community bank to a regional bank through acquisitions of failing banks with favorable loss-sharing agreements with the Federal Deposit Insurance Corporation ("FDIC").

5.     Throughout the Class Period, Defendants misrepresented the true state of its loan portfolio and, in particular, millions of dollars of loans to its largest borrower, Paul Garrett and his real estate development firm, The Garrett Group LLC ("Garrett"[2]).  The Garrett loans represented approximately 14% of the Bank's tangible common equity, a closely watched measure of an institution's net worth.

---

[2] Herein, unless otherwise indicated, "Garrett" refers to Paul Garrett, The Garrett Group LLC, and/or all of its related or owned entities.

When questioned in December 2009 regarding CVB's loans to Garrett, Defendant Myers assured the market that the Bank's eight loans to Garrett totaling over $80 million were "*fully performing in all respects*" and "*performing as agreed*." Moreover, Defendant Myers said, the Bank avoided many of the problem loans that had led to large losses and the failures of two other regional lenders, explaining that of the five largest banks headquartered in the region, four have disappeared, "*we are the last man standing*."

6.    The Bank's record results and assurances that it was not suffering from the same loan-loss problems plaguing its peers earned CVB accolades from analysts and numerous journals, including Forbes magazine (which named CVB the Nation's sixth-best bank, on the heels of the Bank's reportedly strong 2009 financial results), the Bank Director Magazine (which ranked CVB ninth in 2010 due to purported "profitability, capital adequacy and asset quality"), and the ABA Banking Journal, which ranked CVB twentieth in the Nation in 2010.

7.    While publicly claiming that its largest borrower was "fully performing as agreed" and that CVB had managed its purported risks, Defendants Myers and Biebrich sold nearly 100,000 of their own shares at artificially inflated prices, cashing in over $700,000 during the less than ten-month Class Period. This trading was highly unusual and suspicious. In the full year prior to the beginning of the Class Period, Defendant Myers sold no shares and bought 258,000 shares, and Defendant Biebrich sold only 1,608 shares.

8.    By August 2010, Defendants could no longer hide the true state of its loan portfolio and the Garrett loans in particular. On August 9, 2010, CVB announced that *two weeks earlier*, on July 26, 2010, the SEC issued a subpoena to the Bank demanding information about how the Bank handles and discloses troubled loans. Specifically, the subpoena questioned the Bank's loan underwriting guidelines, its allowance for credit losses and how CVB calculates its allowance for loan losses. Analysts immediately reacted to the announcement, stating that the

SEC probe was notable because it revealed that CVB was not fully disclosing potentially problematic loans and that CVB's largest exposure – Garrett – is backed by collateral whose market value is well below that of the loan amount.

9.     The market also reacted swiftly to this previously undisclosed truth about the quality of CVB's loan portfolio and financial reporting.  Following this disclosure, CVB's stock price plunged 22% in a single day, from $10.30 to $8.00, representing a market capitalization loss of approximately $245 million on extremely high trading volume.

10.     One month later, on September 9, 2010, CVB finally admitted analysts' and the market's interpretations of the SEC subpoena, namely that CVB's loans to its largest borrower, Garrett, were in trouble.   Specifically, on September 9, 2010, CVB disclosed that Garrett defaulted on $82 million worth of loans, that CVB had negotiated a Forbearance Agreement with Garrett, and that CVB was forced to remove all $82 million in Garrett loans from its purported "performing" loans, where it had been improperly accruing interest income throughout the Class Period.  Forty-eight million dollars of these Garrett loans were deemed "impaired," which required CVB to immediately stop accruing interest income, and to reverse previously reported interest.  The remaining $34 million was a total loss and had to be written off completely.  In its press release, CVB admitted that its loan loss allowance was inadequate to cover the $34 million in credit losses on the Garrett loans, forcing CVB to immediately record an additional loss provision of $9.3 million in third quarter 2010.

11.     Finally, on January 20, 2011, CVB admitted that Garrett had violated forbearance agreements, and that CVB was considering the sale of certain notes, initiation of foreclosure proceedings and alternative repayment plans.

12.     Real estate loans do not go bad overnight.  Nor does a borrower with $82 million in outstanding loans – 14% of the Company's portfolio – default overnight.  Rather, as numerous confidential witnesses and public documents

corroborate, Defendants knew or recklessly disregarded throughout the Class Period that CVB's loan portfolio was not sound and that the Garrett loans were in serious trouble.  Indeed, directly contrary to CVB's – and in particular Defendant Myers' – reassurances, Defendants knew at least as early as the beginning of 2009 that CVB's loans to its largest borrower, Garrett, were troubled and that CVB kept these loans "current" through its improper "extend and pretend" practices, wherein the Bank extended additional lines of credit or new loans to provide additional capital to keep the borrower current on existing loans.

13.    CVB's fraudulent accounting practices misrepresented the Bank's financial health, concealed impaired loans secured by souring commercial real estate assets, and failed to adequately reserve for loan losses.  As explained herein, CVB failed to record adequate loan loss provisions (expenses), failed to properly account for restructured loans, and failed to properly account for losses in the market value of collateral, all of which overstated income.  CVB's allowance for credit losses was much too small to absorb known losses, which materially overstated stockholders' equity and CVB's true loan portfolio value.   The allowance was inadequate despite CVB having padded it with fictitious amounts by failing to write off loans that had gone bad.  CVB failed to make numerous required disclosures, including disclosures that would have revealed problems with specific loans and specific loan portfolios by early 2009.

## II.    JURISDICTION AND VENUE

14.    This action arises under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

15.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and § 27 of the Exchange Act, 15 U.S.C. § 78aa. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).   Defendant CVB maintains its

principal place of business within this District, Defendants conduct and/or conducted business in this District, and many of the acts giving rise to the violations alleged herein, including the preparation and dissemination of materially false and misleading information and omissions, occurred in substantial part in this District.

16.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, mail, interstate telephone communications, and the facilities of the national securities markets.

## III.   **THE PARTIES**

### A.   **Lead Plaintiff**

17.     Lead Plaintiff Jacksonville Police & Fire Pension Fund ("Jacksonville P&F" or "Lead Plaintiff") was created in 1937, and is a single-employer contributing defined benefit pension plan covering all full-time police officers and firefighters of the Consolidated City of Jacksonville.  Jacksonville P&F purchased CVB common stock during the Class Period, as set forth in the certification previously filed with the Court, and suffered damages as a result of the federal securities law violations alleged herein.  By Order dated January 21, 2011, the Court appointed Jacksonville P&F as the Lead Plaintiff in this action.

### B.   **Defendants**

18.     Defendant CVB is a California corporation with its principal place of business at 701 North Haven Avenue, Suite 350, Ontario, California 91764. According to the Company's profile, CVB operates as a bank holding company for Citizens Business Bank, which provides various retail banking and financial services to small and mid-sized businesses, high net-worth individuals, and professionals in the United States.  The Bank offers various deposit products, including checking, savings, money market, and time certificates of deposit for business and personal accounts.  As of December 31, 2009, CVB operated forty-six

business financial centers located in the Inland Empire, Los Angeles County, Orange County, and the Central Valley of California.

19.   Defendant Myers is, and was throughout the Class Period, the Company's CEO, President and Director of the Company, as well as CEO and President of Citizens Business Bank.  During the Class Period, Defendant Myers signed and/or certified the Company's SEC filings and made additional false statements and omissions as set forth herein.

20.   Because of Defendant Myers' positions with the Bank, and as further detailed below, he had access to the adverse undisclosed information about its business, operations, products, trends, financial statements, markets, and present and future business prospects via access to internal control documents (including but not limited to the Bank's Problem Loan Reports); conversations and connections with other corporate officers, employees, and borrowers; participation at management and Board of Directors ("Board") meetings and committees thereof (including the Bank's monthly Loan Committee meetings), and reports and other information provided to him in connection therewith.

21.   As an officer, director and controlling person of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the NASDAQ, and governed by the provisions of the federal securities laws, Defendant Myers had a duty to promptly disseminate accurate and truthful information with respect to the Bank's financial condition and performance, growth, operations, financial statements, business, products, borrowers, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Bank's publicly traded common stock would be based upon truthful and accurate information. Myers' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

22.     Defendant Myers participated in the drafting, preparation, and/or approval of the various public, shareholder, and investor reports and presentations, as well as other communications alleged herein.  He was aware of, or deliberately disregarded, the misstatements contained therein and omissions therefrom, and was aware of their materially false and misleading nature.

23.     Defendant Myers, because of his position of control and authority as President, CEO and Director of the Bank, was able to and did control the content of the various SEC filings, press releases, investor presentations, and other public statements pertaining to the Bank during the Class Period.  Defendant Myers was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, Defendant Myers is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

24.     Defendant Myers is liable for making materially false and misleading statements and omissions that operated as a fraud or deceit on purchasers of CVB common stock.  Defendant Myers deceived the investing public regarding CVB's business, operations, management, and the intrinsic value of CVB common stock, and enabled CVB insiders to sell their privately held CVB shares while in possession of material, adverse, non-public information about the Bank.

25.     Defendant Biebrich was, during the Class Period, the Company's CFO and Principal Accounting Officer ("PAO"), and the CFO and Executive Vice President of Citizens Business Bank.  During the Class Period, Defendant Biebrich signed and/or certified the Bank's SEC filings and made additional false statements and omissions as set forth herein.  On July 26, 2010 – the same day that CVB received the SEC subpoena – CVB announced Biebrich's projected December 31, 2010 "retirement."  Shortly thereafter, on August 12, 2010, the Bank reported that Biebrich had "postponed" his retirement, claiming that the timing of his

resignation "is strictly a coincidence."  On February 1, 2011, CVB announced that Biebrich was, in fact, retiring effective March 1, 2011.

26.  Because of Defendant Biebrich's position with the Bank, and as further detailed below, he had access to the adverse undisclosed information about its business, operations, products, trends, financial statements, markets, and present and future business prospects via access to internal control documents (including but not limited to the Bank's Problem Loan Reports); conversations and connections with other corporate officers, employees, and borrowers; participation at management and Board meetings and committees thereof (including the Bank's monthly Loan Committee meetings), and reports and other information provided to him in connection therewith.

27.  As an officer and controlling person of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the NASDAQ, and governed by the provisions of the federal securities laws, Defendant Biebrich had a duty to promptly disseminate accurate and truthful information with respect to the Bank's financial condition and performance, growth, operations, financial statements, business, products, borrowers, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Bank's publicly traded common stock would be based upon truthful and accurate information. Biebrich's misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

28.  Defendant Biebrich participated in the drafting, preparation, and/or approval of the various public, shareholder, and investor reports and presentations, as well as other communications alleged herein.  He was aware of, or deliberately disregarded, the misstatements contained therein and omissions therefrom, and was aware of their materially false and misleading nature.

29.     Defendant Biebrich, because of his position of control and authority as CFO and PAO of the Bank, was able to and did control the content of the various SEC filings, press releases, investor presentations, and other public statements pertaining to the Bank during the Class Period.  Defendant Biebrich was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, Defendant Biebrich was responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

30.     Defendant Biebrich is liable for making materially false and misleading statements and omissions that operated as a fraud or deceit on purchasers of CVB common stock.  Defendant Biebrich deceived the investing public regarding CVB's business, operations, management, and the intrinsic value of CVB common stock, and enabled CVB insiders to sell their privately held CVB shares while in possession of material, adverse, non-public information about the Bank.

## IV.   <u>CONFIDENTIAL WITNESSES</u>

31.     The allegations herein are supported in part by first-hand accounts of numerous confidential witnesses, including persons who were employed at Garrett or CVB during the Class Period.  As set forth below, the confidential witnesses were each in a position to know the information alleged, and many corroborate the allegations of one another.  The confidential witnesses have been identified with particularity but without disclosing identities in order to address concerns about retaliation or career injury:

(a)     Confidential Witness 1 ("CW1") worked for the Bank from March 2005 to August 2010.  CW1 was a Vice President, Special Assets Manager for the Special Assets Department, a department which handles troubled credits and impaired loans.  In March 2009, CW1 became a Portfolio

Manager. As a Special Assets Manager, CW1 monitored and handled the delinquencies for every branch to make sure they were not "reportable." If a loan was delinquent for more than thirty days at quarter-end, then the loan was considered reportable to the Board and publicly. CW1 reported to the Bank's Executive Vice President and Chief Credit Officer ("CCO"), James Dowd ("Dowd"), who reported to CEO, Defendant Myers.

