VICK LAW GROUP, APC
  Scott Vick (No. 171944)
  Jason T. Riddick (No. 235980)
  Rachelle S. Torres (No. 243392)
  Lital Gilboa (No. 263372)
800 West Sixth Street, Suite 1220
Los Angeles, California 90017
Telephone:  (213) 784-6225
Facsimile:   (213) 985-7155
E-Mail:   Scott@vicklawgroup.com
          Jason@vicklawgroup.com

WACHTELL, LIPTON, ROSEN & KATZ
  David M. Murphy (*pro hac vice*)
  Warren R. Stern (*pro hac vice*)
  Wayne M. Carlin (*pro hac vice*)
  Jeffrey D. Hoschander (*pro hac vice*)
51 West 52nd Street
New York, New York 10019
Telephone:  (212) 403-1000
Facsimile:   (212) 403-2000
E-Mail:   DMMurphy@wlrk.com
          JDHoschander@wlrk.com

Attorneys for Defendants
CVB FINANCIAL CORP., CHRISTOPHER D.
MYERS AND EDWARD J. BIEBRICH, JR.

## UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| BARRY R. LLOYD, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>   v.<br><br>CVB FINANCIAL CORP., et al.,<br><br>        Defendants. | Case No. CV 10-06256 MMM (PJWx)<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>Date:        August 29, 2011<br>Time:        10:00 a.m.<br>Location:    Courtroom 780 |

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

BACKGROUND ...................................................................................................3

    I.     The SEC Subpoena .................................................................5

    II.    The Garrett Relationship ........................................................5

    III.   Recession-Related Risk Disclosure .......................................7

    IV.   Reported Loan Losses and Allowances...................................8

ARGUMENT ........................................................................................................9

    I.     The CAC Fails to Plead Falsity with the Requisite
        Particularity.........................................................................10

        A.    The CAC's falsity allegations are conclusory,
             immaterial and unreliable........................................12

             1.    "Extend and Pretend" is merely a pejorative
                 slogan. ........................................................12

             2.    The use of an alternative appraisal value does not
                 demonstrate falsity. ....................................14

             3.    CVB's disclosures were forthright about the
                 impact of the recession...............................15

              4.    The CAC does not allege facts showing that CVB
                 had incurred any unrecognized loss.............16

              5.    Allegations of inadequate reserves impermissibly
                 rest on hindsight. ........................................17

              6.    The other accounting allegations are conclusory..........18

         B.    Judicially noticeable facts further undermine the
              CAC.........................................................................20

    II.    The CAC Does Not Allege Facts Giving Rise to a Strong
        Inference of Scienter........................................................21

         A.    The CAC does not include allegations of fact
              demonstrating conscious misconduct by either of the
              individual defendants. ............................................22

              1.    The individual defendants were not involved in
                 any "extend and pretend" practices. .............23

2.    There are no allegations that the individual defendants were aware of the use of "false" appraisals.................................................................24

3.    Allegations regarding CVB's loan committee, reports and the individual defendants' positions are not probative of scienter.................................25

4.    The allegation that Garrett was CVB's largest borrowing relationship does not support an inference of scienter.......................................26

5.    The alleged GAAP violations do not support an inference of scienter.......................................29

B.    The CAC offers no motive for defendants' alleged fraud.............................................................29

1.    Limited trading by insiders negates an inference of fraud. ..............................................................30

2.    The alleged corporate aspirations do not constitute motive.............................................................31

III.    The CAC Does Not Adequately Allege Loss Causation...................32

A.    The stock drop manifestly resulted from the announcement of an SEC subpoena and not from any corrective disclosure.................................................32

B.    The September 9, 2010 announcement was not a corrective disclosure.................................................34

IV.    The Section 20(a) Claim Also Fails. ................................................35

CONCLUSION .................................................................................35

Defendants' Memorandum of Points and
Authorities In Support of Motion to Dismiss
    – ii –    
Case No. 10-CV-06256-MMM (PJWx)

# TABLE OF AUTHORITIES

**Cases**

*Atlas* v. *Accredited Home Lenders Holding Co.*,
 556 F. Supp. 2d 1142 (S.D. Cal. 2008) ...................................................17-18 n.18

*Denny* v. *Barber*,
 576 F.2d 465 (2d Cir. 1978) ....................................................................... 17

*Dura Pharm., Inc.* v. *Broudo*,
 544 U.S. 336 (2005).......................................................................... 9, 32, 34

*ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*,
 553 F.3d 187 (2d Cir. 2009) ....................................................................... 31

*Glazer Capital Management, LP* v. *Magistri*,
 549 F.3d 736 (9th Cir. 2008)....................................................................... 22

*In re Cutera Sec. Litig.*,
 610 F.3d 1103 (9th Cir. 2010) ..........................................................15, 16 & n.15

*In re Downey Sec. Litig.*,
 2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ("*Downey II*") .................... passim

*In re Downey Sec. Litig.*,
 2009 WL 736802 (C.D. Cal. Mar. 18, 2009) ("*Downey I*")........................ passim

*In re Gilead Sciences Secs. Litig.*,
 536 F.3d 1049 (9th Cir. 2008) ............................................................. 33 n.32

*In re Hansen Natural Corp. Sec. Litig.*,
 527 F. Supp. 2d 1142 (C.D. Cal. 2007) ..................................................... passim

*In re Immersion Corp. Sec. Litig.*,
 2011 WL 871650 (N.D. Cal. Mar. 11, 2011) ....................................... 23, 24, 28

*In re Impac Mortg. Holdings, Inc. Sec. Litig.*,
 554 F. Supp. 2d 1083 (C.D. Cal. 2008) ............................................. 15, 22, 28

*In re Maxim Integrated Products, Inc. Securities Litigation*,
 639 F. Supp. 2d 1038 (N.D. Cal. 2009).............................................. 32, 33-34

*In re Omnicom Group, Inc. Sec. Litig.*,
 597 F.3d 501(2d Cir. 2010).............................................................. 33-34 n.33

*In re Silicon Graphics, Inc. Sec. Litig.*,
 183 F.3d 970 (9th Cir. 1999) ...................................................................... 31

*In re Vantive Corp. Sec. Litig.*,
 283 F.3d 1079 (9th Cir. 2002) .......................................................... 10, 17, 30

*In re VeriFone Holdings, Inc. Sec. Litig.*,
 2011 WL 1045120 (N.D. Cal. Mar. 22, 2011) ........................................ 22, 23

*In re Wet Seal, Inc. Sec. Litig.*,
 518 F. Supp. 2d 1148 (C.D. Cal. 2007)........................................... 15, 17, 23, 29

*Matrixx Initiatives, Inc.* v. *Siracusano*,
 131 S. Ct. 1309 (2011)................................................................................ 29

*Metzler Inv. GMBH* v. *Corinthian Colleges, Inc.*,
 540 F.3d 1049 (9th Cir. 2008) ................................................................ passim

Defendants' Memorandum of Points and
Authorities In Support of Motion to Dismiss
– iii –
Case No. 10-CV-06256-MMM (PJWx)

*New York State Teachers' Ret. Sys.* v. *Fremont Gen. Corp.*,
    2009 WL 3112574 (C.D. Cal. Sept. 25, 2009) ............................... passim

*Nordstrom, Inc.* v. *Chubb & Son, Inc.*,
    54 F.3d 1424 (9th Cir. 1995) ............................................................. 22

*Patel* v. *Parnes*,
    253 F.R.D. 531 (C.D. Cal. 2008) ...................................................... 26

*Petrie* v. *Elec. Game Card Inc.*,
    2011 WL 165402 (C.D. Cal. Jan. 12, 2011) ..................................... 15

*Pittleman* v. *Impac Mortg. Holdings, Inc.*,
    2009 WL 648983 (C.D. Cal. Mar. 9, 2009) ................................ 22, 28

*Ronconi* v. *Larkin*,
    253 F.3d 423 (9th Cir. 2001) ...................................................... 10, 30

*Sharenow* v. *Impac Mortg. Holdings, Inc.*,
    385 F. App'x. 714 (9th Cir. 2010) .............................................. 22, 28

*Shields* v. *Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994) ............................................................. 17

*Teachers' Ret. Sys. of La.* v. *Hunter*,
    477 F.3d 162 (4th Cir. 2007) ........................................................... 33

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ........................................................... 9, 21, 29

*Zucco Partners, LLC* v. *Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ...................................................... passim

**Rules and Regulations**

12 C.F.R. §§ 337.1 ............................................................................ 9 n.9

12 C.F.R. §§ 337.12 .......................................................................... 9 n.9

15 U.S.C. § 78u-4(b) ...................................................................... passim

Fed. R. Civ. P. 9(b) ............................................................................. 10

**Other Authorities**

*Disclosures about the Credit Quality of Financing Receivables and the
    Allowance for Credit Losses*, FASB ASU 2010-20 (July 2010) ......... 18

*Instructions for Preparation of Consolidated Reports of Condition and
    Income* (FFIEC 031 & 041) (March 2011) .............................. 19 n.20

# INTRODUCTION

Hindsight being 20/20 — and lawyers being the high priests of hindsight — ever since the recent financial collapse lawyers incant in pleading after pleading that every major loan loss should have been written off sooner, every loss reserve should have been higher, every collateral appraisal should have been lower, and every extension or modification was a sham to make the loan appear current rather than an attempt to work with a borrower to be repaid in full.

This Consolidated Class Action Complaint (the "CAC") is no different.  It is larded with precisely the type of fraud-in-hindsight allegations that the Private Securities Litigation Reform Act of 1995 (the "PSLRA") was enacted to prevent. It contains no particularized allegations of how or why any accounting judgment was mistaken, much less fraudulent, at the time it was made.  It is conclusory hindsight, pure and simple.

Seizing on an unremarkable and unrevealing August 9, 2010 public filing disclosing that defendant CVB Financial Corp. ("CVB") — like numerous other financial institutions over the past two years — had received a subpoena from the Securities and Exchange Commission ("SEC") and was responding to requests for documents on various lending and loss-related subjects,[1] the CAC presents a narrative that, in essence, *assumes* the largest loan write-off taken by CVB on its commercial lending portfolio was attributable *not* to the market's collapse, *not* to the epidemic of commercial bankruptcies, *not* even to credit decisions made years earlier under frothy market conditions, but rather to a decision by defendants to hide their true knowledge or belief about these troubled credits from investors.