(b)     Confidential Witness 2 ("CW2") worked for the Bank from September 1998 to August 2010. CW2 was a Senior Vice President, Regional Manager for the Inland Empire Region. CW2 reported to Todd Hollander ("Hollander"), who reported to CEO, Defendant Myers.

(c)     Confidential Witness 3 ("CW3") worked for the Bank from March 2009 to September 2010. CW3 was a Senior Vice President and Special Assets Manager of CVB's Special Assets Department. In this capacity, CW3 was in charge of troubled loans and managed loan workouts. CW3 reported to Executive Vice President and CCO Dowd, who reported to CEO, Defendant Myers.

(d)     Confidential Witness 4 ("CW4") worked for the Bank from 1999 to February 2010. From 2002 to 2010, CW4 worked for the Bank's Agri-Business Department, and was the Executive Administrative Assistant to the Bank's Vice President of Dairy & Livestock Industries Group, Larry Zivelonghi ("Zivelonghi"), who reported to CEO, Defendant Myers. In this capacity, CW4 was responsible for managing the daily calendar and travel plans, and for receiving the incoming calls of the customers for Zivelonghi.

(e)     Confidential Witness 5 ("CW5") worked for the Bank from May 2006 to February 2010. CW5 was the Bank's Executive Vice President, Relationship Manager. In this position, CW5 managed a loan portfolio and was responsible for new business production, credit analysis including loan write-up and presentation for approval. CW5 has 14 years of experience in

commercial lending, and has effectively underwritten and managed all types of commercial credits including installment loans, lines of credit, and short-term working capital loans.  CW5 reported directly to Branch Manager Neal Newman, who reported to Regional Manager Ted Dondanville.  Dondanville reported to Chief Loan Officer Hollander, who reported to CEO, Defendant Myers.

(f)     Confidential Witness 6 ("CW6") worked for the Bank from March 1997 to May 2010.  CW6 was the Deputy Chief Credit Officer for the Bank's Special Assets Division from June 2006 until March 2009.  In this position, CW6 was responsible for the Dairy and Livestock portfolio.  From March 2009 until May 2010 he worked within the Credit Administration department.  CW6 reported to Frank Basirico, then Ed Mylett, and then CCO Dowd.

(g)     Confidential Witness 7 ("CW7") worked for the Bank from the time of the Bank's acquisition of San Joaquin Bank in October 2009 until February 2010.  CW7 was the Note Department Manager, which was the department through which all loans had to pass during orientation and renewals.

(g)     Confidential Witness 8 ("CW8") worked for The Garrett Group LLC from January 2004 through February 2009.  CW8 was a Vice President of Garrett.  In this capacity, CW8 was responsible for oversight of asset and portfolio management, analysis, leasing, construction, property management (both internal and third party), and loan administration.

## V.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

32.     Prior to and throughout the Class Period, Defendants trumpeted their "growth strategy," which is to "transition[] from a Community Bank to a Regional Bank," as stated, for example, in the Bank's December 2, 2010 private analyst slide

presentation. Indeed, the Bank shared its "10 Year Vision" as follows: "Citizens Business Bank will strive to become the dominant financial services company operating throughout the state of California, servicing the comprehensive financial needs of successful small to medium sized businesses and their owners."

33.     Defendants hoped to accomplish this dominance primarily through acquisitions of other banks. Historically, CVB had acquired First Coastal Bank in June 2007, which as of September 30, 2010, had assets of nearly $150 million. Then, on October 16, 2009, CVB announced that it acquired San Joaquin Bank, which had approximately $732 million in total assets. Under a loss-sharing agreement with the FDIC, the FDIC agreed to absorb 80% of losses up to $144 million and 95% of losses in excess of $144 million for 5, 8 or 10 years depending on the type of loan. In order to make such acquisitions and continue growth, however, CVB had to maintain the appearance that it had strong capital, conservative lending practices, and experienced very low loan losses.

**A.     Defendants' False And Misleading Statements And Omissions CVB's Third Quarter 2009 "Record" Financial Results**

34.     Throughout the Class Period, Defendants emphasized that, despite the "tough economic times," and the fate of its peers, the Bank's "overall credit quality remained solid." Defendants deflected any concerns regarding the Bank's largest borrower, which analysts confirmed was Garrett. As detailed below, these statements were false and misleading.

35.     For example, on the first day of the Class Period, October 21, 2009, the Bank proclaimed "_Record_ Results for Third Quarter 2009." (Emphasis in original.) In a press release, the Bank stated it reported net income of $19.3 million for the third quarter of 2009, the highest quarterly net income in the history of the Bank. The Bank (and in particular, its CEO, Defendant Myers) assured investors that "*[t]he overall credit quality of the loan portfolio is sound*."

36.   The Bank's November 5, 2009 Form-Q, signed by Defendant Biebrich, repeated the Bank's purported record results.  It also included a purported "risk factor" that continuing deterioration in the real estate market "could" affect the ability of loan customers, including the Bank's largest borrowing relationships, to service their debt, which "could" result in loan charge-offs and provisions for credit losses "*in the future*."

37.   Defendants Myers and Biebrich signed Certifications that were included in the Bank's third quarter 2009 Form 10-Q.   These Certifications represented, *inter alia,* that:  (a) the Form 10-Q fairly represented CVB's financial condition; (b) the Form 10-Q did not contain "any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading"; (c) the financial statements and other financial information included with the Form 10-Q, fairly presented in all material respects CVB's financial condition, results of operations and cash flows; (d) Defendants were "responsible for establishing and maintaining disclosure controls and procedures"; and (e) Defendants had evaluated the Bank's disclosure controls and procedures prior to the filing of the Form 10-Q.   Defendants Myers and Biebrich also signed Certifications pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, stating that the information in the Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Bank.

38.   Analysts and investors reacted to the positive news.  The day after the third quarter 2009 earnings release, October 22, 2009, CVB's stock closed up, on heavy trading volume, from $7.86 per share to $8.81 per share.  And analysts, such as B. Riley & Co., reported that "[a]sset quality at CVBF remains very strong relative to other banks operating in southern California."

39.     The above statements in CVB's October 21, 2009 press release and November 5, 2009 Form 10-Q were false and misleading when made.  In truth, Defendants:  (a) extended additional lines of credit or new loans to artificially keep loans "current," a practice referred to as "extend and pretend"; (b) used false appraisals to conceal loan losses and the fact that loans were backed by collateral whose market value was well below that of the loan amounts; (c) knew, or recklessly disregarded, that the purported "risk" had already come to fruition; (d) failed to properly account for CVB's loans, including in particular, CVB's loans to its largest borrower, Garrett; (e) failed to reflect impairment in the loans; and (f) did not adequately reserve for loan losses.

40.     As at least five Confidential Witnesses corroborate, Defendants knew no later than the beginning of 2009 that an increasing number of the Bank's loans were facing delinquency.  Indeed, as explained by CW1, because the Bank's senior management knew there was going to be an increasing number of problems with loans, beginning in March 2009, the Bank nearly tripled the number of employees in its Special Assets Department, from four to eleven.  CW7 likewise confirmed that CVB added additional Special Assets divisions in 2009, including in the Bank's Rosedale office.

41.     With respect to CVB's largest borrower, Garrett, five Confidential Witnesses confirm that it was evident internally at the Bank by no later than early 2009 that the Garrett loans were troubled.  CW5 explained that back in 2008 the Garrett loans were "going sideways," but that Defendants waited to publicly disclose the troubled status of the Garrett loans in hopes that they could build up the Bank's allowance for credit losses (or "Allowance for Loan and Lease Loss Reserve ("ALLL")"), and "piggy-back" on top of a profitable quarter so that it did not impact the Bank's profitability as much.

42.   Garrett's former Vice President, CW8, confirmed that Garrett was having discussions with CVB prior to February 2009 regarding trying to restructure Garrett's debt to CVB.

43.   CW2 explained that CVB's Construction Loan Department initially handled the Garrett loans, but then by early 2009, the Garrett loans were transferred to Julie Engen in the Credit Department.  The Bank's practice was to send a loan to the Credit Department after it was late by thirty days, so that the Credit Department could go after the borrower.  CW3 confirmed that when a loan is with the Credit Department, it could mean the loan and/or the borrower's industry is at risk or troubled and thus the loan is more closely monitored because there is some concern.

44.   CW2 further explained that, while other troubled loans were transferred to the Special Assets Department, the Garrett loans were given special treatment and transferred instead to Julie Engen because she was very familiar with construction loans and she sat next to the Special Assets Department, and thus could seek advice from the Special Assets Department.

45.   CW1 explained that the Garrett loans were transferred to the Special Assets Department in May 2010.  When a loan came into the Special Assets Department, it went into a log sheet that contained information such as the date the file(s) came in, to whom it was assigned, and any communications with the borrower.  CW3 confirmed that the Garrett loans were in fact transferred to the Special Assets Department and recorded on a department monthly report in 2009, but that three days later, the Garrett loans were sent back to the Credit Department for further handling.

46.   CW3 further confirmed that the Credit Department handled and closely monitored the Garrett loans.  According to CW3, the reason that the Garrett loans were with the Credit Department, as opposed to the Special Assets Department, was strictly a decision that the executive management made,

including CEO Defendant Myers, Executive Vice President and CCO Dowd, and the Board of Directors.

47.    As further detailed below in Section VI.A., deed records corroborate that, at least as early as 2008, Defendants kept Garrett's loans appearing "current" only by virtue of CVB extending additional lines of credit or new loans, a practice referred to as "extend and pretend."  At least two Confidential Witnesses, as well as multiple property title searches, corroborate Defendants' "extend and pretend" practices in which the Bank provided additional capital to its borrowers, secured only by collateral of little value, in order to get them current, temporarily replenish the loan interest reserves, give the appearance of low delinquencies, and avoid increased capital requirements.  In an "extend and pretend" practice, money is "round tripped" and never leaves the Bank, but rather it just adds to the loan balance, while making the borrower appear current.  This practice, however, increases the exposure – and ultimately the losses – to the Bank.[3]

48.    As further detailed below in Section VI.A., CVB engaged in this practice, in particular, at quarter end and just prior to regulatory review. Specifically with respect to third quarter 2009, CVB extended Garrett $4.025 in "refinancing" on September 23, 2009, just one week before the end of the third quarter 2009.

49.    Defendants also used false appraisal values in order to conceal the fact that the market value of the collateral was well below that of the loan amounts and thereby avoid recognizing a loss on the loans.  As further detailed below in Section VI.B., CVB used the highest appraisal – the one that was accurate only if the property was fully occupied and without need of maintenance – even when, in

---

[3] As used in this Complaint, "extend and pretend" includes the practices also known as "amend and pretend" (in which a bank gives a borrower more time to repay a loan), and "troubled debt restructurings" (in which a bank modifies an existing loan, *e.g.*, by changing the terms or breaking the loan into pieces).

truth, the property was not fully occupied and was in need of maintenance.  This practice impacted the Bank's bottom line, in particular the ALLL Reserve, because any difference between the principal loan balance and estimated recovery (current appraised value less cost of sale) had to be written off or reserved off.  Using the higher (false) appraisal value made it falsely appear that there was more money that the Bank had a chance of recovering and injecting, and the less the Bank had to show as a loss, or to reserve for.

50.    Moreover, the "record" financial results were achieved only by overstating the Bank's income and loan quality.  As detailed below in Section VI.E., the Bank's failure to report adequate loan loss provisions (expenses), failure to properly account for non-performing and restructured loans, and failure to properly account for losses in the market value of its collateral materially overstated CVB's income, manipulated its insufficient allowance for credit losses (reserves), and inflated CVB's loan values and stockholders' equity.