When the CAC is untangled, it largely boils down to speculation that CVB improperly accounted for secured loans made to Paul Garrett and The Garrett

---

[1]     CVB's filing described the types of information sought by the SEC, and noted the SEC's statement that "[t]he investigation does not mean the [SEC has] concluded that [CVB] or anyone else has broken the law."  The following day, CVB's stock price dropped from $10.30 to $8.00 per share, a decline of 22%.

1  Group LLC (collectively, "Garrett").  The CAC alleges that (1) CVB improperly

2  extended or modified terms of some of these loans in order to mislead investors

3  about the quality of these loans, and (2) the two individual defendants variously

4  made misstatements and omissions in SEC filings and investor presentations

5  relating to these loans and to credit quality in general.  Yet, as is demonstrated

6  herein, even after the class period, when some Garrett-related losses were incurred,

7  CVB continued to show a profit and its stock price hardly moved.

8       Substituting rhetoric for particularized allegations, the CAC repeats the

9  rhyme "extend and pretend" no fewer than 14 times in characterizing such business

10 judgments as loan extensions and modifications.  But a slogan is not an allegation

11 of particularized facts showing when, how and why these business judgments

12 rendered any statement made by any defendant materially false or misleading, or

13 give rise to a strong inference of fraudulent intent.  Conspicuously missing from

14 the CAC is a single allegation demonstrating that any loan extension or

15 modification was inappropriate in the context of contemporaneously available

16 information, much less how any such modification rendered any of CVB's

17 financial statements materially and intentionally or deliberately recklessly false.

18 And for good reason:  If the premise of the CAC were true, CVB's independent

19 auditor, KPMG LLP, would not have issued two unqualified audit opinions,

20 including one dated March 1, 2011, well after the SEC subpoena and the filing of

21 this lawsuit, and CVB would have been required to restate its financial statements.

22      Indeed, the entire premise of the CAC — that the business judgments to

23 work with Garrett in an effort to be repaid in full were fraudulent and that these

24 decisions rendered CVB's financial statements materially false — is negated by the

25 SEC filings on which the CAC relies.  Notwithstanding the worst economic

26 distress since the Great Depression — with a devastating impact on the

27 commercial real estate market in California's Inland Empire, where CVB and

28 many of its borrowers are based — the SEC filings show that CVB produced

---

1    consistently positive earnings before, during and after the purported class period.

2    Apart from the failure to plead falsity and scienter, the CAC should be

3    dismissed for the separate, independent reason of failure to plead loss causation.

4    The CAC does not even come close to alleging facts showing that the alleged

5    economic loss — the stock drop — was caused by corrective disclosure *of the*

6    *allegedly false and misleading statements*. The CAC itself shows that CVB's stock

7    price dropped when CVB announced on August 9, 2010 that it had received an

8    SEC subpoena — an event that did not correct any prior misstatement. It is true

9    that CVB later took a charge against the Garrett loans, but the announcement of

10   that charge was not followed by a significant share price drop and did not result in

11   the losses alleged in the CAC.

12   The heightened pleading standards of the PSLRA were enacted to preclude

13   lawsuits precisely like this one — based on allegations of fraud-in-hindsight and

14   unsupported by particularized facts. To hold otherwise would be to permit a

15   massive class action against defendants merely for disclosing receipt of an SEC

16   subpoena and later incurring — after the alleged class period — a significant loan

17   charge-off in an economy ravaged by a deep and prolonged recession. The CAC is

18   not adequately pled, and the claims should be dismissed.

19                                    **BACKGROUND**

20   Through its subsidiary, Citizens Business Bank, CVB provides banking

21   services to small and midsize businesses in California's Inland Empire, Los

22   Angeles, Orange County and Central Valley regions. *See* CAC ¶ 18. Based in

23   Ontario, California, CVB has more than $6 billion in total assets and holds loans

24   amounting to more than $3.5 billion. *Id.* ¶¶ 2, 18. CVB makes available a variety

25   of credit products, including commercial, agribusiness, consumer and real estate

26   loans. *Id.* ¶¶ 2-3. Defendant Christopher D. Myers is CVB's Chief Executive

27   Officer, and defendant Edward J. Biebrich, Jr. served as CVB's Chief Financial

28   Officer until he retired in March 2011.

1    During the severe economic recession of recent years, the real estate market

2    in California, where a majority of CVB's loan customers are based, suffered a

3    significant slowdown.  *See id.* ¶ 3.  This slowdown was reflected in declining

4    prices, excess inventories and increasing vacancies.  In this context, CVB

5    cautioned investors about the financial risks attendant to continuing deterioration

6    in the real estate market, including potential charge-offs.  *See, e.g., id.* ¶¶ 36, 58.

7    CVB also steadily and substantially increased its allowance for loan losses and

8    publicly reported the increases in these reserves.  *Id.* ¶ 112 (chart).  CVB was and

9    remains a strong business.[2]  While CVB survived the economic downturn, a

10   number of CVB's peer banks headquartered in the same region did not.  *See id.* ¶¶

11   4-6, 96 n.6.[3]



Inland Empire Region Bank Stock Prices

19   _____

20   [2]    CVB reported the following net income figures for the quarters before,
during and after the purported class period:  Third Quarter 2009 – $19.3 million
(CAC ¶ 35); Fourth Quarter 2009 – $17.1 million (CVB Financial Corp., Current
Report at Ex. 99.1, p.2 (Form 8-K) (Jan. 26, 2010) (Ex. K); *see also* CAC ¶ 56);
First Quarter 2010 – $16.1 million (CVB Financial Corp., Current Report at Ex.
99.1, p.2 (Form 8-K) (Apr. 23, 2010) (Ex. L); *see also* CAC ¶ 65); Second Quarter
2010 – $19.0 million (CAC ¶ 71); Third Quarter 2010 – $17.9 million (CVB
Financial Corp., Current Report at Ex. 99.1, p.1 (Form 8-K) (Oct. 22, 2010) (Ex.
N)); Fourth Quarter 2010 – $9.9 million (CVB Financial Corp., Current Report at
Ex. 99.1, p.2 (Form 8-K) (Jan. 21, 2011) (Ex. O); *see also* CAC ¶ 144).  Exhibits
denoted herein as "Ex. [Letter(s)]" are exhibits to the concurrently filed Request
for Judicial Notice ("RJN").

[3]    The chart reflects stock prices for CVB (CVBF) and its peer banks around
the Inland Empire region of California, PFF Bank (PFB), Temecula Valley Bank
(TMCV), Vineyard Bank (VNBC), 1st Centennial Bank (FCEN), until such banks
failed.  *See* RJN § 4, Exs. BB, CC, DD, EE, FF, GG, HH, II, JJ.

## I.      The SEC Subpoena

CVB received a subpoena from the SEC on July 26, 2010, and disclosed that fact in its report on Form 10-Q on August 9, 2010. *Id.* ¶ 128.  CVB stated:

> On July 26, 2010, we received a subpoena from the Los Angeles office of the Securities and Exchange Commission.  The subpoena and the SEC's corresponding investigation are non-public, which means that the information we provide to the SEC will not be publicized.  We are, however, required to publicly disclose the fact that we received a subpoena from the SEC.  The subpoena requests information regarding our loan underwriting guidelines, our allowance for credit losses and our allowance for loan loss calculation methodology, our methodology for grading loans and the process for making provisions for loan losses, and our provision for credit losses. In addition, the subpoena requests information regarding presentations we have given or conferences we have attended with analysts, brokers, investors or prospective investors.
>
> We do not know the events that caused the SEC to request information on these subjects, and the SEC does not make this information known.  According to the correspondence that accompanied the subpoena, "[t]he investigation does not mean the [SEC has] concluded that you or anyone else has broken the law. Also, the investigation does not mean that we have a negative opinion of any person, entity or security."
>
> CVB is fully complying with the SEC's requests, and we look forward to a speedy resolution.

CVB Financial Corp., Quarterly Report at 61 (Form 10-Q) (Aug. 9, 2010) (Ex. I). The following day, CVB shares opened at $8.35 per share, down 19% from the close on August 9 and closed at $8.00 per share, down 22% from the previous close.  *See* CAC ¶ 130; Ex. BB.

## II.     The Garrett Relationship

The CAC alleges that CVB held millions of dollars in secured loans to Paul Garrett and his real estate development firm, The Garrett Group LLC.  CAC ¶¶ 5, 8.  In July 2009, before the purported class period (October 21, 2009 through August 9, 2010), CVB disclosed that this relationship consisted of eight loans in

1   the aggregate amount of $85.2 million.  CVB Financial Corp., Current Report at

2   Ex. 99.1, p.5 (Form 8-K) (July 16, 2009) (Ex. J);[4] *see also* CAC ¶ 119.

3        On September 9, 2010, CVB announced that Garrett — who since the July

4   2009 pre-class period disclosure of CVB's Garrett exposure had continued to pay

5   interest and, indeed, slightly reduced the principal amount owed from $85.2

6   million to $82 million — had recently informed CVB that it was no longer able to

7   continue making principal and interest payments and wanted to negotiate an

8   alternative repayment schedule.  9/10/10 Form 8-K; *see also* CAC ¶ 137.[5]  CVB

9   further disclosed that, in response, it had charged off $34 million (taking a $9.3

10  million provision for the portion of the charge not covered by allocated reserves)

11  and placed the remaining $48 million on non-accrual.  9/10/10 Form 8-K; *see also*

12  CAC ¶ 137.  The market having long viewed Garrett as a high-risk borrower, CVB

13  shares closed down a negligible $0.06 following the news. *See* CAC ¶ 141; Ex.