**B.    Defendants' False And Misleading Statements During November And December 2009 Presentations**

51.    During a November 9, 2009 investor presentation, Defendants repeated the Bank's "*record*" financial results.  They further stressed that the Bank's purported "***strong credit culture and underwriting integrity remain paramount at CVB***," that "geographic diversification, a focus on relationship banking, and ***a strong credit culture have allowed CVB to mitigate loan losses through this economic downturn***," that on a peer comparison basis "***CVB's credit metrics are superior***," and that "***CVB's strong loan underwriting culture has limited its exposure to problem credits***."

52.    Shortly thereafter, during a December 2, 2009 private analyst presentation, in response to questions specifically concerning the Garrett loans, Defendant Myers stressed that the assets are "***fully performing <u>in all respects</u>***,"

"*we don't have specific reserves against that*," and that "*[t]hey are paying everything*. *It's performing as agreed.*"  (Emphasis added.)

53.   Defendant Myers further explained that, of the five largest banks headquartered in the region, four have disappeared, "*we are the last man standing*," adding that CVB avoided trouble with loans faced by its peers.  Myers claimed that, with respect to credit quality, "*we clearly are superior to most of our competition*."

54.   As further support for his statement that the Bank was not facing the same loan loss problems as its peers, CEO Defendant Myers explained during the presentation that, while ten buildings on the avenue where CVB is headquartered each had a 75% vacancy rate, the Bank had "zero loans against those ten buildings."

55.   As detailed herein, the above statements in the November 9, and December 2, 2009 presentations were false and misleading for the following reasons:  (a) Defendants kept borrowers, including Garrett, "current" only by virtue of the Bank's extend and pretend practices; (b) Defendants used false appraisals to conceal loan losses and the fact that loans were backed by collateral whose market value was well below that of the loan amounts; (c) Defendants failed to properly account for CVB's loans, including in particular, CVB's loans to its largest borrower, Garrett; (d) Defendants failed to reflect impairment in the loans; and (e) Defendants did not adequately reserve for loan losses.   Moreover, directly contrary to Defendant Myers' statement, the Bank did, in fact, have an interest in an office building on its street which partly secured a $16 million promissory note issued by CVB and which served as collateral for a $16.575 million revolving credit line that CVB had extended to Garrett in March 2008.

### C. Defendants' False And Misleading Statements And Omissions Regarding CVB's Fiscal Year 2009 "Record" Financial Results

56. On January 21, 2010, CVB announced its fiscal year 2009 results, including "record net interest income." CEO Defendant Myers commented, "***This represents the highest net interest income in the history of the Company, demonstrating our ability to continue to grow top-line income***."

57. CVB reported the purported record results in its Form 10-K filed with the SEC on March 4, 2010. Defendants Myers and Biebrich signed the Form 10-K, repeated their Sarbanes Oxley Certifications, and further signed Certifications pursuant to Section 111(b) of the Emergency Economic Stabilization Act of 2008 as Amended, in light of CVB's receipt of TARP funds.

58. The Bank's Form 10-K disclosed as a purported "risk factor" that the Bank "may be required to make additional provisions for credit losses and charge off additional loans ***in the future***," and that the continuing deterioration of the commercial real estate market "could" affect the ability of the Bank's borrowers, including its largest borrowing relationships, to service their debt, which "could" result in loan charge-offs and provisions for credit losses "***in the future,***" and declining real estate values "could be significantly reduced."

59. Analysts, news commentators and investors were impressed. Indeed, following CVB's reportedly strong 2009 financial results, Forbes magazine named CVB the Nation's sixth-best bank. Likewise, thereafter in 2010, the Bank Director Magazine ranked CVB ninth due to purported "profitability, capital adequacy and asset quality," and the ABA Banking Journal ranked CVB twentieth in the Nation. And *The New York Times* recognized in an April 3, 2010 article entitled "At CVB Financial, Praise and Questions," that "[a] quick look at the company's books shows why investors are captivated by CVB: it isn't suffering from the loan-loss problems plaguing so many of its peers. The trouble is, if Citizens' loans start to go south more quickly than they have until now, its reserves are not that robust."

60.   As detailed herein, the above statements in CVB's January 1, 2010 press release and March 4, 2010 Form 10-K were false and misleading for the following reasons:  (a) Defendants kept borrowers, including Garrett, "current" only by virtue of the Bank's extend and pretend practices; (b) Defendants used false appraisals to conceal loan losses and the fact that loans were backed by collateral whose market value was well below that of the loan amounts; (c) Defendants knew, or recklessly disregarded, that the purported "risk" had already come to fruition; (d) Defendants failed to properly account for CVB's loans, including in particular, CVB's loans to Garrett; (e) Defendants failed to reflect impairment in the loans; and (f) Defendants did not adequately reserve for loan losses.  In particular, as detailed below in Section VI.A.,  Defendants failed to disclose that the Bank kept Garrett "current" at year end 2009 by extending Garrett a $38 million "refinance" on December 29, 2009, just two days before year end.

61.   Moreover, the numbers that Defendants reported in CVB's 2009 Form 10-K for restructured loans were substantially lower than the numbers Defendants reported to the FDIC for the same time period as stated in the FDIC Uniform Bank Performance Report, as set forth below:

| CVB Financial – Restructured Loans Reported as of December 31, 2009 | | | |
|---|---|---|---|
| $ in millions, rounded | Reported in Form 10-K | Reported to FDIC | Discrepancy |
| Restructured loans – past due | $ 2,500 | $16,337 | $13,837 |
| Restructured loans – current | 1,017 | 6,977 | 5,960 |
| Restructured loans – Total | $ 3,517 | $23,314 | $19,797 |

62.   Defendants also failed to disclose in the 2009 Form 10-K that $28.3 million of the 2009 provision for credit losses was for Dairy, Livestock and Agribusiness loans, constituting 35% of CVB's total provision for credit losses of $80.5 million during the year ended 2009.  In addition, Defendants failed to disclose that $31 million of the Bank's December 31, 2009 allowance for credit

losses was for Dairy, Livestock and Agribusiness loans, constituting almost 30% of the total allowance for credit losses of $109 million as of December 31, 2009.[4] This information about the troubled loans in the Dairy sector was ultimately disclosed in the Bank's 2010 Form 10-K filed with the SEC March 1, 2011, without explanation for why it had not previously been timely disclosed.

### D. Defendants' False And Misleading Statements And Omissions During March 2010 Presentations

63.     On March 2, 2010, CEO Defendant Myers discussed a Bank slide presentation at the Sandler O'Neill West Coast Financial Services Conference. CVB filed copies of the slides, attached to a Form 8-K filed with the SEC the same day. The slides reveal that Defendant Myers again emphasized that "***strong credit culture and underwriting integrity remain paramount at CVB***," that "geographic diversification, a focus on relationship banking, and ***a strong credit culture have allowed CVB to mitigate loan losses through this economic downturn***," that "***CVB's strong loan underwriting culture has limited its exposure to problem credits***," and that CVB's "strategic focus" includes "***Capital and strong Loan Loss Reserves are paramount,***" and "***[s]trong, disciplined credit underwriting/credit culture***."

64.     Two weeks later, on March 16, 2010, Defendants Myers and Biebrich participated in a conference call, this one available only to clients of B. Riley and Company, according to an April 3, 2010 *New York Times* article entitled "At CVB Financial, Praise and Questions." Journalist Gretchen Morgenson wrote the following:

---

[4] The *provision* is an income statement item – an expense – so it accumulates over a period of time. The provision for all of 2009 was $80.5 million. The *allowance* is a balance sheet item – a reserve – so it is reported as of a date. The allowance for both the year and quarter ended December 31, 2009, are the same: $109 million.

On March 16 [2010], Christopher D. Myers, CVB's president and chief executive, and Edward Biebrich, Jr., its chief financial officer, participated in a conference call available only to clients of B. Riley and Company, a boutique brokerage firm in Los Angeles . . . . Unfortunately for investors who weren't so lucky to be on the call, CVB requested that no transcript or recording be made available.  But according to people who were on the call, and requested anonymity to preserve their professional relationships, CVB executives spoke broadly about their operation as well as details relating to specific loans.

The exclusive nature of this conference call seems contrary to Securities and Exchange Commission rules discouraging selective disclosure of information in which investors would likely have an interest.  But Mr. Myers said that what he spoke about in the call was already in the public domain.

"It was the same presentation I walked through with investors a week before," he said.

As detailed herein, the above statements in CVB's March 2, 2010 investor presentation, and repeated in Defendants' March 16, 2010 exclusive presentation, were false and misleading for the following reasons:   (a) Defendants kept borrowers, including Garrett, "current" only by virtue of the Bank's extend and pretend practices, including a $38 million "refinance" on December 29, 2009; (b) Defendants used false appraisals to conceal loan losses and the fact that loans were backed by collateral whose market value was well below that of the loan amounts; (c) Defendants failed to properly account for CVB's loans, including in particular, CVB's loans to Garrett; (d) Defendants failed to reflect impairment in the loans; and (e) Defendants did not adequately reserve for loan losses.

E.   **Defendants' False And Misleading Statements And Omissions Regarding CVB's First Quarter 2010 Financial Results**

65.   After the close of the market on April 21, 2010, CVB announced its first quarter 2010 results, including "increased earnings" which beat consensus estimates. CVB reported the purported increased earnings in its Form 10-Q filed with the SEC on May 10, 2010, signed by Defendant Biebrich. Defendants Myers and Biebrich repeated their Certifications with respect to the Form 10-Q, and the Form 10-Q stated that there are no material changes to the risk factors as previously disclosed in CVB's Form 10-K for fiscal year 2009.

66.   Following the announcement, analysts praised the higher than expected earnings and lower than expected loan loss provision. B. Riley & Co. reported that "the primary drivers of the better-than-expected results" included "a lower loan loss provision than projected." Rodman & Renshaw likewise noted that "overall, credit quality appears to be manageable given the Company's capital levels and coverage ratios and the economy's apparent tepid recovery." Likewise, Credit Suisse reported that CVB "has had the lowest charge-off rate" "among publicly traded California based banks for one reason:  it is exceptionally conservative." Keefe, Bruyette & Woods praised CVB as a "superior credit underwriter" with a "low level of problem assets and the low charge-off ratios recorded," and stated that "CVBF has demonstrated that underwriting standards can differentiate banks." Rodman & Renshaw further (correctly) predicted that "[w]e would expect the stock to react favorably to this quarter's release; however, trading enthusiasm may be tempered by the recent run in CVBF's stock."

67.   Indeed, following the positive earnings announcement, CVB's stock traded with extremely high volume, up from a close of $10.76 on April 21, 2010, to close at $11.13 on April 22, 2010.

68.   As detailed herein, the above statements in CVB's April 21, 2010 press release and May 10, 2010 Form 10-Q were false and misleading for the

following reasons:  (a) Defendants kept borrowers, including Garrett, "current" only by virtue of the Bank's extend and pretend practices; (b) Defendants used false appraisals to conceal loan losses and the fact that loans were backed by collateral whose market value was well below that of the loan amounts; (c) Defendants knew, or recklessly disregarded, that the purported "risks" incorporated from the 2009 Form 10-K had already come to fruition; (d) Defendants failed to properly account for CVB's loans, including in particular, CVB's loans to Garrett; (e) Defendants failed to reflect impairment in the loans; and (f) Defendants did not adequately reserve for loan losses.