14  BB.

15       On March 28, 2011, CVB announced that it sold six of seven remaining

16  Garrett notes for $41 million, resulting in an additional charge-off of $1.9 million.

17  CVB Financial Corp., Current Report at Ex. 99.1 (Form 8-K) (March 31, 2011)

18  (Ex. P).  CVB further disclosed that total charge-offs in connection with this

19  relationship amounted to $36 million or 44% of the ending principal balance. *Id.*

20

---

21  [4]    CVB's public disclosures do not refer to loan customers by name.  Thus, this
22  relationship is referred to in CVB's disclosures as its largest borrowing relationship
    or "largest borrower." *See, e.g.*, CVB Financial Corp., Current Report at Ex. 99.1
23  (Form 8-K) (Sept. 10, 2010) (Ex. M) ("9/10/10 Form 8-K").  Various analyst and
    news reports have identified this as the Garrett relationship. *See, e.g.*, Peter Eavis,
24  *Bank's Bugbear: Commercial Real Estate*, Wall St. J., June 29, 2009, at C10 (Ex.
    Z).  And the CAC has done the same. *See, e.g.*, CAC ¶ 5.  Pursuant to Federal
25  Rule of Civil Procedure 12(b)(6), for purposes of this motion, CVB does not
    dispute this assertion.
26  [5]    Prior to September 2010 (when CVB charged off $34 million owed by
27  Garrett), the outstanding principal on all such loans was $82 million (CAC ¶¶ 137-
    38), evidencing a $3.2 million net *reduction* in principal and indicating that Garrett
28  was repaying such loans during the class period.

1    On this news, CVB shares closed up nearly 10%. *See* Ex. BB.[6]

2          The overarching allegation of the CAC (pleaded in the prolix and repetitious

3    style characteristic of securities fraud complaints) is that CVB misrepresented the

4    quality of its lending relationship with Garrett and improperly extended or

5    modified the terms of Garrett loans without taking appropriate reserves or charges.

6    *See, e.g.*, CAC ¶¶ 5, 8, 10-12, 31, 34, 39, 41-48, 52, 55, 60, 64, 68, 70, 72, 75-82,

7    88, 94-97, 105, 110-11, 118-21, 127-28, 131, 134, 137-40, 144-45, 171.  Yet

8    nowhere in the farrago of allegations can one find any alleged fact showing that

9    CVB was required to charge off any portion of the Garrett loans even one day prior

10   to September 8, 2010, that CVB was required by generally accepted accounting

11   principles ("GAAP") to take even one penny more in reserves for those loans, or

12   that CVB failed to warn investors of the risks to its lending business posed by the

13   recession.

14   **III.   Recession-Related Risk Disclosure**

15         The risks inherent in CVB's loan portfolio were well-known throughout the

16   class period.  CVB itself repeatedly warned:

17           There has been a significant slowdown in the real estate markets . . .
18           where a majority of our loan customers, including our largest
             borrowing relationships, are based. . . .  Continuing deterioration in
19           the real estate market could affect the ability of our loan customers,
             including our largest borrowing relationships, to service their debt,
20           which could result in loan charge-offs and provisions for credit losses
             in the future, which could have a material adverse effect on our
21           financial condition, net income and capital.[7]

22

23   _____

24   [6]     CVB took the highly unusual step of highlighting its exposure to Garrett to
     the marketplace.  This is why the market shrugged off the initial write-off after the
25   class period and why CVB's stock price *rose* by 10% after the final resolution of
     the Garrett loans was announced.  It is also why the core theory of the CAC — that
26   the extensions, modifications and business judgments relating to Garrett were part
     of some conspiracy to hide the Garrett risk from investors rather than to be repaid
27   as fully as possible — is specious on its face.  The whole world knew that CVB
     had a large exposure to Garrett and that there was a risk it might one day be unable
28   to continue to perform.

These risks were echoed and elaborated by a number of media and analyst reports, including many that focused on the Garrett loans.  For example:

- A June 29, 2009 Wall Street Journal article refers to CVB's $85 million Garrett exposure and notes:  "Court documents give details of the commercial real-estate collateral Garrett has provided, and in some cases it is land, which in the Inland Empire can be worth little."  Eavis, *Bank's Bugbear: Commercial Real Estate*, *supra* at n.4.

- A January 7, 2010 MarketWatch article refers to CVB's "eight loans totaling $84 million to Garrett, by far its largest lending relationship" reporting that one of the loans was restructured in March 2009 and that two other lenders foreclosed on $40 million in loans to Garrett in late 2009 and noting that "CVB may end up taking a loss" if it forecloses on Garrett loans.  Alistair Barr, *California Bank is Put to Test on Commercial Real Estate*, MarketWatch, Jan. 7, 2010 (Ex. AA).

- A January 25, 2010 analyst report from Macquarie indicates that management "noted that the $84 mil[lion] Garrett Group credit is performing as expected, but remains on classified status (substandard)."  Macquarie Report on CVB Financial Corp. at 1 (Jan. 25, 2010) (Ex. S).

- An April 9, 2010 analyst report from FIG Partners notes that CVB's earnings power is "sufficient to cover losses from the largest lending relationship" and indicates that CVB could experience loan losses of "$215.7 million through the current credit cycle."  FIG Partners Report on CVB Financial Corp. at 1-2 (Apr. 9, 2010) (Ex. T).

## IV.   Reported Loan Losses and Allowances

CVB filed quarterly financial statements and annual audited financial statements as scheduled during and after the class period.  As the recession deepened in the years leading into the class period, CVB's financial statements reported loan losses and allowances that increased each year.[8]

---

[7]     CVB Financial Corp., Quarterly Report at 58 (Form 10-Q) (Aug. 5, 2009) (Ex. F); CVB Financial Corp., Quarterly Report at 60 (Form 10-Q) (Nov. 5, 2009) (Ex. G); *see also* CVB Financial Corp., Annual Report at 19-20 (Form 10-K) (March 4, 2010) ("FY09 Form 10-K") (Ex. D) (with amended language); CVB Financial Corp., Quarterly Report at 24 (Form 10-Q) (May 10, 2010) (Ex. H) (incorporating disclosure from FY09 Form 10-K).

[8]     In the eighteen months between June 30, 2008 and December 31, 2009, CVB nearly tripled its allowance from $37 million to $109 million.  CAC ¶¶ 62, 112 (chart).  For calendar and fiscal years 2006, 2007, 2008 and 2009, CVB's





None of CVB's financial statements covering the class period has been restated. *See* RJN § VII. And KPMG issued unqualified audit opinions on CVB's year-end financial statements, including for the years 2009 and 2010 (the annual reports during and immediately after the class period). FY10 Form 10-K at 76, 128; FY09 Form 10-K at 66-67, 112. Moreover, CVB's lending policies, loan losses and allowances are subject to review by the Federal Deposit Insurance Corporation ("FDIC"), which is its primary regulator. *See* CAC ¶ 78.[9]

## ARGUMENT

Under the PSLRA, it is the duty of this Court to scrutinize securities fraud complaints at the outset of the case and dismiss those that rest on conclusory or hindsight allegations of falsity, materiality and scienter, or that fail to show that the stock losses were caused by correction of materially false or misleading statements. *See, e.g.*, 15 U.S.C. § 78u-4(b); *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007); *Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 341 (2005); *Zucco Partners, LLC* v. *Digimarc Corp.*, 552 F.3d 981, 990 (9th

---

reported annual charge-offs were $0.2 million, $2.1 million, $6.0 million and $26.3 million, respectively, and its reported allowances at year-end were $27.7 million, $33.0 million, $54.0 million and $108.9 million, respectively. CVB Financial Corp., Annual Report, at 21, 45 (Form 10-K) (March 1, 2007) (Ex. A); CVB Financial Corp., Annual Report, at 20, 47 (Form 10-K) (Feb. 29, 2008) (Ex. B); CVB Financial Corp., Annual Report, at 30, 57 (Form 10-K) (Feb. 27, 2009) (Ex. C); FY09 Form 10-K at 28, 57. In 2010, CVB reported annual charge-offs of $65.5 million and an allowance of $105.3 million at year-end. CVB Financial Corp., Annual Report, at 33, 66 (Form 10-K) (March 1, 2011) (Ex. E) ("FY10 Form 10-K").

[9] Per federal regulations, the FDIC conducts full-scope examinations at least once during each twelve-month period. *See* 12 C.F.R. §§ 337.1, 337.12.

Cir. 2009); *Metzler Inv. GMBH* v. *Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008). The CAC should be dismissed for all these reasons.

Stripped of repetition and invective, the CAC rests on the following: (1) an SEC investigation that the SEC itself says is not evidence of guilt; (2) the fact that CVB charged off a portion of the Garrett loans after Garrett — having continued to pay interest for over two years following CVB's warning to the marketplace and having paid down the principal amount owed from $85.2 million to $82 million — expressed an inability to perform, likewise a development that casts doubt on prior statements only by hindsight; and (3) a potpourri of allegations about everyday banking practices that are either consistent with management of a lending relationship or, at most, involve immaterial sums and have nothing to do with the Garrett relationship. The CAC, especially when read in the context of the disclosure documents to which it refers, contains nothing that would lead the Court to find that (a) it has demonstrated the falsity of any statement at the time it was made; (b) it has raised a strong inference that any defendant acted with scienter; or (c) the stock price drop reflected anything more than the uncertainty attendant to receipt of an SEC subpoena. The CAC — which was amended after an investigation that included interviews with former employees and allegedly knowledgeable third parties — should be dismissed without leave to amend.

## I.  The CAC Fails to Plead Falsity with the Requisite Particularity.

A securities fraud complaint must allege falsity with particularity by alleging contemporaneous information showing the statements at issue were materially false when made. 15 U.S.C. § 78u-4(b)(1); Fed. R. Civ. P. 9(b). Courts must dismiss complaints that fail to meet this requirement. *E.g.*, *Zucco Partners*, 552 F.3d at 990-91; *Metzler*, 540 F.3d at 1070; *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1087 (9th Cir. 2002); *Ronconi* v. *Larkin*, 253 F.3d 423, 431 (9th Cir. 2001).

This obligation is particularly important when the allegations of misstatements relate to issues of business judgment, such as decisions to modify or

extend loans, set loan loss reserves or assign values to assets. *See New York State Teachers' Ret. Sys.* v. *Fremont Gen. Corp.*, 2009 WL 3112574, No. 2:07-cv-5756-FMC-FFMx, at *7, *13 (C.D. Cal. Sept. 25, 2009) (dismissing allegations of overstated loan residual interest valuations and of understated loan repurchase reserves); *In re Downey Sec. Litig.*, 2009 WL 2767670, No. CV 08-3261-JFW (RZx), at *4-*5 (C.D. Cal. Aug. 21, 2009) ("*Downey II*") (dismissing allegations of understated loan loss reserves); *In re Downey Sec. Litig.*, 2009 WL 736802, No. CV 08-3261-JFW (RZx), at *7 (C.D. Cal. Mar. 18, 2009) ("*Downey I*") (same). Yet the CAC ignores this obligation.