## F.   Defendants' False And Misleading Statements And Omissions During CVB's May 2010 Presentation

69.   On May 12, 2010, CEO Defendant Myers discussed a Bank slide presentation at the Davidson Companies 12th Annual Financial Services Conference.  CVB filed copies of essentially the same slide presentation, attached to a Form 8-K filed with the SEC the same day.  Myers again emphasized that "***strong credit culture and underwriting integrity remain paramount at CVB***," "geographic diversification, a focus on relationship banking, and ***a strong credit culture have allowed CVB to mitigate loan losses through this economic downturn***," that "***CVB's strong loan underwriting culture has limited its exposure to problem credits***," and that CVB's "strategic focus" includes "***Capital and strong Loan Loss Reserves are paramount***," and "***strong, disciplined credit underwriting/credit culture***."

70.   As detailed herein, the above statements were false and misleading for the following reasons:  (a) Defendants kept borrowers, including Garrett, "current" only by virtue of the Bank's extend and pretend practices; (b) Defendants used false appraisals to conceal loan losses and the fact that loans were backed by collateral whose market value was well below that of the loan amounts; (c) Defendants failed to properly account for CVB's loans, including in particular,

CVB's loans to Garrett; (d) Defendants failed to reflect impairment in the loans; and (e) Defendants did not adequately reserve for loan losses.

### G.   Defendants' False And Misleading Statements And Omissions Regarding CVB's Second Quarter 2010 "Record" Financial Results

71.   After the close of the market on July 21, 2010, and on July 22, 2010, CVB issued a press release and supplemental press release, respectively, announcing "record earnings" for second quarter 2010.  Specifically, the Bank announced reported net income of $19.0 million for the second quarter of 2010, the highest second quarter earnings in the history of the Bank.  The Bank reported that its second quarter 2010 loan loss provision was $11 million, down 9.8% from the $12.2 million posted in the prior quarter, and which was lower than analysts expected.

72.   In connection with its second quarter 2010 results, also on July 21, 2010, CVB filed a slide presentation with the SEC which again emphasized CVB's "***strong credit culture and underwriting integrity remain paramount at CVB***"; that "geographic diversification, a focus on relationship banking, and ***a strong credit culture have allowed CVB to mitigate loan losses through this economic downturn***"; that CVB's purported "credit metrics" were "superior" to its peers, including with respect to Non-Performing Assets and Non-Performing Loans, loan loss reserves, and net charge-offs; and that "***CVB's strong loan underwriting culture has limited its exposure to problem credits***." According to Macquarie (USA) Equities Research ("Macquarie"), "management noted that its $84 million exposure to the Garrett Group continues to perform as expected."

73.   The market and analysts responded positively.  Credit Suisse reported that "[o]ur outperform thesis largely rests in our credit analysis, which leads us to believe that CVBF is well reserved and should see meaningful credit improvement in 2011."  B. Riley & Co. reported that "the primary drivers of the better-than

expected results" included "a lower loan loss provision than projected." Macquarie also noted that the better than expected second quarter 2010 results CVB reported was "driven by lower [loan loss] provision."  Cantor Fitzgerald likewise reported that the results "reflected stable credit quality."

74.    The day after the earnings release, July 22, 2010, the stock price traded with heavy volume, closing up to $10.28, from the prior close of $9.50.  The trend continued the next few trading days, with the stock price closing at $10.61 on July 26, 2010.

75.    As detailed herein, the above statements in CVB's July 21, and July 22, 2010 press releases, and July 21, 2010 investor presentation were false and misleading for the following reasons:  (a) Defendants kept borrowers, including Garrett, "current" only by virtue of the Bank's extend and pretend practices; (b) Defendants used false appraisals to conceal loan losses and the fact that loans were backed by collateral whose market value was well below that of the loan amounts; (c) Defendants failed to properly account for CVB's loans, including in particular, CVB's loans to Garrett; (d) Defendants failed to reflect impairment in the loans; and (e) Defendants did not adequately reserve for loan losses.

## VI.    SCIENTER ALLEGATIONS

### A.    Defendants' "Extend And Pretend" Practices

76.    As detailed below and corroborated by CW1, CW4, and title records, despite knowing that CVB's borrowers, including Garrett, were troubled, Defendants kept borrowers, including Garrett, "current" by extending another line of credit, refinancing, or increasing the customer's credit limit, in attempts to maintain the appearance that CVB's loan portfolio remained "sound."

77.    For example, deed and title records reveal that CVB extended new monies, refinanced, or entered into modified mortgage agreements at quarter-end on numerous occasions for Garrett, including as follows:

- <u>End of First Quarter 2008</u>:  On March 25, 2008, just days before the close of the first quarter, the Bank provided Garrett a $50 million revolving line of credit;

- <u>End of Third Quarter 2008</u>:  On August 23, 2008, the Bank provided $16 million in "refinancing" to Garrett; and

- <u>End of First Quarter 2009</u>:  In late March 2009, including the very last day of the quarter, March 31, 2009, the Bank provided Garrett with $53,325,284 in "refinancing" which consisted of $44 million in a "stand-alone second," and $9,325,284 in "non-purchase money."  The Bank used at least eleven parcels as collateral for the over $53 million refinancing.[5]  Liens for unpaid county property taxes had previously been issued on April 25, 2008, on at least two of the properties serving as collateral.  The deeds of trust reveal that the loans were directly handled by the Company's Deputy Chief Credit Officer.

78.     These transactions occurred right before the FDIC review commenced in April 2009.  After the review, the FDIC ordered the Bank to pay a penalty for failing to obtain adequate insurance on designated loans, failing to maintain sufficient coverage during the term of the designated loans, failing to make timely flood notifications to borrowers regarding designated loans, and failing to maintain a record of receipt of the notices by borrowers on designated loans.

79.     The same practice of extending monies and restructuring loans continued at quarters end throughout 2009, including as follows:

---

[5] The Assessor's Parcel Numbers ("APN") for the parcels serving as collateral for the $53,325,284 refinance include the following:  445-150-001, 426-420-008, 308-140-007, 439-180-015, 438-040-008, 302-030-002, 919-350-020, 919-350-019, 919-350-018, 919-350-017, 438-040-009.

- <u>End of Third Quarter 2009:</u>  On September 23, 2009, just one week before quarter-end, the Bank provided Garrett $4,025,000 in "refinancing"; and

- <u>End of Fourth Quarter 2009:</u>  On December 29, 2009, just two days before the end of the quarter and fiscal year, the Bank provided Garrett nearly $38 million in "refinancing."

80.   CW4 – who had worked for CVB a total of eleven years in various Bank departments including Credit, Finance, and Loan Documentation Departments – confirmed that CVB's attempts to conceal that loans were in default were not limited to the Garrett loans.   CW4 explained that CVB extended additional lines of credit, or increased existing lines of credit, to customers who already had troubled loans, in order to pay down the late or delinquent accounts.  One such troubled account was the account of Vintage Dairy ("Vintage"), which consisted of credit lines for feed and hay.  When Vintage did not make payments, the Bank took an advance off Vintage's line of credit to make the payments so that it appeared as though Vintage made a payment and was not behind.  According to CW4, CW4's boss – the Head of the Bank's Agri-Business Department, Zivelonghi, who reported directly to Defendant Myers – told CW4 directly that on occasion, when Vintage was maxed out on its line of credit and nothing was available, the Bank borrowed from the credit line of a related entity to pay down the line of credit in order to make the payment.  In addition, Zivelonghi held internal staff meetings in which he openly discussed the practice of granting additional funds in order to conceal delinquencies.

81.   Moreover, Garrett (and CVB) allowed the Garrett properties that served as collateral for the CVB loans to become delinquent on property taxes.  According to the Riverside County Office of the Treasurer-Tax Collector, Garrett was delinquent on its property taxes for at least tax years 2008, 2009, and 2010 (first installment), on at least thirty-two properties that CVB financed.  As a result,

the County of Riverside assessed substantial penalties against Garrett, which directly reduced Garrett's available funds to repay CVB loans.  Indeed, after the Class Period, in its September 9, 2010 press release (discussed below), the Bank admitted that one of the Garrett properties was sold for $2.5 million, and that $0.5 million of the proceeds was used in part to pay "***past due property taxes***."

82.    While CVB kept its investors in the dark, other lenders timely disclosed that their loans to Garrett had gone delinquent.  Specifically, in late 2009, two other lenders – Kansas City, Missouri-based Bank Midwest and life insurer Jefferson-Pilot, part of Lincoln Financial Group – foreclosed on loans to Garrett in the amounts of $25.7 million and $15.3 million, respectively, for a total of more than $40 million, according to foreclosure records that are (and were, during the Class Period) readily available to the public (including to Defendants).

### B.    Defendants' Use Of False Appraisals

83.    The Bank also used false appraisal values in order to conceal the fact that the market value of the collateral was well below that of the loan amounts and thereby avoid recognizing a loss on the loans.  CW1 explained that CVB obtains two different appraisal values for properties serving as collateral for loans:  (i) a higher value if the property is "stabilized with market rent," meaning no deferred maintenance was required and the property was fully occupied and leased up at market rent; and (ii) a lower value for the property in the "as-is" condition, that had deferred maintenance.  Due in part to the implied continuity of income from a fully occupied property, there is a large difference between the two values.  A Senior Vice President and Special Assets Manager ordered CW1 to use the higher of the two appraisals, even if there was deferred maintenance and zero occupancy.  This practice impacted the Bank's bottom line, in particular the ALLL Reserve, because any difference between the principal loan balance and estimated recovery (current appraised value less cost of sale) had to be written off or reserved off.  Using the higher (false) appraisal value made it falsely appear that there was more money

that the Bank had a chance of recovering and injecting, and the less the Bank had to show as a loss, or to reserve for.

84.    One specific example of the Bank's false appraisal practice occurred in March 2010, and related to the collateral for a commercial loan for borrower American World Investment.   The property, located at 9500 Haven, Rancho Cucamonga, California, was a vacant, one tenant, two-story office building and in need of maintenance.   At the time, the loan's outstanding principal balance was over $2.77 million.   In early March 2010, CW1 informed a Senior Vice President and Special Assets Manager that the "as-is" appraisal value was $1.9 million, and thus, the Bank would need to take a $1 million charge-off.   The Senior Vice President and Special Assets Manager then ordered CW1 to use an appraisal value of $2.5 million, instead of the $1.9 as-is appraisal value, despite the fact that the property was in need of maintenance and vacant.   The American World Investment account was taken away from CW1 a month later, and reassigned to another employee.

85.    CW4 also explained that if a Bank employee made a mistake in drafting a particular loan document, the employee traced a signature from a previously executed document onto the new corrected document, rather than obtain a signature on the corrected document.   Similarly, Executive Vice President Zivelonghi backdated account documents in order to make it appear that there were not overdrafts in bank accounts.

C.    **Defendants Knew Or Recklessly Disregarded The Status Of the Bank's Loans**

86.    Defendants repeatedly declared to investors that they actively monitored CVB's commercial real estate portfolio and were able to remain the "last man standing" because of CVB's conservative underwriting and their purported acumen in assessing credit risk.   Indeed, CVB's SEC filings (including, for example, in its Form 10-Q for first quarter 2010) reported that its management

and Board of Directors review and analyze on a quarterly basis loans, including the character of the loan portfolio, current economic conditions, past credit loss experience, and such other factors that deserved current recognition in estimating inherent credit losses.

87.     CVB's CEO Defendant Myers himself, when asked about particular troubled loans, admitted that "[w]e certainly are aggressively looking at this stuff all the time," according to an April 3, 2010 *New York Times* article.

88.     Moreover, at least three Confidential Witnesses – all of whom were CVB employees during the Class Period – confirmed that the Bank's senior management remained well informed of the status of troubled loans, including the Garrett loans.  For example, CW1 confirmed that President and CEO Defendant Myers, held a "Loan Committee" meeting monthly, typically the third Wednesday of each month (except for the month when the shareholder meeting took place, in which case the Loan Committee meeting took place the Monday before the shareholder meeting).  Other participants regularly included the CFO Defendant Biebrich, Chairman of the Board and founder George Borba, Vice Chairman of the Board D. Linn Wiley, Board members who were on the Loan Committee including San Vaccaro (who is also a full-time attorney), Credit Administration members, the CCO, and the Special Assets Managers.  Defendant Myers called the meetings to order, then the participants held discussions of the loans approved the prior month and loans "of interest" (*e.g.*, large amounts or large customers), including the Garrett loans.  Then the participants went through the Bank's branches' information including the credits that were booked during the month and the delinquencies.  And finally, the participants discussed merchant card information.