The CAC complains about:

- Assurances regarding CVB's credit quality and underwriting culture, particularly by comparison to CVB's peers (CAC ¶¶ 34-36, 51, 53, 56, 63, 69, 72);

- Indications that the Garrett relationship was performing (*id.* ¶¶ 36, 52, 72);

- Characterization of deterioration in the real estate market as a "risk factor" (*id.* ¶¶ 36, 58, 65);

- Statements of CVB's income, earnings, loan value and stockholders' equity (*id.* ¶¶ 35, 50; 56, 65, 71); and

- Certifications, including pursuant to the Sarbanes-Oxley Act of 2002, that CVB's financial statements were true and fairly represented CVB's financial condition and results (*id.* ¶¶ 37, 57, 65).

And the CAC alleges that these statements were false and misleading because:

- Defendants engaged in "extend and pretend" practices to keep loans appearing current (*e.g.*, *id.* ¶¶ 39, 47, 55, 60, 64, 68, 70, 75);

- Defendants used "stabilized" appraisal values rather than "as-is" appraisal values to "conceal loan losses" (*e.g.*, *id.* ¶¶ 39, 49, 55, 60, 64, 68, 70, 75);

- Defendants did not acknowledge that the deterioration in the real estate market was already affecting CVB's loans (*e.g.*, *id.* ¶¶ 39, 60);

- Defendants did not timely reflect impairment in the Garrett loans (*e.g.*, *id.* ¶¶ 39, 55, 60, 64, 68, 70, 75);

- Defendants did not adequately reserve for loan losses (*e.g.*, *id.* ¶¶ 39, 55, 60, 64, 68, 70, 75); and

- Defendants made accounting errors (*e.g.*, *id.* ¶¶ 39, 55, 60, 64, 68, 70, 75, 98-123).

Supported only by conclusory statements, immaterial anecdotes and unreliable "confidential witness" accounts, the CAC falls far short of the particularity required to plead securities fraud.

### A.   The CAC's falsity allegations are conclusory, immaterial and unreliable.

#### 1.   "Extend and Pretend" is merely a pejorative slogan.

Unable to plead how, in what respect or by what amount a single accounting judgment made by management and reviewed by the outside auditors and bank regulators was erroneous, much less fraudulent, the CAC resorts to the phrase "extend and pretend" some 14 times.  The repetitive rhyme is intended to portray CVB's agreements with borrowers as somehow improper.  According to the CAC, "extend and pretend" is when "money is 'round tripped' and never leaves the Bank, but rather it just adds to the loan balance, while making the borrower appear current."  *Id.* ¶ 47.

Yet the allegations mustered by the CAC show no such thing.  The CAC alleges that "at quarter-end on numerous occasions," CVB "extended new monies, refinanced, or entered into modified mortgage agreements" for Garrett as follows: March 25, 2008 – $50 million "revolving line of credit"; August 23, 2008 – $16 million "refinancing"; March 31, 2009 – $53 million "refinancing"; September 23, 2009 – $4 million "refinancing"; and December 29, 2009 – nearly $38 million "refinancing."[10]  *Id.* ¶¶ 77, 79.  But the CAC says nothing about why these agreements were improper or misrepresented.[11]  Not even a word is written about

---

[10]   Figures are rounded to the nearest million.

[11]   Moreover, three of the five listed agreements occurred *well before the class period*.  How such agreements could have had any material impact on statements made during the class period is left unstated.  Furthermore, there is no allegation

1   whether these agreements "add[ed] to [any] loan balance." All the CAC says is

2   that certain loans were "refinanc[ed]," a quotidian event in the banking business.

3   Banks routinely extend and modify loans, and the CAC alleges nothing to show

4   that the extensions or modifications of the Garrett loans (or CVB's loans in

5   general) were inconsistent with appropriate management of a lending relationship.

6        Did these attempts to work with a real estate developer facing an

7   unprecedented market collapse improve CVB's collateral position, result in

8   additional liens or security interests, or include personal guarantees or cross-

9   collateralizations of previously unsecured loans? The CAC says nothing about

10  such matters, and offers no explanation why *any* of these "refinancing[s]" was

11  improper. Although the CAC attempts to imply impropriety from the fact that

12  such agreements occurred "at quarter-end,"[12] there could be any number of reasons

13  why such agreements occurred when they did. This type of conclusory allegation

14  does not satisfy the particularity requirement of the PSLRA.[13]

15       That CVB's myriad business judgments to extend, modify or work with

16  Garrett in order to maximize the bank's prospects for repayment in an ever-

17  worsening commercial real estate market were anything but an "extend and

18

---

19  that any of the five agreements rendered CVB's statements about, *e.g.*, "net interest income" (*see id.* ¶¶ 56, 100) or the risk of future credit losses misleading.

20  [12]   Notably, the agreement allegedly executed on August 23, 2008 is, of course, better characterized as mid-quarter.

21

22  [13]   The anecdote about a loan to Vintage Dairy (CAC ¶ 80) is likewise unavailing. It has nothing to do with the Garrett relationship, and it is not evident how it renders any statement materially false or misleading. Moreover, it is based on an uncorroborated hearsay account of a confidential witness. *Id.* ¶¶ 31(d), 80. Such accounts are unreliable. *Zucco Partners*, 552 F.3d at 996-97; *Downey II*, 2009 WL 2767670, at *9-*10; *Downey I*, 2009 WL 736802, at *12-*13. Furthermore, the anecdote itself is nebulous as to, *e.g.*, how CVB "borrowed" from a Vintage Dairy line of credit, when and how often such instances occurred or how much money was involved. And the CAC's unsupported allegation that, at internal agribusiness group staff meetings, the group head "discussed the practice of granting additional funds in order to conceal delinquencies" (CAC ¶ 80) is similarly deficient.

---

1   pretend" scheme as the CAC defines such — *i.e.*, the bank's own money being

2   "round tripped" and "add[ed] to the loan balance, while making the borrower

3   appear current" — is plain from the securities filings on which the CAC relies:  As

4   a result of these business judgments, Garrett not only continued to pay interest, but

5   reduced, not "add[ed] to," the loan balance from $85.2 million to $82 million.  The

6   public disclosures incorporated by reference into the CAC thus directly belie a

7   practice of "extend and pretend" as the CAC defines such.

8           **2.  The use of an alternative appraisal value does not demonstrate**

9                **falsity.**

          Relying on one alleged anecdote from an unnamed source, the CAC states

10   that CVB used "stabilized" appraisal values rather than lower "as-is" appraisal

11   values, even when a property was not fully occupied and needed maintenance.

12   CAC ¶¶ 83-84.  Thus, the CAC alleges that CVB misstated its financial statements

13   because such "false" appraisals "conceal[ed] loan losses."  *E.g.*, *id.* ¶¶ 39, 49, 55,

14   60, 64, 68, 70, 75.

15             This allegation does not rationally support the conclusion that defendants

16   made false or misleading statements about CVB's credit quality or loan values.

17   First, there is nothing inherently suspect about appraisals that include multiple

18   estimates of value.  Second, there is no allegation that this appraisal issue has

19   anything to do with any Garrett loan.  Third, the fact that the confidential witness

20   disagreed with a supervisor about the appropriate appraisal value to use (*id.* ¶ 84)

21   proves nothing.  *Downey II*, 2009 WL 2767670 at *11 ("[S]econd-guessing of

22   management decisions by confidential witnesses does not provide a basis for

23   securities fraud.").[14]  Finally, the alleged difference in *appraisal value* was a mere

24

---

25   [14]   Nor is there any inference of impropriety to be derived from the allegation

26   that the subject account was "taken away" from the confidential witness (CW1) a

27   month later.  CAC ¶ 84.  CW1 had been demoted from Special Assets Manager —

a demotion not alleged to be related to false appraisals — and further reduction of

28   CW1's responsibilities seems to be a part of the natural progression to CW1's

departure from CVB a few months later.  *See id.* ¶¶ 31(a), 84.

$600,000 (CAC ¶ 84), a trivial amount not alleged to have had a material impact on CVB's financial statements. *See In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010) ("Central to a 10b-5 claim is the requirement that a misrepresentation or omission of fact must be material.").

### 3. CVB's disclosures were forthright about the impact of the recession.

Referring to "risk factor" disclosures in CVB's SEC's filings, the CAC takes issue with the use of the words "could" and "in the future" and alleges that "the purported 'risk' had already come to fruition." CAC ¶¶ 36, 39, 58, 60, 68. But the impact of the real estate recession on CVB's loans was abundantly evident in advance of and during the class period. For example, early in the class period on March 4, 2010, in its FY09 Form 10-K, CVB reported that annual charge-offs had increased more than 400% from $6.0 million in 2008 to $26.3 million in 2009. *See supra* at 8-9. In any event, it was no secret that CVB's loans were negatively affected by the economic decline. Indeed, in the same report, CVB disclosed, *e.g.*, that "[t]he economic downturn has had an impact on our market area and on our loan portfolio." FY09 Form 10-K at 49. And there was nothing false or misleading about CVB's warning regarding the "risk" of "continuing deterioration" (*see* CAC ¶¶ 36, 58).

The CAC also alleges that defendants compared CVB favorably to its peers with respect to credit culture and quality. *See, e.g.*, CAC ¶¶ 34-36, 51, 53, 56, 63, 69, 72. These statements are nothing but "non-actionable puffing." *Cutera*, 610 F.3d at 1111; *see also Petrie* v. *Elec. Game Card Inc.*, 2011 WL 165402, No. SACV 10-00252 DOC (RNBx), at *5 (C.D. Cal. Jan. 12, 2011); *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008); *Downey I*, 2009 WL 736802, at *6; *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1168 (C.D. Cal. 2007). As the Ninth Circuit has explained, investors know how to "devalue" such statements, and this sort of "mildly optimistic, subjective

1   assessment hardly amounts to a securities violation." *Cutera*, 610 F.3d at 1111.  In

2   any event, the CAC does not plead facts demonstrating that these statements were

3   materially false when made.  For example, nowhere does the CAC even mention

4   the credit culture and quality of CVB's competition, let alone offer specific facts

5   demonstrating that CVB's credit culture and quality were not superior to that of its

6   peers.[15]  In fact, CVB's peer banks in the region failed during the recent economic

7   downturn, and CVB was indeed "the last man standing."  *See* CAC ¶¶ 4-6, 96 n.6.