89.     The regular monthly Loan Committee meetings took place in the Bank headquarter's third-floor Directors' conference room and lasted between 1 and 1½ hours, from approximately 11:30 a.m.-1:00 p.m., with the meetings running longer when they were going over quarter-end information.  These

meetings were held in conjunction with other Bank meetings that CEO Myers and CFO Biebrich held the same day.

90.    In connection with each Loan Committee meeting, each participant was given a 1-inch packet of materials, including CEO Myers' 1-page agenda.  The packet included, in approximately five to ten pages, a detailed list of all loans approved during the prior month, how much the loan was for, what the collateral was, the date of the loan, who approved it, who sustained, and information regarding any existing loans the borrower previously had.  The packet also covered new loans, renewals, second and third liens, loan modifications and restructured loans.  The Bank's Board members were given this packet as part of a larger "Board packet" – a 3-inch thick binder, with the Loan Committee section as one of the first sections.  The Problem Loan Report ("PLR") was also included.  The PLR detailed the Bank's loans that were classified as substandard, watch, or doubtful, and included information about the borrower, the borrower's financials, the quantity of the loan, the reason for the downgrade, and the collateral (including the appraised value, and any delinquent taxes and insurance payments).

91.    CW2 corroborated that CVB's executives and the Board of Directors knew about the status of troubled loans.  CW2 explained that they managed the loans on a monthly and quarterly basis, that the number of delinquencies was always a priority concern for top executives, and they were frequently looking out for those numbers, including daily if they wanted to.  CW2 further elaborated that each office tracked its own loans and once a loan was late by thirty days, someone from the office called and sent the loan to the Bank's Credit Department.  The Credit Department also furnished reports that were sent to the executives.  Every region and office tracked its loans monthly on a standard banking report that looks at all delinquencies and all reserves.  In addition to regions and individual offices creating monthly reports, one master report was made by the Bank each quarter.

92.   CW6 further confirmed that the Bank created PLRs, some of which CW6 reviewed, and that the information was provided to the Board of Directors on a quarterly basis.   CW6 confirmed that banks are required to do an impairment analysis every quarter in which the bank evaluates and makes value changes to any impaired loan.

93.   Moreover, Defendants Myers and Biebrich made disclosures to certain select investors regarding specific loans, including during a March 16, 2010 investor presentation, according to an April 3, 2010 *New York Times* article, as discussed above.   Such specific discussions about individual loans further demonstrate the Defendants' actual knowledge of the status of problem loans.

### D.   <u>Garrett Was The Bank's Largest Borrowing Relationship</u>

94.   As discussed above, throughout the Class Period, Defendants stressed that the Bank's "largest borrowing relationship" was "fully performing" and "performing as agreed."   CVB's long-time largest borrowing relationship was with Paul Garrett and his real estate development firm headquartered in Temecula, California, The Garrett Group.   During the Class Period, Garrett had over $80 million in eight CVB loans outstanding.   By comparison, CVB's next largest borrower had less than $38 million in CVB loans.   Defendant Myers stated during a December 2, 2009 private analyst presentation that Garrett "*is by two-fold, the largest loan relationship in the bank*."

95.   CW8, Garrett's former Vice President, explained that Paul Garrett, along with Garrett CEO Kirk Wright ("Wright"), and CFO William Whinna, directly negotiated loans with CVB.

96.   Garrett and CVB – and, in particular, Defendant Myers – had a close familiar relationship.   According to an e-mail from Wright to Myers filed in the real estate transaction litigation between Garrett, Stratford, and homebuilder Artisan Communities ("Artisan"), encaptioned *Stratford Ranch Partners, LLC v. Paul Garrett,* Case No. RIC 513524 (Riverside Super. Ct.), when a third-party,

Stratford Ranch Partners ("Stratford"), requested Garrett's personal financial statements before it entered into a transaction with him, Garrett's CEO, Wright, proposed that Stratford instead speak directly with Defendant Myers "regarding Paul, his performance over the years, and his financial status."[6]

97.    CW1 confirmed that in light of the size of the borrowing relationship, as well as Garrett's large deposit relationship with the Bank, the Bank's top executives paid particular attention to Garrett, including regularly discussing Garrett during the Loan Committee meetings.  Indeed, at least as early as 2008, during a monthly Loan Committee meeting, CVB's founder and Chairman of the Board, George Borba, asked questions regarding one or more loans to Garrett that were approved the prior month.  The Chairman's questioning of the relationship with Garrett prompted CW1 to check the Bank's records for the source of the funds that were deposited into Garrett's checking account.  CW1 discovered that the Bank round-tripped the cash, *i.e.*, ***it transferred advances from Garrett's line of credit into Garrett's checking account so that it appeared that Garrett had a large deposit.***  The cash balance then looked good in write-ups and during reviews of the loans.

E.    **Defendants' GAAP Violations**

98.    Generally Accepted Accounting Principles ("GAAP") are the authoritative standards, interpretations, rules and underlying concepts established

---

[6] Stratford filed the case against Paul Garrett on November 21, 2008, related to a loan Garrett received from Temecula Valley Bank (which has since failed) for $10.6 million in April 2008.  In May 2007, Paul Garrett personally guaranteed a payment of $5 million to Stratford in return for part of a piece of land it was selling.  Another portion of the land from the deal was transferred from a unit of Artisan to Garrett through a quitclaim deed in late May 2007.  The property was then pledged as part of collateral for the $10.6 million loan from Temecula Valley Bank.  Stratford obtained an Order for a Writ of Attachment against Garrett on May 29, 2009, and an Order for an additional Writ of Attachment against Garrett on November 10, 2009, in the amount of $5.95 million.

and relied on in the United States as the best and most reliable financial reporting and accounting practices.  Regulation S-X, to which the Bank is subject as a registrant under the Exchange Act, provides that annual and interim financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, regardless of accompanying disclosures.  *See* 17 C.F.R. § 210.4-01(a)(1) and § 210.10-01(a), as to annual and interim financial statements, respectively.   The SEC recognizes the financial reporting and accounting standards of the Financial Accounting Standards Board ("FASB") as GAAP.  *See* SEC Release Nos. 33-8221; 34-47743; FR-70.[7]  SEC Rule 12b-20 requires that periodic reports contain such further information as is necessary to make the required statements, in light of the circumstances under which they are made, not misleading.[8]

99.    Management is solely responsible for preparing financial statements that comply with GAAP.   Public Company Accounting Oversight Board ("PCAOB") Auditing Standard No. 1, AU § 110.03, *Distinction between Responsibilities of Auditor and Management*; *see also* Sarbanes-Oxley Act of 2002, §§ 302, 401 and 404.

100.   As detailed herein, CVB's public financial statements and related earnings releases during the Class Period were materially misstated and in violation of GAAP.  Defendants materially overstated CVB's net interest income,

---

[7] Effective July 1, 2009, FASB replaced existing GAAP with its Accounting Standards Codification ("ASC"). Accordingly, the SEC recognizes ASC as GAAP. 17 C.F.R. §§ 211, 231 and 241; Release Nos. 33-9062A; 34-60519A; FR-80A. CVB's GAAP violations in periods ended before July 1, 2009, violated the same or similar GAAP provisions under the prior taxonomy.

[8] CVB and its operating bank subsidiaries are also required by federal and state regulators including the Federal Reserve Bank ("FRB"), FDIC and Federal Home Loan Bank ("FHLB") to comply with banking regulations and accounting rules set forth herein.

net earnings, earnings per share, stockholders' equity and loan values by improperly accounting for its loans and committing other GAAP violations. More specifically, on a quarterly basis, CVB failed to record an adequate loan loss provision (expenses), failed to properly account for restructured loans and failed to properly account for losses in the market value of its collateral, all of which overstated income. CVB's allowance for credit losses (reserves) was much too small to absorb expected losses, which overstated CVB's loan values and stockholders' equity. Further, CVB omitted several GAAP and SEC required disclosures concerning its loans, operating results and management's discussion and analysis ("MD&A"), including disclosures that would have revealed problems with specific loans and specific loan portfolios by first quarter 2009 instead of third quarter 2010.

101. CVB's accounting errors totaled tens of millions of dollars and affected the most important accounts to investors and analysts of bank holding companies. On the income statement: interest income, interest expenses, net income, loan loss provisions; on the balance sheet: loan loss reserves, net asset values and shareholders' equity, along with associated rates of return and loss. If Defendants had complied with GAAP, the Bank's reported Class Period financial results would have been materially different.

### 1.    CVB Intentionally Misreported Loan Statistics To Conceal Its Fraud

102. CVB concealed its inadequate loan loss provisions and allowances for credit losses, *inter alia*, by providing only one number for its loan loss provisions, rather than disclosing the loss amount in each of its eight loan portfolios. During the interim quarters, even the allowance for credit losses was only provided as a single number. Without a breakdown of provisions and allowances at the loan portfolio level, portfolio analysis of loan quality was not possible. CVB compounded this problem by assigning a different set of labels to its categories of

non-performing and delinquent loans, preventing investors from matching the problem loans to their corresponding loan portfolio, and blinding investors to the fact that CVB's largest loan portfolios were comprised of its worst performing loans.

103.   CVB also concealed its fraud in other ways.  For example, it padded the allowance account by failing to write off loans that had already gone bad.  As a result, much of CVB's reported allowance for credit losses was illusory, because it had actually been absorbed by past losses but improperly left on the books. Further, CVB failed to accurately report its impaired loans and troubled debt restructurings, making the allowance for credit losses appear sufficient.  This made CVB and its loan portfolios appear much healthier than its peers.

### 2.   CVB Failed To Accurately Report Its Past Due, Restructured, Non-Performing And OREO Assets And Its Realized Losses

104.   The vast majority of loans "perform" from inception until maturity and their accounting treatment does not change.  Loans which do not perform become delinquent, signaling in advance that some or all of the principle and interest will not be collected when due, or ever.  Such loans – especially real estate loans – take a long time to work through various accounting "buckets" which indicate relative risk to investors.  When a loan begins to show signs of distress by becoming delinquent, GAAP requires changes in accounting for and reporting the loan.  Loan distress worsens as time passes and accordingly, the loan moves through a series of categories reporting the loan and its related allowance for credit losses, which continues to change (increase), from:  (i) past due under 30-59 days, to (ii) past due 60-89 days, to (iii) past due 90 or more, to (iv) non-performing and non-accrual status (*i.e.,* in default).  At this point, interest income is no longer recognized and the last 90 days of interest is reversed.  With most problem loans, distress intensifies and, typically around six months past due, the loan is either (i) restructured, (ii) foreclosed on and repossessed (becoming "OREO," or other

real estate owned), and/or (iii) written off, each one of which require an earnings charge to reflect a loss in loan principle value.  This causes troubled loans to be strictly reported in different "buckets," depending on where in the default/foreclosure/write-off timeline it is in.  *See, e.g.,* SEC Industry Guide 3, *Statistical Disclosure by Bank Holding Companies,* Item III.[9]

105.   During the Class Period, however, CVB provided its investors inaccurate (understated) figures for its delinquent and non-performing loans.  A chronological review of the Bank's largest borrowing relationship in particular reveals CVB's failure to comply with a host of GAAP and SEC accounting and disclosure requirements.  CVB's accounting errors and disclosure violations from this one relationship were sufficient to materially misstate its financial statements throughout the Class Period.

### 3.   Defendants Failed To Record Timely Loan Loss Provisions As Losses Were Incurred

106.   Under GAAP, accounting for losses on lending activities are governed by ASC 450, *Contingencies* and ASC 310, *Receivables*, and related literature.