8            **4.   The CAC does not allege facts showing that CVB had incurred
             any unrecognized loss.**

9

10      In an effort to support its claims that CVB misrepresented the quality of the

11   Garrett loans (*id.* ¶¶ 36, 52, 72) and that CVB's losses, particularly in connection

12   with Garrett, were understated and, thus, CVB's income, earnings and other

13   metrics were overstated (*id.* ¶¶ 35, 50, 57, 65, 71), the CAC makes the following

14   allegations:

15   • Prior to February 2009, CVB had discussions with Garrett about
       restructuring debt; by early 2009, the Garrett loans were transferred to Julie
16     Engen in the Credit Department (a transfer that "could mean" a loan was "at
       risk or troubled"), which "closely monitored" the loans; in 2009, the Garrett
17     loans were briefly transferred to the Special Assets Department and recorded
       on a monthly report before being sent back three days later; and, in May
18     2010, the loans were again transferred to the Special Assets Department.  *Id.*
       ¶¶ 41-46.
19

20   • In late 2009, two Garrett lenders (other than CVB) foreclosed on their $40
21     million in loans to Garrett.  *Id.* ¶ 82.

22   • There were liens for unpaid property taxes on two of "at least" eleven
       parcels used as collateral for the March 31, 2009 Garrett "refinancing" (*id.*
23

24   ──────────────

25   [15]    The CAC's allegation that defendant Myers said CVB had no interest in a
       group of ten buildings with a 75% vacancy rate, even though one such building
26     "partly secured" a CVB line of credit to Garrett (CAC ¶¶ 54-55) does not remedy
       this deficiency.  Moreover, there is no fact pled sufficient to demonstrate
27     materiality.  *Cutera*, 610 F.3d at 1108.  And given the risks CVB had disclosed
       concerning the Garrett lending relationship more generally, it could not have been
28     material.

¶ 77), and Garrett was delinquent on property taxes on at least 32 properties that "CVB financed" (*id.* ¶ 81).

At most, these allegations indicate that Garrett was having some financial difficulty and that CVB was attentive to the Garrett loans.  None of these allegations, however, demonstrates that the Garrett loans at CVB had ceased to perform, that CVB had "specific reserves" against any such loans (*see id.* ¶¶ 52, 72) or that any credit losses had been incurred, at the time of any alleged misstatement.[16]  To the contrary, these allegations are entirely consistent with the contingent character of the risk warning discussed above.  *See supra* at 15-16.

### 5. Allegations of inadequate reserves impermissibly rest on hindsight.

When it charged off a portion of the Garrett loans after the class period in September 2010, CVB recorded an additional $9.3 million provision.  CAC ¶¶ 110, 137.  It is thus unsurprising that the CAC alleges that defendants did "not adequately reserve for loan losses." *See id.* ¶¶ 39, 55, 60, 64, 68, 70, 75.  But this allegation, of course, is nothing more than an impermissible allegation of fraud-in-hindsight.  *See Vantive*, 283 F.3d at 1085; *New York State Teachers' Ret. Sys.*, 2009 WL 3112574, at *13; *Wet Seal*, 518 F. Supp. 2d at 1152.[17]  Indeed, courts routinely reject securities fraud claims based on allegations of inadequate reserves. *See, e.g.*, *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994); *Denny* v. *Barber*, 576 F.2d 465, 467-70 (2d Cir. 1978); *Downey II*, 2009 WL 2767670, at *5; *Wet Seal*, 518 F. Supp. 2d at 1161-62.[18]  Furthermore, CVB nearly

---

[16]    Similarly, the allegations that CVB added personnel to its Special Assets Department (*id.* ¶ 40) demonstrate only that CVB was preparing for an increase in troubled loans.

[17]    Moreover, CVB consistently warned that its allowance might turn out to be insufficient to cover losses. *See, e.g.*, FY09 Form 10-K at 19-20 ("Our allowance for credit losses may not be adequate to cover actual losses.").

[18]    Some courts have permitted securities fraud allegations in connection with inadequate reserves, but they have done so on the basis of particular allegations that the reserves were contradicted by specifically identified contemporaneous data and that defendants deviated from their own appropriate guidelines. *See, e.g.*,

1  tripled its allowance just prior to and during the class period.  *See supra* at n.8; *see*

2  *also Downey II*, 2009 WL 2767670 at *5 ("Plaintiff continues to simply assume

3  that Downey ignored the financial metrics in setting its reserves without alleging

4  any particularized facts. . . .").

5  ### 6.  The other accounting allegations are conclusory.

6  The CAC alleges that defendants otherwise improperly accounted for CVB's

7  loans, and in particular loans to Garrett.  *E.g., id.* ¶¶ 39, 55, 60, 64, 68, 70, 75, 98-

8  123.  But these allegations find no support in the form of particular facts, thereby

9  rendering such allegations inadequate under the PSLRA.  *See also In re Hansen*

10  *Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1153 (C.D. Cal. 2007) ("Plaintiff

11  alleges that Hansen's financial statements were false and misleading as a result of

12  GAAP violations, but fails to explain which line items of the statements were false,

13  why the statements were false, the amount by which the financial statements were

14  misstated, what provisions of GAAP were violated, how those provisions were

15  violated, and who was involved in the alleged GAAP violations.").

16  The CAC attempts to make up for this lack of detail by asking the Court to

17  draw inferences from the fact that CVB provided more detailed disclosure post-

18  class period (*e.g.*, CAC ¶¶ 62, 123) and that charge-offs, as a percentage of the

19  loan loss allowance, slowed during the class period (*e.g., id.* ¶¶ 109, 112).  These

20  inferences are non sequiturs.

21  First, the reason for much of the expanded disclosure in the FY10 Form 10-

22  K was a change in GAAP rules.  *See Disclosures about the Credit Quality of*

23  *Financing Receivables and the Allowance for Credit Losses*, FASB ASU 2010-20

24  (July 2010) (amending ASC Topic 310); *see also* RJN § VI.[19]  It is patently absurd

25  ─────────────────────────────

26  *Atlas* v. *Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1150-53 (S.D. Cal. 2008).

27  [19]   Certain other information allegedly disclosed for the first time in the FY10
28  Form 10-K was actually included in the FY09 Form 10-K.  For example, the CAC alleges the inclusion of a "new TABLE 6, Non-Performing Assets, Non-Covered."

for the CAC to contend that CVB's adherence to new accounting rules is an admission that its previous disclosures were improper or deficient (CAC ¶ 123).[20]

Second, while charge-offs appear to have declined modestly in the year-long period that ended mid-year in the second quarter of 2010, allowances steadily and substantially increased. CAC ¶ 112 (chart). Thus, as a percentage of allowances — the figure the CAC presents — charge-offs appear to have been significantly reduced, even though the absolute decline was modest. The only plausible inference to be drawn from the trend is that, as the economy deteriorated, CVB increased its loan loss allowance — an increase that directly undermines the inference in the CAC. And, in any event, the CAC does not dispute that CVB's charge-offs increased substantially year-over-year both before and during the class period when taking account of CVB's fiscal years. *See supra* at 8-9.

Finally, the CAC alleges that CVB violated SEC and GAAP disclosure by inadequately presenting information on, *e.g.*, "loss exposure," "concentration of risk" and "loss estimates" and by not updating CVB's loan loss reserve methodologies. CAC ¶¶ 116-22. But none of these allegations is supported by particular facts in the CAC. As the CAC notes, CVB did disclose Garrett-related risk. *Id.* ¶¶ 36, 58. Indeed, even the $85.2 million exposure was disclosed. *See supra* at 5-6. Furthermore, the CAC does not specify particular loan provisions, allowances, restructurings, charge-offs or loss estimates that ought to have been

---

CAC ¶ 123. But this information was included in a nearly identical format in the FY09 Form 10-K. *Compare* FY10 Form 10-K at 57 *with* FY09 Form 10-K at 48. Similarly, the FY10 Form 10-K included an allegedly "new TABLE 8, Summary of Credit Loss Experience." CAC ¶ 123. But the FY09 Form 10-K included a nearly identical "TABLE 8 — Summary of Credit Loss Experience." *Compare* FY10 Form 10-K at 67 *with* FY09 Form 10-K at 58.

[20] Likewise, the CAC does not explain how material falsity is demonstrated by its allegation that an SEC report differed from an FDIC report (CAC ¶ 61), even though FDIC reporting is subject to regulations distinct from SEC and GAAP requirements and, in any event, both reports were publicly available. *See, e.g.*, *Instructions for Preparation of Consolidated Reports of Condition and Income* (FFIEC 031 & 041) (March 2011); *see also* RJN §§ VI, VII.

1    disclosed in connection with the Garrett (or any other) loans.  And there is no

2    allegation of fact demonstrating that CVB was required to update its loan loss

3    reserve methodologies (or to disclose otherwise).  As such, these conclusory

4    allegations do not meet the standards of the PSLRA.

5    **B.      Judicially noticeable facts further undermine the CAC.**

6         Facts of which this Court may take judicial notice further undermine any

7    inference that defendants' statements regarding loan practices or results were false

8    or misleading when made.  *See, e.g., Metzler*, 540 F.3d at 1061 (review for

9    dismissal under Rule 12(b)(6) is based on the "complaint, materials incorporated

10   . . . by reference, and matters of which the court may take judicial notice").

11        First, CVB's financial statements have not been restated.  *See supra* at 9.

12   Moreover, KPMG, CVB's independent auditor, has expressed the opinion that

13   CVB's financial statements for the fiscal years ended December 31, 2009 and

14   December 31, 2010 "present fairly, in all material respects, the financial position of

15   [CVB] . . . in conformity with U.S. generally accepted accounting principles."[21]

16   The absence of a restatement and the two clean audit opinions — completely

17   covering the class period — undercut the CAC's conclusory claims of financial

18   misstatements.  Even more telling is the fact that KPMG issued its clean audit

19   opinion for CVB's 2010 fiscal year — without any restatement — after this lawsuit

20   was filed.  *See supra* at 9.

21        Similarly, the CAC does not allege that the FDIC has criticized CVB's

22   underwriting practices or its financial statements.  There is an allegation that the

23   FDIC conducted a review of CVB in April 2009 and issued a fine for alleged flood

24   insurance-related violations, a finding irrelevant to the gravamen of the CAC.