107.   A loss contingency is an existing condition, situation or set of circumstances involving uncertainty as to possible loss.   FASB ASC, *Master Glossary*.  "The assets of an enterprise may include receivables that arose from credit sales, loans, or other transactions.  The conditions under which receivables exist usually involve some degree of uncertainty about their collectibility, in which

---

[9] The SEC amended Guide 3 with Financial Reporting Release No. 13, adding a new disclosure section, *Risk Elements*, which states*:*  "A significant change in the amended guidelines for disclosure of nonaccrual, past due and restructured loans is the exclusion of certain instructions present in the current Guide which allowed for the use of different criteria, and permitted exclusion of certain loans.  ***This change has the effect of enhancing comparability of disclosures among registrants. Users of this information, particularly financial statement analysts, have stressed the importance of comparability in this area.***"  *See* FRR.T.401.08a, *Risk Elements Involved in Lending Activities*.

case a contingency exists." *See* ASC 310-10-35-7, *Losses From Uncollectible Receivables*. GAAP requires that estimated losses from loss contingencies be accrued by a charge against income when a loss is both probable and reasonably estimable. ASC 450-20-25-2. Loans are explicitly subject to ASC 450. *Id.*

108. For public companies like CVB, among the most important related literature is FRR.T.401.09, *Accounting for Loan Losses by Registrants Engaged in Lending Activities*, as set forth in SEC Financial Reporting Release No. 28 ("FRR 28"), *Accounting for Loan Losses by Registrants Engaged in Lending Activities*. FRR 28 goes well beyond the GAAP literature, prescribing a detailed and systematic reserve-setting methodology, along with policies and procedures that SEC registrants must abide by when assessing and recording expected loan losses.

109. FRR 28 sets expectations and provides numerous directives intended to achieve a consistent, reliable and comparable methodology for loss estimates. As discussed herein, CVB dramatically slowed its write-offs of bad loans during the Class Period. Writing off loans when they go bad removes the bad loan and the related allowance for credit losses from CVB's balance sheet. In failing to write off bad loans during the Class Period, CVB inflated its allowance so it improperly reflected the existence of reserves that were not available for other loans that would go bad.

110. By third quarter 2010, CVB's available allowance was both (i) grossly inadequate from inadequate loan provisioning and (ii) materially inflated from bad loans that had not been written off. Further, it was time to write-off a large portion of its loans to Garrett, and thus CVB could no longer conceal its knowledge that Garrett was in dire financial straights and its loans were impaired. However, since CVB had not taken sufficient Garrett loss provisions in prior periods, and because much of the reported allowance for credit losses was needed for prior losses that had not been written off, CVB's allowance at the time was insufficient to both write off a portion of Garrett and still appear credible and sufficient to account for

future expected losses.   Thus, in third quarter 2010, CVB had to record an additional provision to set up an allowance for Garrett, so they could write off a portion of Garrett – in the same period.   CVB knew investors would require an explanation, and issued its September 10, 2010 press release.

111.   CVB claimed in the press release that it only learned about Garrett's financial troubles in August 2010, when Garrett called and told them.  This was not true; CVB was aware of Garrett's financial problems since at least March 2009, seventeen months earlier, when CVB restructured the largest Garrett loan, and even earlier according to confidential witnesses and title records as discussed above.  In fact, as a bank holding company, CVB routinely monitors the financial condition of its largest borrowers in the ordinary course of business.

112.   The chart below shows that CVB slowed its write-offs of bad loans during the Class Period.  As of June 30, 2009, immediately preceding the Class Period, CVB had written off 72% of the June 30, 2008 allowance during the year, so just 28% of the June 30, 2008 allowance remained on its books as of June 30, 2009.   During the next year, however, CVB only wrote off 24% of its June 30, 2009 allowance.  Thus, as of June 30, 2010, 76% of CVB's allowance was at least one year old.  After the Class Period, Defendants immediately accelerated write-offs of bad loans:



113.   In calculating CVB's loan losses, Defendants were required to consider the declining value of the collateral underlying its loans.   CVB's management should have reviewed nonperforming loans prior to foreclosure and evaluated the current market values of the underlying collateral to arrive at estimated impairment losses.   FASB Emerging Issues Task Force, in EITF Topic No. D-80, states that "[a]n institution should *ensure that an appraisal of collateral reflects a realistic estimate of fair value*, which takes into consideration the time it will take the institution to realize the value of the collateral and *current market conditions for selling the collateral*."

114.   Given that values of the collateral underlying CVB's non-performing loans were dropping rapidly, market conditions required that Defendants record additional loan loss provisions to reflect the default loss risks.   Defendants,

however, failed to timely and sufficiently adjust CVB's ALLL Reserves or reassess the value of the Bank's collateral assets.

### 4. Defendants' Failure To Write-Off Loan Losses As They Occurred Inflated CVB's Understated Reserves

115. Defendants failed to write-off loan losses as they occurred. This caused CVB to overstate its allowance for credit losses, and provided the illusion that CVB much stronger reserves than it actually had. When loan losses are not written off, the result is that gross loans and allowance for credit losses are overstated by the same amount. However, because gross loans were 35-40 times the allowance, CVB's practice of not writing off loan losses had 35-40 times the proportional impact on the allowance account. Consequently, throughout the Class Period, CVB's reported allowance for credit losses was materially greater than the amount reportable under GAAP and SEC rules. Thus, CVB's understated allowance was concurrently inflated. This helped conceal the inadequacy by providing the illusion that CVB had much stronger reserves than were actually available.

### 5. CVB's Omitted Financial Statement Disclosures In Violation Of GAAP

116. To help conceal their financial statement fraud, Defendants violated numerous SEC and GAAP disclosure requirements by making false and misleading disclosures and omitting to make required disclosures in the Bank's financial statement footnotes and MD&A.[10] According to SEC rules and GAAP, such disclosures were necessary to prevent CVB's financial statements from being misleading. *See, e.g.,* SEC Regulation S-K, Item 303 and Accounting Principles Bulletin Opinion No. 22, *Disclosure of Accounting Policies.*

---

[10] "The term 'financial statements' as used in this regulation shall be deemed to include all notes to the statements and all related schedules." *See* SEC Regulation S-X, Article 1, Rule 1-01(b), *Application of Regulation S-X.*

117.   Even if CVB had not materially overstated its income, earnings per share, stockholders' equity and loan values, its financial statements would be false and misleading as a result of the omissions set forth below.   These omissions included the following specific disclosures required by the SEC:

*Concentration Of Credit Risk*

118.   CVB failed to comply with the requirements that it present the SEC and GAAP detailed information about CVB's material loss exposure specific to Garrett, including disclosures of loan provisions, allowances, restructuring and write-offs throughout 2008, 2009 and 2010.  *See* SEC Regulation S-X, Rule 9-03, ¶7(a)(7), *Assets*.

*Risk Elements Involved In Lending Activities*

119.   CVB failed to comply with SEC Financial Reporting Release No. 13, requiring it to disclose details about lending risks.  *See* FRR.T.401, *Banks and Bank Holding Companies,* § 401.08, *Risk Elements Involved in Lending Activities.* Furthermore, according to GAAP, "[an] entity shall disclose all significant concentrations of credit risk arising from all financial instruments, whether from an individual counterparty or groups of counterparties."  *See* ASC 825-10-50-20, *Concentrations of Credit Risk of All Financial Instruments*.   CVB's omitted disclosures include the $85 million maximum loss – assuming a complete failure to perform by Garrett and collateral with no value – and a description of Garrett's collateral.  *Id*. 825-10-50-21.   CVB failed to make the required disclosures about its concentration of risk associated with Garrett.

*Management's Discussion And Analysis*

120.   CVB failed to comply with SEC Regulation S-K, Item 303(a)(3), *Management's Discussion and Analysis of Financial Condition and Results of Operations,* requiring CVB to disclose any unusual or infrequent transactions that materially affected its income from continuing operations.  Regulation S-K, Item 303(b) *Interim Periods*, also requires that registrants include a management's

discussion and analysis in all interim period financial statements filed with the SEC, "so as to enable the reader to assess material changes in financial condition and results of operations" for the most recent quarter and year-to-date periods of both the current and prior year.  This required CVB to discuss Garrett's financial status in each reporting period.  Accordingly, the SEC also required CVB to disclose changes in Garrett loss estimates and their impact on CVB's financial statements.

*Critical Accounting Estimates*

121.  SEC Release 33-8040, *Cautionary Advice Regarding Disclosure about Critical Accounting Policies* (codified as FRR.T.501.14) instructs registrants to comply with Regulation S-K, Item 303(a), *Management's Discussion and Analysis of Financial Condition and Results of Operations*.  When estimates are susceptible to material change, the company must discuss not just the possibility that its estimates may turn out differently, but also (i) the factors that may cause different outcomes, and (ii) the potential amount of variability in its significant estimates:  "Companies should provide quantitative as well as qualitative disclosure when quantitative information is reasonably available and will provide material information for investors."  *See* SEC Release 33-8040.  With respect to the Garrett loans, throughout the Class Period, CVB was in violation of SEC Regulation S-K, Item 303(a).

122.  CVB failed to disclose to its investors the fact that its loan loss provisions were estimated using a method that was either heavily dependent on favorable historical period(s) with respect to the actual losses, not readily adaptive to changing circumstances, or both.  During the Class Period, CVB failed to update its reserves or reserve setting methodologies based on changes in market conditions that had taken place throughout 2007 and 2008.  CVB should have told investors that its loan loss estimates were based on assumptions that the market

downturn was temporary and would reverse, and that the impact on its financial statements would be disastrous if the market downturn failed to reverse.

### 6. Following Commencement Of The SEC Investigation, CVB Has Now Changed Its Disclosure Practices

123. After the Class Period, and faced with the continuing SEC investigation, on March 1, 2011, the Bank effectively admitted in its 2010 Form 10-K that its prior disclosures about its loan portfolios and delinquent and non-performing loans were improper and deficient by providing, for the first time, certain loan details alleged herein to be required disclosures throughout the Class Period. Information that CVB provided for the first time in its 2010 Form 10-K included as follows:

• CVB combined information about its real estate loans as a whole, including nine categories of real estate underlying the loans and other information not previously provided.

• A new disclosure that included a "rollforward" of the allowance for credit losses for each individual portfolio. A rollforward is an activity statement that shows beginning and ending balances and all components of change that took place during the period. The table was called, Allowance for Credit Losses and Recorded Investment in Financing Receivables and reflected all eight loan portfolios, with individual provisions, charge-offs, recoveries and the beginning and ending allowance for credit losses for each portfolio. Previously, the Bank had reported the rollforward information in a single table, with just one beginning and ending balance.

• A table called Non-Covered Impaired Loans showing for each of the eight loan portfolios, the original loan amount, the unpaid loan balance, the allowance and the average recorded investment. This information was split between two groups – loans with no related allowance recorded and loans

with a related allowance recorded.  During the Class Period, this information was not only omitted at the portfolio level, it was not provided at all.

• A new TABLE 6, Non-Performing Assets, Non-Covered, which properly combined all non-accrual loans, restructured loans and other real estate owned ("OREO") assets in a single table.

• A new TABLE 8, Summary of Credit Loss Experience, which provided the provisions, charge-offs and recoveries for each loan portfolio. CVB had not previously presented this critical information in the proper format, or with the required information.

• A new TABLE 9, Allocation of Allowance for Credit Losses, showing all eight loan portfolios, their beginning and ending individual allowances for credit losses, and the percentage of the total which each portfolio comprised.

• A table entitled Non-Covered Past Due and Non-Accrual Loans, showing five "buckets" of payment status for all loans.  Previously, the Bank provided only three categories for payment status.  The loans were grouped into ten categories, and included important information not provided previously, such as "Construction − Speculative," and "Construction − Non-Speculative."

• Credit Quality Indicators, which included Credit Risk Profile by Internally Assigned Grade.  It showed the same ten categories as Non-Covered Past Due and Non-Accrual Loans, and the amount of loans labeled "Pass," "Watch List," "Special Mention," "Substandard," or "Doubtful" for each of the ten.  During the Class Period, this information was not only omitted at the portfolio level, it was not provided at all.