25   CAC ¶ 78.  But conspicuously missing from the FDIC's order (or elsewhere) is any

26   FDIC criticism of CVB's financial statements or of any decision to extend or

27

28   [21]     KPMG's audit opinions were included in CVB's Forms 10-K for 2009 and
         2010.  FY09 Form 10-K at 66-67, 112; FY10 Form 10-K at 76, 128.

1   modify the terms of any loan.[22]  If any inference about the FDIC's reviews can be

2   derived, it is that the FDIC gave CVB's credit portfolio a clean bill of health.

3                              *        *        *

4          In sum, the CAC has not adequately alleged the contemporaneous falsity of

5   CVB's statements on its credit quality, the performance of the Garrett loans, the

6   risk of deteriorating real estate markets or of CVB's reported financial metrics.

7   And since the certifications of CVB's financial statements would only be false if

8   the financial statements were false, this tag-along misstatement claim fails as well.

9   Thus, the CAC should be dismissed for failure to allege material misstatements.

10  **II.    The CAC Does Not Allege Facts Giving Rise to a Strong Inference of**

11  **Scienter.**

12         To plead scienter under the PSLRA, a plaintiff must "state with particularity

13  facts giving rise to a strong inference that the defendant acted with the required

14  state of mind." *Tellabs*, 551 U.S. at 314 (quoting 15 U.S.C. § 78u-4(b)(2)).  At a

15  minimum, this requires a mental state of deliberate recklessness approaching actual

16  intentional misconduct.  *Zucco Partners*, 552 F.3d at 991 (citations omitted).

17  Consistent with the legislative objective of curbing abuses of the private securities

18  fraud action, this "exacting" pleading standard is not a burden to be taken lightly.

19  *Tellabs*, 551 U.S. at 313, 320-21.  To the contrary, a securities fraud complaint

20  cannot survive a motion to dismiss under Rule 12(b)(6) unless the inference of

21  scienter is "cogent and at least as compelling as any opposing inference one could

22  draw from the facts alleged." *Id.* at 314; *see also Zucco Partners*, 552 F.3d at 991

23  (quoting *Tellabs*).

24         The CAC includes six sets of scienter allegations, five intended to

25  demonstrate conscious misconduct and the last intended to demonstrate personal

---

26  [22]    As evident from the publicly available FDIC order, there is no connection

27  between the modest FDIC penalty for alleged violations of flood insurance

28  requirements and the Garrett loans or any alleged misstatement. *See In re Citizens Business Bank*, FDIC-09-100k (Apr. 8, 2009) (Order) (Ex. KK).

motive:

- Defendants engaged in "extend and pretend" practices (CAC ¶¶ 76-82);

- Defendants used "false" appraisals (*id.* ¶¶ 83-85);

- Defendants "knew or recklessly disregarded" the status of CVB's loans (*id.* ¶¶ 86-93);

- Garrett was CVB's largest borrowing relationship (*id.* ¶¶ 94-97);

- Defendants made accounting errors (*id.* ¶¶ 98-123); and

- Defendants Myers and Biebrich engaged in "insider trading" (*id.* ¶¶ 124-27), and CVB had certain growth aspirations (*id.* ¶¶ 4, 33).

As evident, many of these scienter allegations are the same allegations that the CAC uses to try to demonstrate falsity; they fail for the reasons described above.  These allegations are further deficient, as are the other scienter allegations, because they fail to adequately demonstrate a mental state approaching conscious misconduct or motive on the part of the individual defendants.  And there can be no inference of corporate scienter because the CAC does not identify any other member of management who, with scienter, made a false or misleading statement on behalf of CVB.  *See Glazer Capital Mgmt., LP* v. *Magistri*, 549 F.3d 736, 745 (9th Cir. 2008); *In re VeriFone Holdings, Inc. Sec. Litig.*, 2011 WL 1045120, No. C 07-6140 MHP, at *9 (N.D. Cal. Mar. 22, 2011) (citing *Nordstrom, Inc.* v. *Chubb & Son, Inc.*, 54 F.3d 1424, 1436 (9th Cir. 1995)); *Pittleman* v. *Impac Mortg. Holdings, Inc.*, 2009 WL 648983, No. SACV 07-0970 AG (MLGx), at *3 (C.D. Cal. Mar. 9, 2009) *aff'd sub nom. Sharenow* v. *Impac Mortg. Holdings, Inc.*, 385 F. App'x 714 (9th Cir. 2010); *Impac Mortg.*, 554 F. Supp. 2d at 1101 n.12.

### A.   The CAC does not include allegations of fact demonstrating conscious misconduct by either of the individual defendants.

The CAC's scienter allegations depend on alleged statements by eight "confidential witnesses."  None is alleged to have any personal knowledge of the state of mind of the individual defendants (or anyone else responsible for CVB's

financial reporting), *e.g.*, by having witnessed any contemporaneous statement by Myers or Biebrich contradicting any of the alleged misstatements.[23]  *See, e.g.*, *Zucco Partners*, 552 F.3d at 998 (scienter allegations inadequate where they fail to establish that the witness "has reliable personal knowledge of the defendants' mental state"); *New York State Teachers' Ret. Sys.*, 2009 WL 3112574, at *11 (no scienter where not established that confidential witnesses were in a "position to gain personal knowledge of what Defendants saw, knew, or thought"); *VeriFone*, 2011 WL 1045120, at *14 (no scienter where confidential witnesses did not have any interactions with defendant).  Instead, the allegations show only that some of the purported witnesses reported to people who reported (directly or indirectly) to Myers.  CAC ¶ 31.  But allegations that a confidential witness allegedly reported to a superior, who in turn reported to a defendant, do not support an inference of scienter under the PSLRA.  *In re Immersion Corp. Sec. Litig.*, 2011 WL 871650, No. C-09 4073 MMC, at *5 (N.D. Cal. Mar. 11, 2011).  And there is no basis for finding scienter absent allegations that any particular defendant knew of any contradictory information or that it would have been "patently incredible" for a defendant not to have known.  *Wet Seal*, 518 F. Supp. 2d at 1173.

In any event, each of the CAC's purported scienter allegations is rife with pleading deficiencies:

## 1. The individual defendants were not involved in any "extend and pretend" practices.

As previously described, the CAC's allegations of "extend and pretend" practices are insufficiently particular to pass muster under the PSLRA.  *See supra* at 12-14.  But just as fundamentally, no facts are pled demonstrating that Myers or Biebrich was involved in any such practices or were privy to the details of any of

---

[23]     Indeed, three (CW4, CW5 and CW7) are alleged to have left CVB by February 2010, with a fourth (CW6) by May 2010, and the former Garrett employee (CW8) left Garrett before the class period even began.  CAC ¶ 31.

1   the five referenced Garrett agreements.  There is no allegation that either had

2   knowledge, information or belief that any one of these five extensions or

3   modifications was improper, and indeed no allegation in what respect, by what

4   amount, or with what amount of effect on CVB's financial statements any of these

5   five extensions or modifications was improper.  Absent such particularized

6   allegations, mere incantation that Myers and Biebrich knew that CVB was

7   "extend[ing] and pretend[ing]" is wholly insufficient and subject to dismissal.

8       Similarly, there is no allegation that Myers or Biebrich had any awareness

9   of, or involvement in, the alleged Vintage Dairy anecdote or agribusiness internal

10  staff meetings.  *Cf.* CAC ¶ 80.  These allegations are thus not probative of scienter.

11      **2.  There are no allegations that the individual defendants were**
12      **aware of the use of "false" appraisals.**

13      The CAC alleges that the use of "false" appraisals supports an inference of

14  scienter.  *Id.* ¶¶ 83-85.  But, as explained above, there is nothing improper about

15  obtaining both an "as-is" and a "stabilized" value in appraisals of collateral.  *See*

16  *supra* at 14-15.  Moreover, the CAC offers only a single "confidential witness"

17  account to support the otherwise baseless allegation that CVB used "false appraisal

18  values . . . [to] avoid recognizing a loss."  CAC ¶¶ 83-84.  And it is not clear from

19  the CAC how the appraisal could be "false" if it was one of multiple values

20  obtained before a loss recognition decision was made by CVB management.

21  Furthermore, there is no allegation that the appraisal, however it may have been

22  used, lacked independence from an outside appraiser.  And finally, but

23  significantly, even if this incident did ultimately involve some misapplication of

24  alternative appraisal values, the CAC's account does not implicate either of the

25  individual defendants because there is no allegation whatsoever that either of them

26  knew about the issue.  *See Immersion Corp.*, 2011 WL 871650, at *6 ("[A]lthough

27  CW1 states he had disagreements with Vogel about recognizing revenue . . . CW1

28  does not state he made his complaints known to any defendant responsible for

---

Immersion's financial statements.").[24]

### 3. Allegations regarding CVB's loan committee, reports and the individual defendants' positions are not probative of scienter.

The CAC offers a number of allegations about the management of CVB. CAC ¶¶ 86-93. For example, the CAC alleges that Myers held a monthly loan committee meeting in which Biebrich and others participated, and that participants were provided a "Problem Loan Report," which was also included in materials provided to CVB's Board of Directors. CAC ¶¶ 88-92. But the CAC fails to allege the contents of these reports or other specific information of which the individual defendants were made aware that contradicted their public statements. General allegations about management meetings and internal reports, such as here, do not give rise to an inference of scienter. *See Zucco Partners*, 552 F.3d at 1000-01 ("Allegations that Digimarc's management had access to the purportedly manipulated quarterly accounting numbers, or that management analyzed the inventory numbers closely, do not support the inference that management was in a position to know that such data was being manipulated."); *New York State Teachers' Ret. Sys.*, 2009 WL 3112574, at *11 ("The allegations are lacking in specificity regarding precisely what information was reported . . . and how Defendants' statements can be judged to be materially false in light of those practices."); *Downey II*, 2009 WL 2767670, at *9 n.6 ("Plaintiff again fails to allege with particularity what information any Individual Defendant received or reviewed, or how that information demonstrates that any particular alleged false statement was made intentionally or with deliberate recklessness.").

The CAC also alleges that defendant Myers was reported to have said, regarding particular troubled loans, that "[w]e certainly are aggressively looking at

---

[24] Similarly, there is no allegation that either of the individual defendants had any awareness of alleged "traced" signatures and "backdated account documents" allegedly reported by an anonymous witness (CAC ¶ 85).