### F.    Insider Trading

124.  Defendants Myers and Biebrich reaped substantial proceeds from insider sales at artificially inflated prices during the Class Period.  At the same

time, Defendants were emphasizing that the "interests of senior management and board of directors [are] aligned with those of shareholders" (November 4, 2009 slide presentation), the "strong board ownership" in the Bank by the directors, and how "we have really taken a longer-term intermediate term perspective on what we do."

> We are not as interested in our results in the next quarter, as we are what [sic] we're building for the future . . . .  We have strong board ownership position 16%, so we make decisions for the long run.

(December 2, 2009 private analyst presentation transcript).

125.  Notwithstanding Defendants' statements about their "longer-term" perspective, during the Class Period, Defendants started selling off their shares. Specifically, during the Class Period, CFO Defendant Biebrich sold 57,680 shares for a total of $565,618.  During the entire year prior to the beginning of the Class Period, Biebrich had only one transaction, selling 1,608 shares for a total of $16,080.  During the Class Period, Defendant Biebrich sold approximately half of the 110,929 shares he held at the start of the Class Period.  Specifically, Defendant Biebrich sold 10,000 shares on November 16, 2009, at $8.39 per share; sold another 20,000 shares on January 25, 2010, at $9.37 per share; sold another 10,000 shares 4 days later on January 29, 2010, at $9.95 per share; sold another 3,000 shares on March 24, 2010, at $10.53 per share; sold another 10,000 shares on April 26, 2010, at $11.51 per share; and sold another 4,680 shares on March 27, 2010, at $10.29 per share.

126.  During the entire year prior to the beginning of the Class Period, Defendant Myers did not sell any shares, but purchased 258,000 shares.  Then, after the beginning of the Class Period, on February 24, 2010, Defendant Myers sold 13,000 shares.  Shortly thereafter, on June 15, 2010 (just five weeks before receipt of the SEC subpoena), Myers instituted a 10b5-1 trading plan (the "Plan"), with the reported purpose of allowing Myers "to pay the income taxes related to

the vesting of his restricted stock grants." Then, on August 2, 2010, Myers sold an additional 5,500 shares pursuant to the Plan. In total, during the Class Period, Defendant Myers purchased no shares, but sold 18,500 shares, for proceeds of $180,889.

127.   Defendants Myers and Biebrich received these proceeds while they were in possession of material, non-public information concerning CVB, namely, as explained above, that:

(a)   Defendants failed to properly account for CVB's commercial real estate loans and failed to reflect impairment in the loans;

(b)   CVB had not adequately reserved for loan losses such that its financial statements were presented in violation of GAAP;

(c)   Defendants knew or recklessly disregarded that CVB's largest borrower, Garrett, had defaulted and was about to be foreclosed on; that the loans were backed by collateral whose market value was well below that of the loan amounts, and were kept "current" only by virtue of its "extend and pretend" practice of extending new monies to help borrowers pay existing loans; and

(d)   Defendants knew or recklessly disregarded that there was not a mere "risk" that continuing deterioration in the real estate market "could" affect the ability of CVB's loan customers, including its largest borrowing relationships, to service their debt; rather, Defendants knew or recklessly disregarded that this "risk" had already come to fruition.

## VII.   THE TRUTH EMERGES

128.   After the close of the market on August 9, 2010, CVB shocked the market when it announced that, two weeks earlier, on July 26, 2010, the Bank had received a subpoena from the SEC demanding information about how the Bank

handles and discloses troubled loans.  Specifically, the subpoena questioned the Bank's loan underwriting guidelines, its allowance for credit losses and how CVB calculates its allowance for loan losses.  Analysts immediately reacted to the announcement, stating that the SEC probe was notable because it revealed that CVB was not fully disclosing potentially problematic loans and that CVB's largest exposure – Garrett – is backed by collateral whose market value is well below that of the loan amount – concerns the Bank had previously denied.  Specifically, CVB announced:

> The subpoena requests information regarding our loan underwriting guidelines, our allowance for credit losses and our allowance for loan loss calculation methodology, our methodology for grading loans and the process for making provisions for loan losses, and our provision for credit losses. In addition, the subpoena requests information regarding presentations we have given or conferences we have attended with analysts, brokers, investors or prospective investors.

129.   The Bank provided no explanation for why it had waited two weeks to disclose the subpoena it had received on July 26, 2010 – the same day the Bank had, instead, announced that CFO Defendant Biebrich was "retiring."

130.   The market reacted quickly and negatively.  Immediately following the news of the SEC probe and analysts reports confirming that the subpoena revealed that CVB was not fully disclosing potentially problematic loans, CVB's stock fell $2.30 per share to close at $8.00 per share on August 10, 2010 – a one-day decline of over 22% on extremely high volume of 4.26 million shares, representing a market capitalization loss of approximately $245 million.

131.   The announcement of the SEC investigation validated what until then Defendants had publicly denied – namely, whether the Bank was (i) fully disclosing potentially problematic loans, in particular, loans to its largest customer, Garrett; (ii) whether the market value of the collateral was below the loan amounts;

and (iii) whether CVB extended new loans to borrowers to keep their existing loans current.  For example, after the announcement, on August 10, 2010, Dow Jones published an article with the headline "HEARD ON THE STREET:  CVB Financial's Can of Worms," which stated in part:

> A Securities and Exchange Commission probe of a midsized California bank may open more than one can of worms.
>
> CVB Financial, of Ontario, Calif., announced Monday that on July 26 it received a subpoena from the SEC, seeking information about, among other things, bad loan reserves.   Its stock plunged 22% Tuesday.
>
> The investigation is notable for two reasons.  ***First, it could determine whether CVB Financial's critics are right in thinking that the bank isn't fully disclosing potentially problematic loans, an accusation the bank rejects.***  Second, the subpoena was received after the Federal Deposit Insurance Corp. in May had concluded an annual examination of the bank.
>
> \*   \*   \*
>
> ***Discussion of CVB Financial centers on its largest exposure, loans to a property company called the Garrett Group.  Skeptics believe this exposure is backed by collateral whose market value is well below that of the loan amount.  Some also question whether CVB extended a new loan to Garrett to help it pay existing loans, something Myers denies.  He said the Garrett Group was current on its loans at the end of the second quarter, but the bank had reserves against the exposure.***

132.  Similarly, Macquarie reported on August 10, 2010, that the SEC investigation indicated that the adequacy or consistency of CVB's disclosures could be at issue, and that it expected the investigation to remain a material

overhang on the stock, "*particularly given lingering concerns in the investment community around the company's asset quality and financial reporting*."

133.   CVB admitted the "extraordinary market activity in the Company's stock volume and price today."  The next day, on August 10, 2010, in an apparent attempt to stop the stock price from continuing its downhill slide, CVB announced a repurchase plan:

> "We believe the decline in stock price presents an opportunity for us to repurchase CVBF stock to enhance shareholder value. We are taking advantage of this opportunity," said Chris Myers, President and CEO.
>
> The Bank's regulators recently completed their annual safety and soundness examination of Citizens Business Bank. "While the results of this examination are confidential, the fact that there was no negative disclosure on the FDIC website should speak for itself," said Myers.   Annual regulatory examinations involve a comprehensive review of the Company's loan portfolio, underwriting practices, and the adequacy of its loan loss reserves and methodology.
>
> In addition to the annual safety and soundness examinations, we regularly have our loan portfolio reviewed by outside consultants.
>
> CVB Financial Corp. has reported over 130 consecutive quarterly profits.  On July 21, 2010, the Company reported record earnings for the second quarter of 2010.

134.   Also on August 10, 2010, Credit Suisse reported that the SEC investigation revealed two issues, regarding:  (i) the adequacy of CVB's reserves, including specifically with respect to the Bank's largest loans (Garrett); and (ii) the adequacy of CVB's disclosures.

135.   On August 11, 2010, FIG Partners explained as follows:

*It appears the SEC is looking into whether CVBF misled the Street by hiding the true performance of loans the company said were performing.  In doing so, the SEC is also implying that company management hid the true nature of the loan portfolio from the FDIC and California Department of Financial Institutions (the bank's primary regulators) . . . .  The information sought [in the SEC subpoena] is very similar to stories in the press recently that the company was overstating credit quality.*  (Emphasis added.)

136.   The report further explained that "[i]n response to the 22% decline in the stock price yesterday, management issued a rare public statement after market close."   The Bank defended its internal credit monitoring process, reminded investors it is on good terms with banking regulators and executed, for the first time, on an existing 10 million share repurchase program.

137.   On September 9, 2010, just one month after the Bank announced its receipt of the SEC subpoena questioning the Bank's loan underwriting guidelines and loan loss reserves, CVB finally disclosed that Garrett was not in fact "fully performing" or "current" on its debt.  Rather, *CVB had suddenly charged-off $34 million in debt owed by Garrett, and placed the remaining $48 million in the Bank's non-performing and impaired loan category.  The Bank also admitted that the reserves it had previously allocated for the Garrett loans were insufficient, at only $24.7 million (or 30% of the loan amount)*, and because of its inadequate Garrett reserves, it had to record an additional provision of $9.3 million in third quarter 2010*.*

138.   Specifically, the Bank's announcements in its September 2010 press release and conference call slides filed with the SEC stated that in August, the Bank's largest borrower (Garrett) informed the Bank that they were not able to make principal and interest payments on their loans as scheduled and wanted to negotiate an alternative repayment schedule:

The borrowing relationship is comprised of seven loans and totals approximately $82 million in outstanding debt.  This is the largest borrowing relationship in the Bank.

In response to the information from our largest borrower, we have taken the following actions:

- On September 2, 2010 all of the loans were put on non-accrual ($48 million in loans after charging off $34 million).

- We charged-off $34 million in loans versus our June 30, 2010 reserve of $24.7 million.  Based on our charge-off of $34 million, we are recording an additional $9.3 million provision for credit losses in the third quarter.

- The $34 million charge-off figure was determined as follows: we currently hold first trust deed liens on 25 different properties with an aggregate appraised value of $52.1 million.  Each of the 25 properties has been appraised by MAI certified third party appraisers with the exception of two properties which were appraised by a third-party State Certified Real Estate appraiser.  The combined value of the two non-MAI appraised properties is $5.7 million.  All of the 25 property appraisals were updated in 2010 with the exception of one property which was appraised in November 2009 and was valued at $3.0 million at that time.  The remaining $48 million in non-accrual loan balance represents 92% of the $52.1 million in aggregate appraised values . . . .

- The Borrower sold a 26th property recently for $2.5 million.  The majority of the proceeds of this sale ($2 million) are held as payment collateral for our loans, which collateral is

> to be used to make all principal and interest payments scheduled through December 15, 2010.  The remaining $0.5 million in proceeds were used to pay past due property taxes, sales commissions and borrower cost reimbursements. This is part of a Forbearance Agreement with the subject borrower.  The Agreement expires December 15, 2010.

139.   With respect to the largest of the seven Garrett loans, with a $42.5 million loan balance, the Bank disclosed that it had no direct liens on the properties that were purportedly serving as collateral for the loan, and that the Bank was now suddenly reducing the value of the Bank's UCC-1 filings on the properties to *zero*. The Bank disclosed as follows:

> This loan is further supported by UCC-1 filings on the borrower's equity interests in 15 income producing properties, aggregating nearly two million square feet of office and industrial space.  All of the 15 properties have existing first trust deeds recorded by other lenders, so we have no direct lien on the properties.   The excess cash flow realized on these properties (after paying the mortgage payments) has been utilized to assist our Borrower in paying CBB loan obligations. Of the 15 properties, all properties are income producing (nine are industrial properties and six are office buildings).  However, in recent months, cash flow has declined significantly due to vacancies and reduced rents.   Due to our weakened equity-based collateral position on these properties, we have discounted the value of our UCC-1 filings on the subject properties to zero . . . .