1  this stuff all the time." *See, e.g.*, CAC ¶ 87. If anything, this public recognition of

2  troubled loans tends to negate an inference of scienter regarding the alleged

3  concealment of the same. *New York State Teachers Ret. Sys.*, 2009 WL 3112574,

4  at *14 ("The public disclosure of the company's problems and its efforts to address

5  those problems (no matter how inadequate the efforts ultimately proved to be)

6  weighs against a conclusion that, taken together, the [defendants] knowingly or

7  recklessly made misleading public statements."). And, "[t]aken as a whole," the

8  CAC's allegations "do not give rise to a 'strong inference' that, at the time they

9  made the statements, defendants knew or should have known that the state of

10  affairs was much worse than they had acknowledged publicly." *Patel* v. *Parnes*,

11  253 F.R.D. 531, 559-60 (C.D. Cal. 2008) (emphasis omitted).

### 4.  The allegation that Garrett was CVB's largest borrowing relationship does not support an inference of scienter.

14  It is emblematic of the entire CAC that plaintiffs nowhere connect their

15  vague allegations of "extend and pretend" practices to either of the individual

16  defendants. The allegations that Garrett was CVB's largest borrowing relationship

17  and Myers publicly recognized it as such and may have known Paul Garrett (CAC

18  ¶¶ 94, 96-97) do not remotely meet that standard.[25] The allegation that Garrett was

19  "regularly" discussed during loan committee meetings (*id.* ¶ 97) is similarly

20  unavailing, because there is no allegation that the individual defendants were made

21  aware of a single fact that would have called into question CVB's accounting for

22  the Garrett loans.[26] If anything, the fact that the outside auditors at KPMG and the

---

23  [25]      Moreover, the allegation attributed to CW8 (a former Garrett employee) that

24  top executives *at the Garrett organization* "directly negotiated loans with CVB" (*id.* ¶ 95) is nothing but an exercise in misdirection.

25  [26]      The allegation attributed to CW5 that "back in 2008 the Garrett loans were

26  'going sideways'" and "[d]efendants waited to publicly disclose the troubled status . . . [so] that they could build up [the allowance]" (*id.* ¶ 41) is manifestly

27  unreliable. CW5 was removed from defendant Myers by at least four degrees in the supervisory chain, apparently worked at a branch office (though the branch is

28  not specified) and did not evidently have any substantial connection to the Garrett

FDIC had been regularly reviewing the Garrett loans because they represented the largest single credit exposure in the bank would suggest that the individual defendants had reason to take comfort that those loans were accounted for correctly.  What is certain, however, is that the CAC comes nowhere near a specific factual allegation that the individual defendants were ever shown or told otherwise.

The CAC's lone factual allegation that any individual may have known or suspected that CVB was accounting incorrectly for any of the Garrett loans is too vague and conclusory to sustain the complaint.  CW1 alleges that "at least as early as 2008," CVB's Chairman "asked questions regarding one or more loans to Garrett that were approved the prior month." *Id.* ¶ 97.  This "prompted" CW1 to check for the source of "the funds" deposited into Garrett's checking account. *Id.* CW1 allegedly discovered that the cash had been "round-tripped," apparently meaning that CVB had "transferred advances from Garrett's line of credit into Garrett's checking account." *Id.* (emphasis omitted).  The CAC further alleges that the "cash balance then looked good in write-ups and during reviews of the loans." *Id.*

This allegation, even if assumed true for purposes of a motion to dismiss, omits the details that would support any inference, not to mention a "strong inference," of scienter.  It is not clear what is meant by "at least as early as 2008"; no specific date for this alleged event is provided.  We are also not told what the Chairman allegedly asked or why such questioning "prompted" CW1 to investigate.  But more fundamentally, notwithstanding the CAC's characterization of "round-tripped" cash, there is nothing necessarily improper about a transfer from an existing line of credit to a bank account.  For instance, there is no allegation that Paul Garrett misled CVB as to how he planned to use the loan

relationship.  *Cf. id.* ¶ 31(e); *see also Zucco Partners*, 552 F.3d at 995-97; *Downey II*, 2009 WL 2767670, at *9-*10; *Downey I*, 2009 WL 736802, at *12-*13.

1   proceeds, or that the use of the loan proceeds in such a fashion was anything other

2   than a matter of convenience.  Nor, significantly, does the CAC allege that CVB

3   improperly increased the principal owed at the end of the loan term (which is how

4   the CAC describes the vice of "extend and pretend" (*id.* ¶ 47)).  Beyond this, no

5   details are provided about the "write-ups" and "reviews" for which this cash

6   balance was supposedly relevant, and there is no allegation that CVB ever made

7   any *public* statement as to the cash balance of Garrett's checking account.  Finally,

8   after CW1 made this discovery, there is no allegation that CW1 informed Myers or

9   Biebrich (or anyone else, for that matter).  Thus, absent any such details as to the

10  impropriety of the use of these loan proceeds, this anecdote is not remotely

11  probative of scienter as to CVB or the individual defendants.  *See, e.g., Sharenow*,

12  385 Fed. Appx. at 716;  *Zucco Partners*, 552 F.3d at 1000-01; *Immersion Corp.*,

13  2011 WL 871650, at *6; *Pittleman*, 2009 WL 648983, at *3; *New York State*

14  *Teachers' Ret. Sys.*, 2009 WL 3112574, at *11; *Downey II*, 2009 WL 2767670, at

15  *11; *Impac Mortg.*, 554 F. Supp. 2d at 1099-1100.[27]

16          Plaintiffs have filed this lawsuit in the hope that the mere size of the Garrett

17  lending relationship and the amount of the write-offs taken after the end of the

18  class period will suffice to get them past a motion to dismiss.  But when one reads

19  their complaint carefully, one is struck by the lack of any factually specific

20  allegation that either individual defendant knew of, or recklessly disregarded,

21  information at odds with CVB's public statements.

22

23

24  _____

25  [27]    Also not indicative of scienter is the CAC's allegation that CVB lied in its
        September 9, 2010 press release when it said it "only learned about Garrett's

26  financial troubles in August 2010, when Garrett called and told them."  CAC
        ¶ 111.  What CVB actually said was that its largest borrower "[r]ecently . . .

27  informed [CVB] that they were not able to make principal and interest payments
        on their loans as scheduled and wanted to negotiate an alternative repayment

28  schedule."  9/10/10 Form 8-K.

### 5. The alleged GAAP violations do not support an inference of scienter.

As above, the allegations of accounting errors are overwhelmingly conclusory and dependent upon the CAC's otherwise discredited allegations. *See supra* at 16-20. And the unsupported allegations of violations (CAC ¶¶ 98-123) of a "laundry list of generic GAAP requirements" are "inadequate to support a strong inference of scienter." *Downey I*, 2009 WL 736802, at *12; *see also Downey II*, 2009 WL 2767670, at *12 ("Such violations . . . must be augmented by other specific allegations that defendants possessed the requisite mental state.").[28] Furthermore, CVB's independent auditor expressed an unqualified opinion on each of the relevant financial statements in CVB's annual reports. *See supra* at 9. Such opinions are "highly probative" of the absence of scienter with respect to alleged GAAP violations. *Hansen*, 527 F. Supp. 2d at 1157-58; *see also Metzler*, 540 F.3d at 1068-69 ("The TAC does not allege that Corinthian's external auditors counseled against the practice."); *Wet Seal*, 518 F. Supp. 2d at 1166 ("[T]he Deloitte approval weighs against scienter as well.").

### B.     The CAC offers no motive for defendants' alleged fraud.

The requirement under the PSLRA is to plead a "cogent" inference of scienter that is at least as compelling as any opposing inference of non-fraudulent intent. *Tellabs*, 551 U.S. at 314. Here, the CAC's failure to allege a compelling motive on the part of the individual defendants for engaging in the alleged fraud undermines any inference of fraudulent intent. *Cf. Matrixx Initiatives, Inc.* v. *Siracusano*, 131 S. Ct. 1309, 1324 (2011) ("The absence of a motive allegation, though relevant, is not dispositive.") (citation omitted).

---

[28]     Additionally, CVB's expanded disclosure in its FY10 Form 10-K, as required by newly effective GAAP rules (*see supra* at 18-19), cannot serve as a basis for a finding of scienter. *See Zucco Partners*, 552 F.3d at 1003 n.6 (language changes as a result of changed SEC rules "cannot be indicative of scienter.").

## 1. Limited trading by insiders negates an inference of fraud.

The CAC alleges that, during the class period, defendant Biebrich sold approximately half the shares he held at the start of the class period for $565,618. CAC ¶ 125. But the CAC also recognizes that CVB announced Biebrich's retirement near the end of the class period. *Id.* ¶ 25. Thus, Biebrich's sales are hardly surprising and do not support an inference of scienter. *See Ronconi*, 253 F.3d at 435 ("A corporate insider may sell stock to fund major family expenses, diversify his portfolio, or arrange his estate plan."). And that other insiders, particularly defendant Myers, did not make substantial sales of stock during the period further undermines any inference of improper motive on the part of Biebrich. *See Metzler*, 540 F.3d at 1067 ("We typically require . . . corroborative sales by other defendants — to allow insider trading to support scienter.").

Certainly not indicative of scienter are the modest sales by defendant Myers alleged during the class period. Specifically, Myers is alleged to have sold 18,500 shares for $180,889. CAC ¶ 126. This amounts to a mere 5.6% of the 333,000 shares held by Myers at the beginning of the class period.[29] If anything, such modest sales and substantial continued holdings "tend to negate" an inference of fraud. *Vantive*, 283 F.3d at 1094; *see also Metzler*, 540 F.3d at 1067 ("We typically require larger sales amounts . . . to allow insider trading to support scienter."); *Hansen*, 527 F. Supp. 2d at 1160 ("[A]ny inference of scienter is defeated when an insider sells only a portion of his stock holdings and 'end[s] up reaping the same large losses as did' Plaintiff when the stock price dropped.").

Moreover, there is nothing suspicious about the fact that Myers did not make sales in the year preceding the class period. Though the CAC alleges that Myers acquired 258,000 shares in that year (CAC ¶ 126), it does not allege that Myers

---

[29]   *See* CVB Financial Corp., Statement of Changes in Beneficial Ownership (Form 4) (Christopher D. Myers) (Feb. 26, 2010) (Ex. R) (indicating 320,000 shares remaining after the sale of 13,000 shares on February 24, 2010).