140.   Overall, the Bank reported that it expected its non-performing loans ("NPLs") will increase $59 million for the third quarter going from $83 million to $142 million; of this increase, $48 million represents the balance of the loans to Garrett, after the $34 million charge-off, and the remaining $11 million in increase

is primarily attributed to two dairy borrowers, who recently were reclassified to non-performing status.  The Bank reported that charge-offs for the third quarter are projected to total approximately $38 million; of this amount, $34 million represents the charge-off on Garrett, and the remaining $4 million is for smaller, unrelated loans to other borrowers.  The Bank further reported that in order to partially absorb the sharp increase in Net Charge-Offs, CVB recognized $28 million in sales of securities.

141.   Following the Bank's disclosure after the close of the market on September 9, 2010, the price of CVB stock dropped from $7.05 to a low of $6.88, a drop of 2.41%, before closing at $6.99, on volume of 4,379,983, more than five times the volume traded on the previous day.   Moreover, the decline was particularly significant in light of the fact that, the same day, the Standard and Poors 500 ("S&P 500") *increased,* from 1104.18 to 1109.55, and the index of all state banks also increased.

142.   On September 10, 2010, Credit Suisse, reported in part:

More importantly, in our view, CVBF announced that it was placing its largest (and most controversial) loan on non-performing status, and writing it down to its recent appraisal value (less assumed OREO costs).

While the SEC subpoena remains outstanding, we believe the announcement removes a major component of uncertainty in regards to problem loans; for which the subpoena also seeks to address (to a certain extent).

143.   On September 13, 2010, Howe Barnes Hoefer & Arnett explained as follows:

The company's share price plummeted by ~22% to $8.00 on August 10, which was the day after it disclosed the SEC investigation. Since then, the share price has drifted down by an additional ~13% to

$6.99 on September 10.  There was only a modest decline of ~1% following the earnings preannouncement as further deterioration in credit quality and uncertainty surrounding the SEC investigation are already reflected in the share price.

144.   Shortly thereafter, on January 20, 2011, CVB further disclosed that Garrett had failed to comply with forbearance agreements (which CVB had previously disclosed on September 9, 2010, was "a Forbearance Agreement," (singular), but which CVB now reported was multiple "forbearance agreements"). The Bank explained:

> As a result, we are continuing to explore all of our rights and remedies on a loan-by-loan basis, including without limitation the sale of certain notes, initiation of foreclosure proceedings against certain collateral and alternative repayment plans.  There can be no assurance as to the outcome of such efforts, which the borrower may oppose. The current aggregate balance after prior payments and charge-offs is $45.2 million.  Further charge-offs may need to be taken based on loan developments, borrower actions and/or reappraisals of collateral.

145.   Eventually, CVB recorded numerous Notices of Default on Garrett, including at least the following:  (1) on January 24, 2011, for $8,711,151.55; (2) on January 26, 2011, for $4,920,283.08; (3) on January 27, 2011, for $2,725,162.94; and (4) on February 15, 2011, for $42,361,705.24.

## VIII.  APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET DOCTRINE

146.   At all relevant times, the market for CVB's publicly traded common stock was an efficient market for the following reasons, among others:

(a)   The Bank's common stock met the requirements for public listing and was listed and actively traded on the NASDAQ, a highly efficient market. The average daily volume of CVB's common stock during the Class Period

was 1,058,754 shares based on information from the Yahoo Finance website. Further, approximately 60% of the stock was owned by institutional investors;

(b)     As a regulated issuer, CVB made public filings, including its Forms 10-K, Forms 10-Q and related press releases, with the SEC;

(c)     CVB was followed by analysts from major brokerages including, among others, Cantor Fitzgerald, Sandler O'Neill & Partners, LP, Stifel Nicolaus, Wunderlich Securities, Macquarie, Keefe, Bruette & Woods, Credit Suisse, and B. Rile & Company, Inc.  The reports of these analysts were redistributed to the brokerages' sales force, their customers, and the public at large;

(d)     CVB regularly communicated with public investors via established market communication mechanisms, including the Bank's website, regular disseminations of press releases on the major news wire services, and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)     The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of CVB's common stock; and

(f)     Without knowledge of the misrepresented or omitted material facts, Lead Plaintiff and the other members of the Class purchased or otherwise acquired CVB common stock between the time Defendants made the material misrepresentations and omissions and the time the truth was disclosed, during which time the price of CVB common stock was inflated by Defendants' misrepresentations and omissions.

147.   As a result, the market for CVB's publicly traded common stock promptly digested current information with respect to CVB from all publicly available sources and reflected such information in the price of the Bank's

common stock.  Under these circumstances, all purchasers of CVB's common stock during the Class Period suffered similar injury through their purchase of the stock at artificially inflated prices, and a presumption of reliance applies.

## IX.   <u>NO SAFE HARBOR</u>

148.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to facts and conditions existing at the time the statements were made. No statutory safe harbor applies to any of Defendants' material false or misleading statement.

149.   Moreover, the statutory safe harbor is inapplicable with respect to the false and misleading statements included in CVB's financial statements, which purported to be prepared in accordance with GAAP.

150.   Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of CVB who knew that those statements were false when made.

## X.   <u>CLASS ACTION ALLEGATIONS</u>

151.   Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired CVB common stock between October 21, 2009, and

August 9, 2010, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are the Individual Defendants, the officers and directors of CVB and Citizens Bank Corp. at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

152.    The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, CVB common shares were actively traded on the NASDAQ.   CVB has over 106 million shares of CVB common stock issued and outstanding.   While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the Class.   Record owners and other members of the Class may be identified from records maintained by CVB or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

153.    There is a well-defined community of interest in the questions of law and fact involved in this case.   Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether Defendants violated the Exchange Act;

(b)    Whether Defendants omitted or misrepresented material facts;

(c)    Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether Defendants knew or deliberately disregarded that their statements were materially false and misleading when made;

(e)    Whether the price of CVB common stock was artificially inflated; and

(f)    The extent of damage sustained by Class members and the appropriate measure of damages.

154.   Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct in violation of federal law that is complained of herein.

155.   Lead Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Lead Plaintiff has no interests which conflict with those of the Class.

156.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable.    Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.    <u>CLAIMS FOR RELIEF</u>

### COUNT I

#### For Violation Of § 10(b) Of The Exchange<br>Act And Rule 10b-5 Against CVB, Myers And Biebrich

157.   Lead Plaintiff incorporates by reference each and every allegation contained above, as if set forth herein.

158.   This claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, on behalf of Lead Plaintiff and members of the Class against Defendants CVB, Myers, and Biebrich.

159.   During the Class Period, Defendants made materially false and misleading statements and omissions that were intended to and, throughout the Class Period, did deceive the investing public regarding CVB's business and operations, including but not limited to its underwriting and credit quality, and the

intrinsic value of CVB common stock; and enable CVB insiders to sell shares of their privately held CVB stock while in possession of material adverse non-public information about the Bank.  Defendants, jointly and individually (and each of them), took the actions set forth herein.

160.  Defendants CVB, Myers, and Biebrich: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Bank's common stock in an effort to maintain artificially high market prices for CVB's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are legally responsible as primary participants in the wrongful and illegal conduct charged herein, and the Individual Defendants are also legally responsible as controlling persons as set forth in Count II below.

161.  Defendants CVB, Myers, and Biebrich, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or mail, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of CVB as specified herein.

162.  Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of CVB's value and performance, and continued credit risk management, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about CVB, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a

fraud and deceit upon the purchasers of CVB common stock during the Class Period.

163.   The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or recklessly disregarded the truth in that they failed to ascertain and to disclose such facts.  Such Defendants' material misrepresentations and omissions were done knowingly or with deliberate disregard for the purpose and effect of concealing CVB's financial results and deteriorating credit quality from the investing public and supporting the artificially inflated price of its common stock.   As demonstrated by Defendants' overstatements and misstatements of the Bank's business, operations, and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether those statements were false or misleading.

164.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of CVB common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of CVB's publicly traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired CVB common stock during the Class Period at artificially high prices and were damaged thereby.

165.   At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.   Had Lead Plaintiff and the other members of the Class and the

marketplace known the truth regarding CVB, which was not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their CVB common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

166.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

167.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Bank's common stock during the Class Period.

<h2 style="text-align:center">COUNT II</h2>

<h3 style="text-align:center">For Violation Of § 20(a) Of The<br>Exchange Act Against Myers And Biebrich</h3>

168.   Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

169.   Defendants Myers and Biebrich acted as controlling persons of CVB within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, their ownership and contractual rights, participation in and awareness of the Bank's operations, and intimate knowledge of the fraudulent scheme and the false financial statements filed by the Bank with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Bank, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading. Defendants Myers and Biebrich were provided with, or had unlimited access to, copies of the Bank's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and shortly after these

statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

170.   In particular, each of these Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Bank and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. For example, the Individual Defendants were able to and did control the content of the various SEC filings, press releases, investor presentations, and other public statements pertaining to the Bank during the Class Period.   The Individual Defendants had access to the adverse undisclosed information about CVB's business, operations, products, trends, financial statements, markets, and present and future business prospects via access to internal control documents (including but not limited to the Bank's Problem Loan Reports); conversations and connections with other corporate officers, employees, and borrowers; participation at management and Board of Directors meetings and committees thereof (including the Bank's monthly Loan Committee meetings), and reports and other information provided to them in connection therewith.

171.   The Individual Defendants both participated in the drafting, preparation, and/or approval of the various public, shareholder, and investor reports and presentations, as well as other communications alleged herein.   CVB's SEC filings document the Individual Defendants' direct involvement in the Bank's day-to-day operations.   For example, in its Form 10-Q for first quarter 2010, CVB reported that the Individual Defendants reviewed and analyzed loans on a quarterly basis, including the character of the loan portfolio, current economic conditions, past credit loss experience, and such other factors that deserved current recognition in estimating inherent credit losses.   Indeed, CW1 confirmed that the Individual Defendants both regularly participated in monthly Loan Committee meetings. During these meetings, they discussed branch information, loans approved the

prior month, "loans of interest" (including the Garrett loans), delinquencies, and merchant card information.  CW2 also corroborated that the Individual Defendants knew about the status of troubled loans.   In addition, CW1 confirmed that Defendant Myers closely monitored the Garrett loans, and an April 3, 2010 New York Times article reported that he "aggressively" monitored troubled loans "all the time."  Defendants Myers and Biebrich also regularly monitored the Credit Department in general.

172.    As set forth above, CVB and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Bank's common stock during the Class Period.

## XII.  PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Lead Plaintiff as class representative and Lead Counsel as Class Counsel;

B.    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such other and further relief as the Court may deem just and proper.

# XIII.  JURY DEMAND

Lead Plaintiff demands a trial by jury.


Dated: March 7, 2011                          Respectfully submitted,

                                              BERNSTEIN LITOWITZ BERGER
                                                 & GROSSMANN LLP


                                                  */s/ Niki L. Mendoza*
                                              NIKI L. MENDOZA

                                              BLAIR A. NICHOLAS  (Bar No. 178428)
                                              (blairn@blbglaw.com)
                                              TIMOTHY A. DeLANGE (Bar No.190768)
                                              (timothyd@blbglaw.com)
                                              NIKI L. MENDOZA  (Bar No. 214646
                                              (nikim@blbglaw.com)
                                              PAUL M. JONNA  (Bar No. 265389)
                                              (paulj@blbglaw.com)
                                              12481 High Bluff Drive, Suite 300
                                              San Diego, CA 92130
                                              Tel:   (858) 793-0070
                                              Fax:   (858) 793-0323
                                                       -and-
                                              GERALD H. SILK
                                              (jerry@blbglaw.com)
                                              AVI JOSEFSON
                                              (avi@blbglaw.com)
                                              1285 Avenue of the Americas, 38th Floor
                                              New York, NY 10019
                                              Tel:   (212) 554-1400
                                              Fax:   (212) 554-1444

                                              *Counsel for Lead Plaintiff Jacksonville
                                              Police & Fire Pension Fund and Lead
                                              Counsel for the Class*