1   held a significant volume of salable shares prior to that acquisition.[30]  Thus, it

2   makes perfect sense that Myers sold a small portion of his suddenly much larger

3   stock holdings during the class period.  *See In re Silicon Graphics, Inc. Sec. Litig.*,

4   183 F.3d 970, 987 (9th Cir. 1999) ("[A]lthough Kelly had never before sold such a

5   large quantity of stock, he had only been with SGI for a year and had no significant

6   trading history for purposes of comparison.").  For the same reason, no impropriety

7   can be inferred from Myers's adoption of a 10b5-1 plan to pay income taxes

8   related to the vesting of his restricted stock grants and the small sale of 5,500

9   shares pursuant to such plan during the class period (CAC ¶ 126).

10                **2.  The alleged corporate aspirations do not constitute motive.**

11          The CAC implies that the alleged misstatements were intended to help CVB

12   with its "growth strategy" by facilitating FDIC-assisted acquisitions (though none

13   occurred during the class period).  *See* CAC ¶¶ 4, 33.  But such general corporate

14   aspirations do not support an inference of fraud.  *See Zucco Partners*, 552 F.3d at

15   1006; *ECA & Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan*

16   *Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009).

17                          *          *          *

18          Unable to plead facts giving rise to a strong inference of scienter, the CAC

19   cobbles together unsupported, conclusory and often altogether irrelevant

20   allegations designed to disparage CVB and its employees.  This effort fails to

21   satisfy the pleading requirements of the PSLRA.  For even if the facts set forth in

22   the CAC were deemed to support any inference of scienter, that inference would be

23   less strong, cogent and compelling than the competing inference — namely, that

24   CVB managed its loan portfolio through a catastrophic real estate downturn in part

25   _____

26   [30]     Moreover, 250,000 of those shares were actually an employee stock grant on
     September 16, 2009, just before the class period.  *See* CVB Financial Corp.,

27   Statement of Changes in Beneficial Ownership (Form 4) (Christopher D. Myers)
     (Oct. 13, 2009) (Ex. Q) (indicating 250,000 shares acquired on September 16, 2009

28   for $0).

1    by trying to maximize its recovery from its largest borrower.  In sum, far from

2    committing securities fraud, CVB got Garrett to keep paying off his loans and

3    reducing CVB's overall principal exposure and, by so doing, avoided losses that

4    would have been far greater than they were.

5    **III.    The CAC Does Not Adequately Allege Loss Causation.**

6        In *Dura*, the Supreme Court announced that a plaintiff complaining of

7    violations of section 10(b) and Rule 10b-5 must allege "'loss causation,' *i.e.*, a

8    causal connection between the material misrepresentation and the loss."  544 U.S.

9    at 342, 346-47.  And, as the Ninth Circuit has explained, a contention that the

10   market "understood" a statement precipitating a loss as "a coded message revealing

11   the fraud" is plainly insufficient.  *Metzler*, 540 F.3d at 1064.

12   **A.    The stock drop manifestly resulted from the announcement of an
13        SEC subpoena and not from any corrective disclosure.**

14       On August 9, 2010, after the close of the market, CVB announced that it had

15   received a subpoena from the SEC.  CAC ¶ 128.  CVB's disclosure summarized

16   the SEC's requests and also expressly disclosed that SEC correspondence

17   accompanying the subpoena stated that "[t]he investigation does not mean the

18   [SEC has] concluded that [CVB] or anyone else has broken the law."  *See supra* at

19   5.  On August 10, 2010, CVB shares opened down 19% at $8.35 per share before

20   hitting a low of $7.75 per share and closing at $8.00 per share, down 22% from the

21   previous close.  *See* CAC ¶ 130; Ex. BB.

22       The CAC's allegations of loss causation are much like the loss causation

23   allegations rejected in *In re Maxim Integrated Products, Inc. Securities Litigation*.

24   639 F. Supp. 2d 1038, 1046-47 (N.D. Cal. 2009).[31]  In *Maxim*, the defendants were

25   accused of fraudulently backdating stock options.  *Id.* at 1042-43.  Plaintiffs

26   identified a number of allegedly corrective disclosures, including:  (i) analyst

27   reports highlighting a potential options backdating issue; (ii) an announcement by

28   _____

[31]    Notably, the CAC does not even mention the words "loss causation."

the defendant corporation that the SEC was conducting an inquiry into options backdating; (iii) an announcement of the receipt of a U.S. Attorney subpoena asking for documents about options grants and practices; and (iv) a subsequent analyst report highlighting the backdating exposure. *Id.* at 1046. The court found that, while these disclosures provide notice of the "risk" of "future corrective information," they do not themselves "reveal the alleged fraud." *Id.* at 1046-47. Thus the court held the statements were not "corrective disclosures" sufficient to serve as the basis for loss causation. *Id.*; *see also Metzler*, 540 F.3d at 1064 (loss causation not pled where a defendant's disclosure merely "reveals a 'risk' or 'potential' for . . . fraudulent conduct."); *Hansen*, 527 F. Supp. 2d at 1162 (quoting *Teachers' Ret. Sys. of La.* v. *Hunter*, 477 F.3d 162, 187-88 (4th Cir. 2007)) (loss caused by announcement of SEC investigation "is not one for which the plaintiffs . . . are entitled to compensation").[32]

Here, the CAC alleges that (i) CVB announced the receipt of an SEC subpoena requesting information on its handling and disclosure of troubled loans; and (ii) analyst and news reports on the SEC subpoena discussed the possibility that previous disclosures were inadequate. CAC ¶¶ 128-36. But, as in *Maxim*, none of these "goes beyond speculation" and none can be a corrective disclosure sufficient to plead loss causation. 639 F. Supp. 2d at 1046-47.[33] Indeed, the case

---

[32]    An SEC subpoena operates very differently from the FDA "Warning Letter" described in *In re Gilead Sciences Securities Litigation*, which reflected a finding of illegal marketing practices by defendant and "chastised" defendant for the same. 536 F.3d 1049, 1052 (9th Cir. 2008). Thus, *Gilead* is inapposite.

[33]    Moreover, the analyst and news reports are even less relevant here, as all evidently postdate the August 10, 2010 stock drop. *See* CAC ¶¶ 131-36; *see also Metzler*, 540 F.3d at 1063 ("losses suffered before the revelation" are irrelevant to loss causation). Furthermore, these reports demonstrate that concerns about the risks of the Garrett relationship were already pervasive prior to the August 9, 2010 SEC subpoena announcement. *See, e.g.*, CAC ¶ 131 (quoting August 10 article referring to preexisting "skeptics" and discussion of Garrett exposure), ¶ 132 (quoting August 10 analyst report referring to "lingering concerns"). The public record further supports this point, as there have been various news and analyst

1   for loss causation here is even weaker than in *Maxim*.[34]

2   **B.   The September 9, 2010 announcement was not a corrective**
3   **disclosure.**

4   Although the CAC discusses at length the September 9, 2010 announcement
5   of the charge-off of part of the Garrett loans and the placement of the remainder on
6   non-accrual (CAC ¶¶ 137-40), this does not seem to be the basis upon which the
7   CAC claims a loss.  In any event, this announcement is no different than the
8   second announcement in *Dura*.  In *Dura*, the Supreme Court declined to find loss
9   causation based on an announcement (revealing that the FDA would not approve
10   defendant's new drug) that significantly postdated the class period and was
11   followed by only a temporary fall in stock price.  544 U.S. at 339, 347-48.  Here
12   too, there was nothing in the September 9, 2010 announcement that indicated that
13   CVB's previous disclosures were misleading.  Nor was there a significant stock
14   drop.  *See* CAC ¶ 141 (noting an intraday drop of 2.4% and a decline at the close
15   of only 0.85%).  And CVB share prices made up the *de minimis* drop almost
16   immediately.  *See* Ex. BB.  Thus, this announcement cannot serve as the basis for

---

17   reports about concerns regarding potentially problematic loans, particularly in
18   connection with the Garrett relationship, in the marketplace during and even before
19   the class period.  *See supra* at 7-8.  At most, the CAC has shown only the
      "negative characterization of already-public information," a showing insufficient to
20   demonstrate loss causation.  *In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501,
      512-14 (2d Cir. 2010).

21   [34]   Analyst speculation (post-stock drop) about what the SEC subpoena might
22   mean fails to satisfy the loss causation pleading requirements set forth in *Dura* for
      yet another reason.  While the CAC tries to characterize speculation by a few
23   selected analysts as "confirming . . . that CVB was not fully disclosing potentially
      problematic loans" (CAC ¶ 130), on their face, the reports do not do that.  For
24   example, after citing to speculation about the SEC subpoena by Fig Partners (*id.* ¶
25   135), the CAC conspicuously fails to disclose (much less quote) the analyst's
      ultimate conclusion about the issue in the same report:  "[W]e see no reason to
26   treat the [subpoena] as an impending action against the company, much less an
      admission of guilt."  Worse yet, the report goes on to state that there is "doubt as to
27   the validity of the subpoena and the ultimate outcome of the action."  Ex. W.
      Surely the stringent *Dura* standard is not satisfied by speculation, innuendo, and
28   mischaracterizations of analyst reports published after the alleged stock drop.

loss causation.

**IV.     The Section 20(a) Claim Also Fails.**

The section 20(a) claim should be dismissed summarily because the CAC has failed to adequately plead a primary violation of section 10(b).  *See, e.g., Zucco Partners*, 552 F.3d at 990.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court dismiss the CAC with prejudice.

DATED:  May 13, 2011                        Respectfully submitted,


By:   /s/  Scott Vick
_____

VICK LAW GROUP, APC
Scott Vick (No. 171944)
Jason T. Riddick (No. 235980)
Rachelle S. Torres (No. 243392)
Lital Gilboa (No. 263372)
800 West Sixth Street, Suite 1220
Los Angeles, California 90017

WACHTELL, LIPTON, ROSEN & KATZ
David M. Murphy (*pro hac vice*)
Warren R. Stern (*pro hac vice*)
Wayne M. Carlin (*pro hac vice*)
Jeffrey D. Hoschander (*pro hac vice*)

Attorneys for Defendants
CVB FINANCIAL CORP., CHRISTOPHER D. MYERS AND EDWARD J. BIEBRICH, JR.