VICK LAW GROUP, APC
    Scott Vick (No. 171944)
    Jason T. Riddick (No. 235980)
    Rachelle S. Torres (No. 243392)
    Lital Gilboa (No. 263372)
800 West Sixth Street, Suite 1220
Los Angeles, California 90017
Telephone: (213) 784-6225
Facsimile: (213) 985-7155
E-Mail: Scott@vicklawgroup.com
            Jason@vicklawgroup.com

WACHTELL, LIPTON, ROSEN & KATZ
    David M. Murphy (*pro hac vice*)
    Warren R. Stern (*pro hac vice*)
    Wayne M. Carlin (*pro hac vice*)
    Jeffrey D. Hoschander (*pro hac vice*)
51 West 52nd Street
New York, New York 10019
Telephone: (212) 403-1000
Facsimile: (212) 403-2000
E-Mail: DMMurphy@wlrk.com
            JDHoschander@wlrk.com

Attorneys for Defendants
CVB FINANCIAL CORP., CHRISTOPHER D.
MYERS AND EDWARD J. BIEBRICH, JR.

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| BARRY R. LLOYD, Individually and on Behalf of All Others Similarly Situated,<br><br>            Plaintiff,<br><br>    v.<br><br>CVB FINANCIAL CORP., et al.,<br><br>            Defendants. | Case No. CV 10-06256 MMM (PJWx)<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>Date:        June 4, 2012<br>Time:        10:00 a.m.<br>Location:   Courtroom 780 |

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 3

I.     The Garrett Relationship ......................................................................... 5

II.    CVB's Financial Statements ................................................................... 7

III.   The "Confidential Witness" Allegations.............................................. 8

ARGUMENT....................................................................................................... 9

I.     The FAC does not allege with particularity that CVB's statements
       were materially false or misleading when made ............................... 10

       A.     The FAC does not allege with particularity facts demonstrating
              that the Garrett loans were not current or performing ......................... 11

       B.     References to "continuing deterioration in the real estate
              market" as a "risk factor" were not materially misleading.................. 14

       C.     CVB's statements about underwriting quality and superiority
              relative to failed peers were neither false nor actionable..................... 15

       D.     The GAAP and financial statement allegations are vague,
              conclusory and otherwise inadequate under the PSLRA..................... 16

II.    The FAC does not raise a strong inference of scienter .................................. 19

       A.     The inadequate "confidential witness" allegations of the CAC
              are still inadequate in the FAC............................................................ 20

       B.     The new "confidential witness" allegations do not demonstrate
              knowing or deliberately reckless misconduct by either
              individual defendant............................................................................ 22

       C.     The alleged GAAP and SEC violations do not support an
              inference of scienter ............................................................................ 23

       D.     Like the CAC, the FAC offers no compelling theory of motive .......... 24

E.    Plaintiffs' other efforts to bolster the deficient scienter allegations are futile ........................................................................ 25

III.  The FAC does not adequately plead loss causation ......................................... 26

A.    The stock drop manifestly resulted from the announcement of an SEC subpoena and not from any corrective disclosure ..................... 26

B.    Other disclosures did not result in any alleged significant stock drop ............................................................................................ 28

IV.   The Section 20(a) claim also fails ................................................................... 30

V.    The FAC should be dismissed with prejudice .................................................. 30

CONCLUSION ........................................................................................................ 30

# TABLE OF AUTHORITIES

Page

**Cases**

*Alaska Elec. Pens. Fund* v. *Adecco S.A.*,
434 F. Supp. 2d 815 (S.D. Cal. 2006) ................................................ 16, 30

*Berson* v. *Applied Signal Technology, Inc.*,
527 F.3d 982 (9th Cir. 2008) ............................................................. 26 n.26

*Dura Pharmaceuticals, Inc.* v. *Broudo*,
544 U.S. 336 (2005) ................................................................................. 26

*In re Almost Family, Inc. Sec. Litig.*,
2012 WL 443461 (W.D. Ky. Feb. 10, 2012) ............................................. 27

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010) .................................................................. 15

*In re Downey Sec. Litig.*,
2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) .......................................... 23

*In re Downey Sec. Litig.*,
2009 WL 736802 (C.D. Cal. Mar. 18, 2009) ............................................. 23

*In re Gilead Sciences Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ............................................................ 27 n.27

*In re Hansen Natural Corp. Sec. Litig.*,
527 F. Supp. 2d 1142 (C.D. Cal. 2007) ............................................... 24, 27

*In re Immersion Corp. Sec. Litig.*,
2011 WL 871650 (N.D. Cal. Mar. 11, 2011) ............................................. 27

*In re LeapFrog Enterprises, Inc. Sec. Litig.*,
527 F. Supp. 2d 1033 (N.D. Cal. 2007) .............................................. 14 n.16

*In re Maxim Integrated Products, Inc. Sec. Litig.*,
639 F. Supp. 2d 1038 (N.D. Cal. 2009) .......................................... 26, 27, 28

*In re Omnicom Group, Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010) ............................................................... 28 n.28

*In re Vantive Corp. Sec. Litig.*,
   283 F.3d 1079 (9th Cir. 2002)........................................................................10, 30

*In re VeriFone Holdings, Inc. Sec. Litig.*,
   2011 WL 1045120 (N.D. Cal. Mar. 22, 2011)...............................................21 n.20

*In re Wet Seal, Inc. Sec. Litig.*,
   518 F. Supp. 2d 1148 (C.D. Cal. 2007)...................................................................24

*Lifschitz* v. *NextWave Wireless Inc.*,
   2011 WL 5839682 (S.D. Cal. Nov. 21, 2011) ...............................................22 n.21

*McCasland* v. *FormFactor Inc.*,
   2009 WL 2086168 (N.D. Cal. July 14, 2009)................................................22 n.21

*Metzler Inc. GMBH* v. *Corinthian Colleges, Inc.*
   540 F.3d 1049 (9th Cir. 2008).........................................................................passim

*Meyer* v. *St. Joe Co.*,
   2012 WL 94584 (N.D. Fla. Jan. 12, 2012)..........................................................19, 27

*N.Y.S. Teachers' Ret. Sys.* v. *Fremont Gen. Corp.*,
   2011 WL 5930459 (9th Cir. Nov. 29, 2011).............................................................30

*N.Y.S. Teachers' Ret. Sys.* v. *Fremont Gen. Corp.*,
   2009 WL 3112574 (C.D. Cal. Sept. 25, 2009).........................................................21

*Ronconi* v. *Larkin*,
   253 F.3d 423 (9th Cir. 2001)...................................................................10, 24 n.23

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ...........................................................................9 n.11, 19, 20

*Wozniak* v. *Align Tech., Inc.*,
   2011 WL 2269418 (N.D. Cal. June 8, 2011) ................................................22 n.21

*Zeid* v. *Kimberley*,
   930 F. Supp. 431 (N.D. Cal. 1996) .................................................................14 n.16

*Zucco Partners, LLC* v. *Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009)...........................................................................passim

**Statutes**

15 U.S.C. § 78u-4(b)...............................................................................passim

**Rules**

Fed. R. Civ. P. 9(b) ........................................................................10, 20

Fed. R. Civ. P. 12(b)(6) ..........................................................................19

**Regulations and Guidelines**

17 C.F.R. § 210.9-03.................................................................................18

SEC Financial Reporting Release No. 13 ..................................................18

ASC 310-40-15-5.....................................................................................18

Interagency Policy on Classification of Assets (June 15, 2004) .................11

# INTRODUCTION

As this Court observed in dismissing plaintiffs' Consolidated Class Action Complaint ("CAC"), the most compelling narrative in that previous pleading was that defendants "attempted to work with Garrett" through a progressively worsening credit crisis until — after the class period — it became obvious that The Garrett Group would be unable to meet a portion of its obligations.[1]  As defendants demonstrated in briefing the first motion to dismiss, plaintiffs' allegations showed only defendants' efforts to work with a borrower experiencing business difficulties.  Nothing in that pleading demonstrated that defendants knew that Garrett would not be able to continue paying both interest and principal on its loans.  To quote this Court: "[T]he complaint does not adequately plead the falsity of defendants' statements," and "plaintiffs' allegations do not give rise to a 'strong inference' that, *at the time they made the statements*, defendants knew or should have known that their statements were false and misleading."

This Court's original analysis and conclusions apply just as squarely to plaintiffs' amended pleading.  The First Amended Consolidated Class Action Complaint ("FAC") tells the same story.  It does not allege that Garrett was in default at the time any defendant stated the Garrett loans were performing.  It does not allege that, privately, any defendant concluded that any Garrett loan was in default or was "impaired" or should have been classified as a "troubled debt restructuring" while at the same time, publicly, such defendant stated otherwise.

Astonishingly, even with the benefit of an additional year, extensive briefing on the first motion to dismiss and this Court's thorough sixty-six page opinion granting that motion, plaintiffs have failed to address, much less remedy, the most glaring infirmities of the CAC — namely, as this Court put it, the inadequate pleading of "the falsity of defendants' statements" or the utter lack of specific allegations that "give rise to a 'strong inference' that, *at the time they made the statements*, defendants knew

---

[1]      The Garrett Group LLC and Paul Garrett are referred to herein as "Garrett."

1    or should have known that their statements were false and misleading."

2           Rather, the FAC serves up the same re-warmed fare about Garrett having

3    experienced financial difficulties throughout the class period without ever alleging

4    with particularity why or how any of defendants' public statements was false, much

5    less made with scienter.  As before, the FAC implicitly concedes (as is shown by

6    CVB's audited financial statements) that (1) Garrett continued to pay interest and to

7    amortize principal to CVB during the entire class period, (2) Garrett owed CVB less at

8    the end of the class period than before it, and (3) Garrett never made good on his

9    alleged bluff to file for bankruptcy, but instead kept current on his loans with CVB

10   throughout the class period.  As before, the FAC fails to allege any specific moment

11   during the class period when Garrett was in fact in default but when defendants

12   allegedly stated otherwise.  And as before, the FAC utterly fails to allege scienter with

13   particularity because it alleges no facts that could support a "strong inference" that

14   defendants knew or believed Garrett's loans were in default while publicly stating

15   otherwise.  Quite the contrary, given that Garrett continued to pay interest and to

16   amortize principal during the class period; continued to reduce the total amount owed;

17   and never made good on any of his alleged threats to seek bankruptcy protection, the

18   far more plausible inference from the facts alleged in the FAC is that, at each point

19   during the class period, defendants believed Garrett would continue to meet its

20   obligations to CVB.

21          To be sure, plaintiffs have done some reorganizing and rewriting, larding a few

22   of their prior allegations with additional color from "confidential witnesses," while

23   abandoning other allegations.  Plaintiffs continue to make sweeping, generalized

24   accusations about "extend and pretend," inadequate loss reserves, "troubled debt

25   restructurings" and "impairments."  But just as this Court observed in dismissing their

26   previous pleading, plaintiffs once again have failed to make a single specific

27   allegation of facts or circumstances known to CVB senior management, at any time

28   within the class period, that made any public statement false.  That negotiations with a

---

DEFENDANTS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT
OF MOTION TO DISMISS THE FAC

Case No. 10-CV-06256-MMM (PJWx)

borrower took place, that threats or bluffing or posturing may have taken place, that another lender might have made a different business judgment about Garrett's ability to meet its obligations — none of this matters in the absence of particularized allegations that these defendants made false public statements either knowingly or with reckless disregard for whether they were true.  Search as one may, nowhere in this amended pleading — just as in the previous pleading dismissed by this Court — is there a single specific allegation that any of the defendants, as of any date during the class period, *privately concluded* that the Garrett loans were "nonperforming" or in default, but *publicly stated* the loans were performing or current.  Why not?  Because if the premise of the FAC were true, CVB's independent auditor, KPMG, would not have issued three unqualified audit opinions, including one during the class period and two well after the SEC subpoena and the filing of the instant lawsuit with full knowledge of plaintiffs' allegations, and CVB would have been required by KPMG and its federal bank regulators to restate its financial statements.

Like the CAC, the FAC ultimately does no more than question the business judgments of CVB in its efforts to work with Garrett.  But that is not the stuff of a securities fraud claim.  Like the CAC, the FAC fails to plead particularized allegations — as required under the PSLRA — of how or why any statement was materially false, much less fraudulent, at the time it was made.  And for all of the reasons this Court dismissed the CAC without prejudice, the FAC should be dismissed with prejudice.

## BACKGROUND

Through its subsidiary Citizens Business Bank, CVB Financial Corporation ("CVB") provides banking services to small and midsize businesses in California's Inland Empire, Los Angeles, Orange County and Central Valley regions.  FAC ¶ 19.  Based in Ontario, California, CVB has more than $6 billion in total assets and holds loans amounting to more than $3.5 billion.  *Id.*  Defendant Christopher D. Myers is CVB's Chief Executive Officer, and defendant Edward J. Biebrich served as CVB's Chief Financial Officer until he retired in March 2011.  *Id.* ¶¶ 20, 21.

During the recent severe economic recession, the California real estate market suffered a significant slowdown, reflected in declining prices, excess inventories and increasing vacancies. *See id.* ¶ 24. Far from downplaying this, CVB cautioned its investors about the attendant risks, including additional charge-offs. *See, e.g., id.* ¶¶ 92, 108. CVB also announced substantial increases in its allowance for loan losses. Yet CVB was and remains a strong business.[2] While CVB survived the economic downturn, a number of CVB's peer banks headquartered in the same region did not. *See* FAC ¶¶ 7, 25, 163 n.12.[3]



During the purported class period (October 21, 2009 – August 9, 2010), CVB executives met with investors and analysts and addressed loan difficulties, including with respect to Garrett, a relationship that was well known to the financial community. *See, e.g.,* FAC ¶¶ 101, 115; Peter Eavis, *Bank's Bugbear: Commercial Real Estate,* Wall St. J., June 29, 2009, at C10 (Ex. Z) ("Court documents give details of some of

---

[2]   CVB reported the following net income figures for the quarters before, during and after the purported class period:  2009 Q3 – *$19.3 million*; 2009 Q4 – *$17.1 million*; 2010 Q1 – *$16.1 million*; 2010 Q2 – *$19 million*; 2010 Q3 – *$17.9 million*; 2010 Q4 – *$9.9 million*; 2011 Q1 – *$16.6 million*; 2011 Q2 – *$21 million*; 2011 Q3 – *$22.4 million*; 2011 Q4 – *$21.7 million*. FAC ¶¶ 88, 133; CVB Form 8-K at Ex. 99.1, p.2 (Jan. 26, 2010) (Ex. K); CVB Form 8-K at Ex. 99.1, p.1 (Apr. 23, 2010) (Ex. L); CVB Form 8-K at Ex. 99.1, p.1 (Oct. 22, 2010) (Ex. N); CVB Form 8-K at Ex. 99.1, p.2 (Jan. 21, 2011) (Ex. O); CVB Form 8-K at Ex. 99.1, p.1 (Apr. 21, 2011) (Ex. LL); CVB Form 8-K at Ex. 99.1, p.1 (July 21, 2011) (Ex. MM); CVB Form 8-K at Ex. 99.1, p.1 (Oct. 20, 2011) (Ex. NN); CVB Form 8-K at Ex. 99.1, p.1 (Jan. 19, 2012) (Ex. OO). Exhibits denoted herein as "Ex. [Letter(s)]" are exhibits to the concurrently filed Request for Judicial Notice ("RJN").

[3]   The chart reflects stock prices for CVB (CVBF) and its peer banks around the Inland Empire region of California, including PFF Bank (PFB), Temecula Valley Bank (TMCV), Vineyard Bank (VNBC) and 1st Centennial Bank (FCEN), until such peer banks failed. *See* Exs. BB, CC, DD, EE, FF, GG, HH, II, JJ.

---

the commercial real-estate collateral Garrett has provided, and in some cases it is land, which in the Inland Empire can be worth little."). In response to questions about Garrett, CVB executives indicated that, though classified as "substandard," the loans were current and performing as agreed. *See, e.g.*, FAC ¶¶ 101, 115; Macquarie Report on CVB at 1 (Jan. 25, 2010) (Ex. S) ("1/25/10 Macquarie Report") ("[Management] noted that the $84 mil[lion] Garrett Group credit is performing as expected, *but remains on classified status (substandard)*.") (emphasis added).

On July 26, 2010, CVB received a subpoena from the SEC and disclosed that fact in its report on Form 10-Q on August 9, 2010. *See* FAC ¶¶ 10, 172. The subpoena sought information on the handling and disclosure of troubled loans. *E.g.*, *id*. ¶ 172. CVB also reported that the correspondence from the SEC that accompanied the subpoena stated: "The investigation does not mean the [SEC has] concluded that you or anyone else has broken the law. Also, the investigation does not mean that we have a negative opinion of any person, entity or security." CVB Form 10-Q at 61 (Aug. 9, 2010) (Ex. I). The following day, CVB shares closed at $8.00 per share, down 22% from the previous close. FAC ¶ 174; Ex. BB.

The filing of this lawsuit followed shortly thereafter, on August 23, 2010. After consolidation with a subsequently filed action and appointment of lead plaintiff, the CAC was filed on March 7, 2011 [Docket No. ("DN") 31]. Defendants filed their motion to dismiss on May 13, 2011 [DN 43].[4] A hearing on the motion was held before this Court on September 1, 2011. The Court issued its order granting the motion to dismiss with leave to amend on January 12, 2012 [DN 59] ("MTD Order").

## I.   The Garrett Relationship

The FAC alleges that CVB held millions of dollars in secured loans to Paul Garrett and his real estate development firm, The Garrett Group LLC, and that this relationship was CVB's largest, reaching $85 million. FAC ¶¶ 2, 6, 12. But the FAC

---

[4]   Defendants' motion was accompanied by a memorandum of points and authorities in support [DN 44, Att. 1]. Plaintiffs filed their opposition brief on July 19, 2011 [DN 49]. Defendants filed their reply brief on August 9, 2011 [DN 54].

concedes that these loans amounted to no more than approximately 2.4% of CVB's

$3.5 billion in loans.  *Id.* ¶¶ 2, 19.[5]

Like the CAC, the gravamen of the FAC is that CVB misrepresented the quality

of the Garrett loans, while secretly extending or modifying their terms.  *E.g.*, FAC

¶ 38.[6]  But the FAC remains void of the required factual details of any particular loan

terms that were allegedly modified, yet nonetheless jumps to the conclusion that CVB

failed to properly account for the loans.  For example, the FAC alleges that the Garrett

loans were, in colloquial terms, "troubled" because of Garrett's financial difficulties

and, therefore, each modification or extension of a Garrett loan constituted, in an

accounting term of art, a "troubled debt restructuring."  *E.g.*, FAC ¶¶ 4, 30, 41, 42, 58,

66.[7]  But the FAC does not allege that CVB granted any concession, such as a

reduction to below-market interest rates or forgiveness of principal, in connection with

any such modification or extension.  And while Garrett is alleged to have been

financially "troubled" during the purported class period, the FAC does not allege that

the Garrett loans went into default or failed to perform.

A month after the purported class period, on September 9, 2010, CVB

announced that Garrett had recently informed CVB that it was no longer able to make

principal and interest payments and wanted to negotiate an alternative repayment

---

[5]      $85 million is approximately 2.4% of $3.5 billion.

[6]      According to the FAC, it is apparent that Garrett was paying down the principal
on its loan obligations from well before and throughout the purported class period.
This is evident from the allegations that the outstanding principal on the Garrett loans
declined from $85 million in September 2008 to $82 million in September 2010 just
after the end of the purported class period (FAC ¶¶ 2, 12) combined with the absence
of any allegation that this reduction in principal was due to anything other than
repayment by Garrett.  By contrast to the CAC, the FAC now de-emphasizes the
CAC's allegations of "extend and pretend," wherein, according to the CAC, "money
is 'round tripped' and never leaves the Bank, but rather it just adds to the loan balance,
while making the borrower appear current."  *Compare, e.g.*, CAC ¶¶ 12, 39, 47.
Indeed, consistent with its allegation that the principal on Garrett loan balances was
reduced in and around the class period, the FAC never alleges that CVB engaged in
any "round-tripp[ing]" of money by adding to Garrett loan balances during that time.

[7]      Though less prominent, similar allegations were included in the CAC.  *See, e.g.*,
CAC ¶¶ 12, 41, 47 & n.3.

---

schedule.  FAC ¶¶ 181-82.  In response, CVB charged off $34 million in Garrett

loans and placed the remaining $48 million on non-accrual.  *Id.* ¶ 181.  But having

long classified the Garrett loans as "substandard" — as publicly reported — and

having reserved accordingly, CVB had already allocated $24.7 million in reserves on

the Garrett loans and, therefore, CVB needed to record only a $9.3 million provision

to replenish the portion of the charge not covered by allocated reserves.  *Id.*; 1/25/10

Macquarie Report.  CVB shares closed down a negligible $0.06 following the news.

FAC ¶ 185; Ex. BB.

On March 28, 2011, CVB announced that it sold six of seven remaining Garrett

notes for $41 million, resulting in an additional charge-off of $1.9 million.  CVB

Form 8-K at Ex. 99.1 (Mar. 31, 2011) (Ex. P).  CVB further disclosed that total

charge-offs in connection with this relationship amounted to $36 million or 44% of

the ending principal balance.  *Id.*  The FAC does not allege otherwise.  On this news,

CVB shares closed up nearly 10%.  *See* Ex. BB.[8]

## II.    CVB's Financial Statements

CVB filed quarterly financial statements and annual audited financial

statements as scheduled during and after the class period.  As the recession deepened

in the years leading into the class period, CVB's financial statements reported loan

losses and allowances that increased significantly each year.[9]

Moreover, none of CVB's financial statements has been restated.  RJN § IX;

---

[8]      CVB disclosed later that it had sold the final Garrett note for $2.6 million,
ending its exposure to any Garrett loans and resulting in a small recovery, rather than
a further charge-off.  CVB Form 10-Q at 39 (Aug. 9, 2011) (Ex. PP).  The FAC does
not allege otherwise.

[9]      For calendar and fiscal years 2006, 2007, 2008 and 2009, CVB's reported
annual charge-offs were $0.2 million, $2.1 million, $6.0 million and $26.3 million,
respectively, and its reported allowances at year-end were $27.7 million, $33.0
million, $54.0 million and $108.9 million, respectively.  CVB Form 10-K at 21, 45
(Mar. 1, 2007) (Ex. A); CVB Form 10-K at 20, 47 (Feb. 29, 2008) (Ex. B); CVB
Form 10-K at 30, 57 (Feb. 27, 2009) (Ex. C); CVB Form 10-K at 28, 57 (Mar. 4,
2010) ("FY09 Form 10-K") (Ex. D).  In 2010, CVB reported annual charge-offs of
$65.5 million and an allowance of $105.3 million at year-end.  CVB Form 10-K at 33,
66 (Mar. 1, 2011) ("FY10 Form 10-K") (Ex. E).

DEFENDANTS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT
OF MOTION TO DISMISS THE FAC

Case No. 10-CV-06256-MMM (PJWx)

1  *see also* MTD Order at 30.  And KPMG, CVB's independent auditor, has issued
2  unqualified audit opinions on CVB's year-end financial statements, including for the
3  years 2009 and 2010 (the annual reports during and immediately after the class
4  period) and 2011, even after seeing plaintiffs' accounting allegations.  CVB Form
5  10-K at 83, 142 (Feb. 29, 2012) ("FY11 Form 10-K") (Ex. QQ); FY10 Form 10-K at
6  76, 128; FY09 Form 10-K at 66-67, 112.

7        Reporting progressively increasing allowances and charge-offs, the financial
8  statements are inconsistent with a theory that CVB was trying to hide loan
9  deterioration.  And the absence of any restatement belies the notion that the ultimate
10  Garrett charge-offs evidenced that the financial statements were inaccurate.

11  **III.   The "Confidential Witness" Allegations**

12        The FAC repeats some of the CAC's allegations attributed to seven
13  "confidential witnesses" identified as CVB former employees, but abandons others.
14  *Compare, e.g.*, FAC ¶¶ 22, 42, 44, 46, 89, 152, 154, 157, 158, 161, 162, 167, 215
15  *with, e.g.*, CAC ¶¶ 31, 40, 41, 43, 44, 45, 76, 80, 83, 84, 85, 88, 91, 92, 97, 171.
16  Indeed, "Confidential Witness 3" remains listed in the FAC, but not a single allegation
17  is attributed to this "witness."  *See* FAC ¶ 22.  The FAC does identify an eighth
18  former CVB employee as a new "confidential witness" ("CW12"), but does not allege
19  facts showing to whom this employee reported or whether this employee was involved
20  with the Garrett loans or communicated with the individual defendants, and, in any
21  event, offers no consequential allegations.  *See id.* ¶¶ 22, 160, 162.

22        The FAC adds some allegations attributed to unnamed former Garrett
23  employees, including Garrett's former Chief Operating Officer ("CW9").  *See id.*
24  ¶ 22.  But none of them is alleged to have met with the individual defendants.

25        With an oft-repeated misleading account, the FAC alleges that, according to
26  CW9, at two meetings between Garrett executives and CVB executives[10] in
27  September 2008 and January 2010, Garrett threatened CVB that it would file for

28

---

[10]        Biebrich is not even alleged to have been present at either of these meetings.

bankruptcy if CVB did not grant Garrett modifications. *E.g.*, FAC ¶¶ 33, 40, 71, 89, 102, 141, 142. *But the FAC never alleges that CW9 was actually present at these discussions*. Thus, CW9 did not actually hear what Garrett told CVB or how CVB responded. As a result, the FAC does not — because it cannot — allege specifically what was said in the two alleged conversations. Nor are any details of modified loan terms provided. And the FAC nowhere alleges that defendants believed that any bankruptcy threat — if there was any — was anything more than a common negotiating ploy. Thus, the most plausible inference is that defendants believed that Garrett could and would continue to meet its obligations, as it in fact did. Indeed, the FAC does not allege that Garrett ever filed for bankruptcy, even to this day, more than three years after the first alleged conversation. Finally, the other allegations attributed to Garrett former employees generally relate to internal Garrett discussions regarding its financial difficulties that did not even involve CVB. *E.g.*, *id*. ¶¶ 34-36.

These allegations add nothing to the allegations previously included in the CAC that CVB was aware that Garrett was encountering financial difficulties, a fact that was well-known (and publicly reported by the press and analysts). And they still do not show that Garrett was unable to perform on its CVB loans during the class period.

## ARGUMENT

Under the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), a court must scrutinize securities fraud complaints at the outset of the case and dismiss those that rest on conclusory or hindsight allegations of falsity, materiality and scienter. MTD Order at 32.[11] Dismissing the CAC, this Court found that "plaintiffs' allegations of falsity [were], in virtually all respects, insufficiently particular to pass muster under the PSLRA" and that "plaintiffs' allegations do not give rise to a 'strong inference' that, *at the time they made the statements*, defendants knew or should have

---

[11]    *See also* 15 U.S.C. § 78u-4(b); *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007); *Zucco Partners, LLC* v. *Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009); *Metzler Inv. GMBH* v. *Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008).

1   known that their statements were false and misleading."  MTD Order at 50, 64.  The

2   FAC is substantively identical and should be dismissed for the same reasons.

3        Finding that the CAC was subject to dismissal for failures to adequately plead

4   falsity and scienter, the Court declined to address plaintiffs' loss causation allegations.

5   *Id*. at 33, 64 n.197.  But since, manifestly, the loss alleged was due to the

6   announcement of an SEC subpoena — as opposed to any financial or loan disclosure

7   corrective of previous misstatements — the FAC also warrants dismissal for failure to

8   allege loss causation.

9   **I.    The FAC does not allege with particularity that CVB's statements were**

10  **materially false or misleading when made.**

11       "A securities fraud claim cannot survive a motion to dismiss … merely by

12  alleging that certain statements were false."  MTD Order at 31 (citations omitted).

13  Rather, a complaint must allege specific contemporaneous information showing the

14  statements at issue were materially false when made.  *See* 15 U.S.C. § 78u-4(b)(1);

15  Fed. R. Civ. P. 9(b).  Courts must dismiss complaints that fail to meet this

16  requirement.  *E.g.*, MTD Order at 31-32; *Zucco Partners*, 552 F.3d at 990-91;

17  *Metzler*, 540 F.3d at 1070; *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1087 (9th

18  Cir. 2002); *Ronconi* v. *Larkin*, 253 F.3d 423, 431 (9th Cir. 2001).

19       The FAC (¶ 87) purports to rely upon "four categories" of falsity allegations:

20       1.  Indications that the Garrett relationship was current and performing;

21       2.  Characterizations of deterioration in the real estate market as a "risk

22           factor";

23       3.  Assurances regarding CVB's credit quality and underwriting culture,

24           particularly by comparison to CVB's peers; and

25       4.  Various accounting judgments and related disclosures.

26  None of these is new; all were in the previous complaint and were found wanting by

27  this Court.  *Compare* FAC ¶ 87 *with* MTD Order at 33-50.  Like the CAC, the FAC

28  fails to plead with particularity that CVB's statements were false when made.  Thus,

---

DEFENDANTS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT
OF MOTION TO DISMISS THE FAC

- 10 -

Case No. 10-CV-06256-MMM (PJWx)

1  the FAC should be dismissed for failure to allege material misstatements.[12]

2      **A.**     **The FAC does not allege with particularity facts demonstrating that the Garrett loans were not current or performing.**

4      The FAC contests CVB's alleged statements that the Garrett loans were

5  "performing as agreed" or "performing as expected." But the FAC takes these

6  statements completely out of context and ignores that it was well-known that Garrett

7  was having financial difficulties. As just one egregious example: the FAC selectively

8  and misleadingly quotes part of a sentence from a January 25, 2010 analyst report

9  saying that "management noted that the $84 million Garrett Group credit is

10  performing as expected" (FAC ¶ 115), but that full sentence ends with the clause —

11  omitted from the FAC — "*but remains on classified status (substandard)*." 1/25/10

12  Macquarie Report (emphasis added). And a "substandard" loan is one for which there

13  is a "distinct possibility that the institution will sustain some loss if the deficiencies

14  are not corrected." *See, e.g.*, Interagency Policy on Classification of Assets and

15  Appraisal of Securities (June 15, 2004) (Ex. SS).[13] Thus, the allegations in the FAC

16  regarding Garrett's financial difficulties are not inconsistent with CVB's public

17  statements.[14]

18      The FAC emphasizes that Garrett was encountering financial difficulties before

19  and during the class period. But the CAC emphasized this same fact, and this Court

20  explicitly took that fact into account in finding falsity insufficiently pled. As this

---

[12] And since the certifications of CVB's financial statements (*see, e.g.*, FAC ¶¶ 20, 21, 49, 96-97, 112, 114, 125, 128) would only be false if financial statements were false, this tag-along misstatement claim fails as well.

[13] Of course, a "substandard" classification is not the more serious "doubtful" classification and does not necessarily mean a loan is impaired. *See, e.g.*, *id.* But the fact that senior management took such care to be precise with these classifications (i) negates any inference of scienter and (ii) explains why, even with 20/20 hindsight and knowledge of plaintiffs' previous complaint, KPMG continued to issue clean audit opinions and required no restatement.

[14] As this Court recognized, that CVB "made a different decision" than other lenders that foreclosed on Garrett (FAC ¶ 39) "does not necessarily render its earlier statements materially false." MTD Order at 38.

Court explained, "the fact that Garrett began discussing a restructuring of its loans with CVB … does not alone demonstrate the falsity of CVB's representations."  MTD Order at 35.  This is because, the Court wrote, "Garrett could have been current but seeking relief from the debt burden it was carrying."  *Id.* at 35.

Faced with this ruling, one would expect plaintiffs, in their amended attempt to state a claim, to allege how and why the Garrett loans were not current and not performing as agreed when the allegedly false statements were made.  This, the FAC does not do.

The FAC does not allege, as the PSLRA plainly requires, (a) which loans became delinquent or ceased to perform; (b) when such loans became delinquent or ceased to perform; (c) how long such loans remained delinquent; (d) when such loans fell into default (i.e., following more than 90 days delinquency (*see* FAC ¶ 64)); or (e) how much past-due interest was owed on such loans.  Like the CAC, the FAC fails even to allege *generally* that any Garrett loan had ever become significantly delinquent, let alone had fallen into default or met the criteria for being classified as nonperforming.

And, as this Court previously ruled, the FAC's oft-repeated yet vague allegations of Garrett's bankruptcy threats do not render false CVB's statements that the Garrett loans were current and performing as agreed.  They add nothing to the idea that CVB knew that Garrett was in financial difficulty and worked with Garrett to get it through a difficult period, an approach that this Court recognized as a valid, non-deceptive banking practice.  *See, e.g.*, MTD Order at 37, 64.

In any event, these allegations are too vague and unreliable to be credited under the PSLRA.  Although found throughout the FAC, they are specifically attributed to only one "confidential witness," "CW9."  *E.g.*, FAC ¶¶ 3, 4, 33, 40.  According to the FAC, the threats were conveyed to CVB at a meeting in or around September 2008 and at a meeting in January 2010.  But — in a glaring omission — the FAC does not allege that CW9 was actually present at either of these meetings; to the contrary, when

parsed carefully, the FAC reveals that CW9 did not attend either of these meetings. *See supra* at p.9.  Allegations about these meetings must, therefore, be discounted. *See, e.g.*, MTD Order at 36 (citing *Zucco Partners*, 552 F.3d at 995-96).  The FAC does not allege with particularity what was said to CVB at any particular time. Indeed, while the FAC repeats the word "bankruptcy" more than thirty times, *the FAC does not tell if that word was ever spoken at either of the two alleged meetings*.  Nor, most importantly, does the FAC allege anything as to what CVB executives said to Garrett in response or concluded privately or internally.  Beyond this, the FAC does not even allege any specific modification of the loans following the alleged January 2010 meeting.

Put simply, the FAC fails to allege with particularity facts demonstrating that at any time during the class period, Garrett ever caused CVB's management to conclude that Garrett could not or would not repay the principal and interest on its outstanding loans.  And, in fact, throughout the class period Garrett (a) continued to pay market-rate interest and to amortize principal, (b) reduced rather than increased the total amount owed, (c) is not alleged by plaintiffs to have ever been seriously delinquent, much less in default or nonperforming, and (d) even to this day has not filed for bankruptcy.  Each of these points demonstrates that, throughout the class period, CVB's senior management had every reason to view Garrett's threats and bluster as a negotiating ploy — and that, far from being engaged in an "extend and pretend" scheme, CVB's management fully expected to be repaid by Garrett.[15]

---

[15]    Although the FAC does allege that there were "repeated modifications" of Garrett loans (*see, e.g.*, FAC ¶¶ 8, 38), the FAC does not allege with particularity how the terms were modified.  As this Court has already recognized, allegations that these modifications were accomplished at a time when Garrett was facing financial difficulties do not equate to a showing that CVB "knew that Garrett would not be able to repay its loans."  MTD Order at 37.  Rather, as this Court explained, "[i]t is possible — as is sometimes the case with borrowers who encounter financial difficulties — that the Bank merely sought to help Garrett through a difficult period, or as defendants put it, 'an unprecedented market collapse,' so that it could continue to pay the loans."  *Id*. at 37.  In short, the FAC fails to allege with particularity that Garrett was not current or not performing on any of its CVB loans at the time any alleged misstatements were made.

---

**B.      References to "continuing deterioration in the real estate market" as a "risk factor" were not materially misleading.**

Like the CAC, the FAC alleges that CVB's references to "continuing deterioration in the real estate market" as a "risk factor" for additional losses were misleading because "the purported 'risk' had already come to fruition."  *See, e.g.*, FAC ¶¶ 92-93.  But as the FAC itself relates, "[b]y the start of the Class Period … land and developed real estate prices were plummeting in the geographic region in which CVB did business."  *Id*. ¶ 24.  And the impact of the real estate recession on CVB's loans was abundantly evident in advance of and during the purported class period.  For example, during the class period on March 4, 2010, in its FY09 Form 10-K, CVB reported that annual charge-offs had increased more than 400% from $6.0 million in 2008 to $26.3 million in 2009.  *See supra* at n.9.

Nevertheless, the FAC — like the CAC — takes issue with the use of the words "could" and "in the future."  *E.g.*, FAC ¶¶ 92-93.  But the FAC itself admits that CVB's disclosures made it clear that any such "future" losses and charge-offs would be *in addition* to the losses and charge-offs CVB had already reported as a result of the downturn.  *See, e.g.*, *id*. ¶ 108 ("The Bank's Form 10-K disclosed as a purported 'risk factor' that the Bank 'may be required to make *additional* provisions for credit losses and charge off *additional* loans in the future.") (emphasis added).  In any event, it was no secret that CVB's loans were negatively affected by the economic decline. As this Court recognized, CVB disclosed, e.g., that "[t]he economic downturn has had an impact on [its] market area and [its] loan portfolio."  MTD Order at 40 (citing FY09 Form 10-K at 49).  As thus evident, it was perfectly appropriate for CVB to caution investors regarding the "risk" of "continuing deterioration."  Certainly, there was nothing materially false or misleading about such disclosures.[16]

The FAC also attacks CVB's statements that it did not have "serious doubts" concerning the ability of borrowers to repay their loans.  *See, e.g.*, FAC ¶¶ 8, 90, 91,

---

[16]      *See also In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1048 (N.D. Cal. 2007); *Zeid* v. *Kimberley*, 930 F. Supp. 431, 437 (N.D. Cal. 1996).

112, 113.  But as this Court held in dismissing the CAC, "[w]hile the Garrett loans might thus have been loans about which defendants had 'serious doubts' concerning ability of the borrower to pay, the complaint does not provide sufficient facts to support an allegation that this statement in the Form 10-K was false at the time it was made."  MTD Order at 40.

The FAC does not alleviate this deficiency.  Although, as discussed above, the FAC vaguely alleges, based on the account of a single "confidential witness," that Garrett may have threatened bankruptcy to negotiate loan term modifications, that Garrett former employee was not actually present for any such meetings or discussions.  *See supra* at p.9.  And the other added allegations attributed to former Garrett employee "confidential witnesses," which address *internal* Garrett accounts in connection with Garrett's financial condition (*see, e.g.*, FAC ¶¶ 34-36), are completely irrelevant to what CVB knew at the time of its statements.  Thus, like the CAC, the FAC fails to allege particularized facts demonstrating that CVB's statements were false when made.

## C.   CVB's statements about underwriting quality and superiority relative to failed peers were neither false nor actionable.

This Court held that the CAC "contain[ed] no facts indicating a significant increase in defaults or delinquencies during the class period, no evidence of CVB's underwriting practices and the manner in which they were violated during the class period, and no data regarding CVB's loan holdings that corroborates the testimony of the [confidential witnesses]."  MTD Order at 44.  Thus, the Court held that the CAC's allegations of falsity regarding CVB's statements about the strength of its credit quality and underwriting were insufficient under the PSLRA.  *Id*. at 40-45.

Similarly, the Court held that the CAC's allegations regarding CVB's statements favorably comparing CVB to its failed competitors were mere puffery that was "not actionable."  *Id*. at 45; *see also In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) ("investors do not rely on vague statements of optimism").  This Court

also held that "the failure of many of CVB's competitors tends to weigh against a finding that the statements were false at the time they were made."  MTD Order at 45.

Nevertheless, the FAC repeats these deficient allegations.  *See, e.g.*, FAC ¶¶ 7, 99.  But the FAC still fails to demonstrate the falsity of defendants' statements when made.  Moreover, CVB continues to thrive, whereas its competitors are long gone.

## D.     The GAAP and financial statement allegations are vague, conclusory and otherwise inadequate under the PSLRA.

Lacking particularized allegations demonstrating the falsity of CVB's statements, the FAC offers a litany of citations to alleged GAAP and SEC accounting guidelines.  As in the CAC, the accounting allegations in the FAC fail because they (a) are dependent on the otherwise inadequate falsity allegations, and (b) lack the requisite particularity required for such allegations under the PSLRA.  *See* MTD Order at 46-47.  "These allegations are conclusory and do not satisfy the PSLRA." *See id.* at 46 n.147.  For example:

> 1.  The FAC does not adequately allege GAAP violations with respect to loss reserves or charge-offs.

The FAC alleges that defendants understated CVB's loan loss reserves (allowance for loan and lease losses or "ALLL") and charge-offs and, therefore, overstated profits.  *E.g.*, FAC ¶¶ 6, 27, 29, 30, 31.  But bare allegations that CVB's allowances were inadequate are "insufficient 'because even reasonable predictions turn out to be wrong.'"  MTD Order at 43 (quoting *Alaska Elec. Pens. Fund* v. *Adecco S.A.*, 434 F. Supp. 2d 815, 823 (S.D. Cal. 2006) *aff'd sub nom. In re Adecco Sec. Litig.*, 2007 WL 4142984 (9th Cir. Nov. 20, 2007)).  To state a claim with particularity, allegations regarding understated reserves must "include details," among other things, about "when and to what level" the loans should have been written down and "when and to what level the allowance should have been changed."  *See id.*  None of these details is alleged in the FAC.

Dismissing the CAC, this Court held that "plaintiffs simply have not alleged

1  adequate facts to show that defendants' loan loss reserves were false or misleading."

2  *Id*. at 43.  Yet plaintiffs rehash the same deficient allegations here.  For example, the

3  FAC's allegations about appraisals with multiple estimates of value are just as

4  inadequate as they were in the CAC.  As the Court recognized, there is nothing

5  inherently suspect about appraisals that include multiple estimates of value.  *See id*. at

6  42 & n.139.

7      The FAC's other property valuation allegations are similarly unavailing.  For

8  example, the FAC's allegations about Garrett collateral and the carrying value on

9  *Garrett's* books,[17] as well as certain alleged property tax deficiencies (*see, e.g.*, FAC

10  ¶¶ 47-48) offer no particularized facts about CVB's practices regarding estimates of

11  value in appraisals, the setting of loan loss reserves or charge-offs.  And the FAC's

12  allegation that CVB says it "strive[s] to have a maximum loan-to-value ratio of 65-

13  75%" (*e.g.*, *id.* ¶ 43) is completely irrelevant.  The FAC does not even attempt to

14  demonstrate how many of CVB's loans exceeded that ratio, much less that CVB did

15  not strive to achieve that objective.

16      2.  Terms like "troubled debt restructuring" and "impaired" do not remedy
17          the FAC's deficiencies and are no substitute for factual allegations.

18      The FAC frequently uses terms like "impaired" and "troubled debt

19  restructuring."  But the FAC does not allege with sufficient particularity that the

20  Garrett loans constituted "troubled debt restructurings" and were, therefore,

21  "impaired."

22      The FAC baldly alleges that each "modification" was "made to accommodate

23  borrowers' existing loans" and "because" of this each was "required to be accounted

24

25  _____

26  [17]   The FAC's confusing allegation referring to the value on CVB's books of one
    of the many Garrett properties serving as collateral, the Empire Corporate Center, is
27  attributed to a Garrett former employee and is inherently contradictory.  *See* FAC
    ¶ 47.  And the allegation from the same Garrett former employee that two CVB
    financed Garrett developments were vacant similarly says nothing about whether
28  Garrett was meeting its obligations or whether CVB appropriately set reserves at the
    time.  *See id.* ¶ 37.  These allegations are, therefore, plainly unreliable and irrelevant.

for as a 'troubled debt restructuring.'"  FAC ¶ 30.  But a "troubled debt restructuring" requires two elements:  (1) a debtor's financial difficulties, *and* (2) a "concession" granted to the debtor "that it would not otherwise consider" as a result.  *See* ASC 310-40-15-5 (Ex. TT).  The FAC fails to allege with particularity any such required "concession."  To the contrary, rather than, for example, alleging with particularity that Garrett secured a concession of forgiveness of principal or a substantial reduction of interest rates, the FAC alleges that CVB obtained additional collateral for certain modifications.  *See, e.g.*, FAC ¶ 38.

Likewise, the FAC alleges that "[i]n a 'troubled debt restructuring,' for accounting purposes, CVB's loans had suffered a collective loss in value and thus, were 'impaired.'"  *Id*. ¶ 41 (emphasis omitted).  But the premise is lacking because the FAC does not adequately allege that any of the alleged modifications amounted to a "troubled debt restructuring."  In any event, the FAC does not allege that CVB had ever determined at the time of any alleged misstatement that Garrett would be unable to repay its loans in full, including both principal and interest (i.e., that the loans were impaired).  As in the CAC, plaintiffs merely attempt to impose their 20/20 hindsight in place of the good faith credit judgments at the time of CVB management, as repeatedly validated by its auditors and bank regulators.  This is plainly insufficient to demonstrate falsity of defendants' statements at the time they were made.

        3.   CVB was not obligated to specifically describe the Garrett relationship in its SEC filings.

The FAC alleges that CVB was required to include a specific description of Garrett relationship risk in its SEC filings and cites to certain SEC guidance and GAAP materials.  FAC ¶¶ 81, 82, 83.  But this guidance did not require any such specific description.  For example, SEC Regulation S-X Rule 9-03 ¶ 7(a), cited by the FAC, purports to require under certain circumstances only that total loans for certain loan "*categories*" be separately disclosed.  17 C.F.R. § 210.9-03.  And SEC Financial Reporting Release No. 13 (Ex. RR), also cited by the FAC, addresses loan

concentrations "exceeding 10% of total loans," a threshold not nearly met here with the Garrett relationship, which amounted to only 2.4% of CVB's loan portfolio.  *See supra* at pp.5-6.[18]

### 4.  The other GAAP and SEC regulation allegations also fail.

"'A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet th[e] standard [set forth in the PSLRA].'"  *See* MTD Order at 46 (quoting *Metzler*, 540 F.3d at 1070).  And nothing is gained from the FAC's reliance on the allegation that CVB "[c]hanged [i]ts [d]isclosure [p]ractices" in its 2010 Form 10-K after the class period. FAC V.C.6. at p.39, ¶ 86.  Simply stated, "[c]hanging the way certain disclosures were made in 2010 does not necessarily indicate that prior disclosures violated GAAP."  *Meyer* v. *St. Joe Co.*, 2012 WL 94584, at *11 (N.D. Fla. Jan. 12, 2012).

## II.    The FAC does not raise a strong inference of scienter.

To plead scienter under the PSLRA, a plaintiff must "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *Tellabs*, 551 U.S. at 314 (quoting 15 U.S.C. § 78u-4(b)(2)).  At a minimum, this requires a mental state of deliberate recklessness approaching actual intentional misconduct.  MTD Order at 33 (citations omitted); *Zucco Partners*, 552 F.3d at 991.  Yet nothing in the FAC shows the requisite deliberate recklessness approaching intent to deceive.  Consistent with the legislative objective of curbing abuses of the private securities fraud action, this "exacting" pleading standard is not a burden to be taken lightly.  *Tellabs*, 551 U.S. at 313, 320-21.  To the contrary, a

---

[18]      The Court previously held that the CAC failed to demonstrate material misstatements on the basis of alleged violations of SEC regulations, such as Regulation S-K, Item 303.  MTD Order at 49-50 (citations omitted).  These allegations remain deficient in the FAC.  And though the Court found that "[p]laintiffs appear adequately to have alleged a violation of SEC Financial Reporting Release No. 13 and GAAP" because of the size of the Garrett relationship (*id*. at 48-49), that finding appears to be based on the misleading allegation that the Garrett loans amounted to 14% of *tangible common equity*.  *See, e.g.*, *id*. at 57; CAC ¶ 5.  For purposes of those rules, the relevant threshold is 10% of total loans, a threshold not nearly met by the 2.4% Garrett relationship.

securities fraud complaint cannot survive a motion to dismiss under Rule 12(b)(6) unless the inference of scienter is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324; *see also Zucco Partners*, 552 F.3d at 991 (quoting *Tellabs*).

As the Court found, the most compelling narrative to be derived from the allegations in the CAC, even as a whole, was that CVB "attempted to work with Garrett" in order "to ensure it could meet its obligations," and CVB continued these efforts "until it became obvious that Garrett would be unable" to repay its loans. *See, e.g.*, MTD Order at 64. Thus, finding that the CAC did not raise a "strong inference" of scienter "that is as compelling as competing inferences," the Court dismissed the CAC on this basis as well. *Id.* at 63-64. Though the FAC now uses buzzwords like "bankruptcy" and "troubled debt restructuring," when the allegations are carefully read, the story is the same: CVB attempted to work with Garrett until it became obvious that its efforts would be futile and Garrett could no longer repay its loans. Thus, the FAC should be dismissed for failure to plead scienter.

### A.   The inadequate "confidential witness" allegations of the CAC are still inadequate in the FAC.

This Court referred to the allegations attributed to the "confidential witnesses" in the CAC as "rife with speculation and conjecture" and "lack[ing] the specificity demanded by Rule 9(b) and the PSLRA." MTD Order at 44. Yet plaintiffs repeat these allegations in the FAC. *See supra* at pp.8-9. They still do not demonstrate scienter.[19] And rather than adding relevant allegations to these "confidential witness" accounts, plaintiffs have abandoned certain allegations. *See supra* at pp.8-9. Not one of these "confidential witnesses" is alleged to have any personal knowledge of the state of mind of the individual defendants (or anyone else responsible for CVB's

---

[19]   For example, plaintiffs' Vintage Dairy anecdote (FAC ¶¶ 42, 89, 91) repeated from the CAC still does not "provide sufficient information to evaluate whether it rendered any of defendants' public statements false" (*see* MTD Order at 38 n.126), much less demonstrate scienter.

financial reporting), e.g., by having heard any contemporaneous statement by Myers or Biebrich contradicting any of the alleged misstatements.  *See, e.g.*, MTD Order at 36 (citation omitted); *Zucco Partners*, 552 F.3d at 998 (scienter allegations inadequate where they fail to establish that the witness "has reliable personal knowledge of the defendants' mental state").[20]

The inadequate scienter allegations of the CAC remain inadequate in the FAC. For example, references to a Problem Loan Report and Loan Committee meetings are insufficient in the absence of detailed information about the content of such report or meetings.  *See* MTD Order at 55; *see also Zucco Partners*, 552 F.3d at 1000-01 ("Allegations … that the management analyzed the inventory numbers closely, do not support the inference that management was in a position to know that such data was being manipulated."); *N.Y.S. Teachers' Ret. Sys.*, 2009 WL 3112574, at *11 ("The allegations are lacking in specificity regarding precisely what information was reported … and how Defendants' statements can be judged to be materially false in light of those practices.").  The FAC never even alleges that problems with the Garrett loans were discussed at the meetings or appeared in the Problem Loan Report, let alone the details of such discussions or content with the particularity required by the PSLRA.  And rather than giving rise to an inference of scienter, "the fact that high-level officials within the institution were so careful about monitoring the performance of problematic loans could be said to give rise to the *opposite* inference, which is that rather than recklessly disregarding underperforming loans, Bank officials were actually paying quite close attention to them."  MTD Order at 55 (citation omitted).

---

[20]   *See also N.Y.S. Teachers' Ret. Sys.* v. *Fremont Gen. Corp.*, 2009 WL 3112574, at *11 (C.D. Cal. Sept. 25, 2009) (no scienter where not established that confidential witnesses were in a "position to gain personal knowledge of what Defendants saw, knew, or thought"); *In re VeriFone Holdings, Inc. Sec. Litig.*, 2011 WL 1045120, at *14 (N.D. Cal. Mar. 22, 2011) (no scienter where confidential witnesses did not have any interactions with defendant).

**B.    The new "confidential witness" allegations do not demonstrate knowing or deliberately reckless misconduct by either individual defendant.**

Of the four new "confidential witnesses" cited in the FAC, three are former Garrett employees who are not alleged to have interacted with either individual defendant. And the fourth appears to have been too low in CVB's hierarchy to have reliable knowledge of the matters at issue. *See Zucco Partners*, 552 F.3d at 995. The FAC does not even allege the reporting line of this alleged "confidential witness" ("CW12"), who is described as a former CVB "Vice President." FAC ¶ 22. Even with respect to a higher level employee, an "Executive Vice President" (CAC ¶ 31; *see also* FAC ¶ 22), this Court held, "CW5 also appears to be fairly low in CVB's hierarchy and is at least four degrees removed from Myers and other top-level officials, lending even less credence to his statement." MTD Order at 36 n.118.

Furthermore, the FAC's vague allegations that Garrett may have twice threatened bankruptcy in an effort to secure better loan terms are insufficiently particular or reliable to support any inference of scienter. As described above, there are no particular allegations about what was actually said at such meetings or what CVB believed as a result. The source of these allegations, CW9, was not even at the meetings. Such allegations cannot support an inference of scienter. *See, e.g.*, *Zucco Partners*, 552 F.3d at 995 (confidential witnesses must be "described with sufficient particularity to establish their reliability and *personal knowledge*," and that "those statements which are reported by confidential witnesses with sufficient reliability and *personal knowledge* must themselves be indicative of scienter") (cited by MTD Order at 36) (emphasis added).[21] Certainly, none of these allegations of Garrett's alleged

---

[21]    *See also Lifschitz* v. *NextWave Wireless Inc.*, 2011 WL 5839682, at *2 (S.D. Cal. Nov. 21, 2011) ("[C]ourts are generally skeptical of using CWs' opinions to prove scienter."); *Wozniak* v. *Align Tech., Inc.*, 2011 WL 2269418, at *12 (N.D. Cal. June 8, 2011) ("Plaintiff alleges only the existence of the meetings, and the general topics discussed … [s]uch vague and conclusory allegations do not give rise to an inference … that defendants acted with deliberate recklessness."); *McCasland* v. *FormFactor Inc.*, 2009 WL 2086168, at *6 (N.D. Cal. July 14, 2009) ("[T]he complaint still does not (1) identify any specific information that was either received

---

negotiating tactics demonstrate that defendants knew that Garrett would no longer be able to satisfy its obligations to CVB.

As this Court held with regard to the CAC, "[m]ost fundamentally, plaintiffs allege no facts from which it can be inferred that management knew during the class period that the Garrett relationship had passed the point of repair."  MTD Order at 59. The same is true for the FAC.  Even according to the very account that the FAC relies upon, that of CW9, CVB was "trying to keep" Garrett "standing."  FAC ¶ 33.[22]  That Garrett was encountering financial difficulties and that the Garrett loans ultimately generated losses does not mean that CVB's efforts to work with Garrett "to ensure it could meet its obligations" were insincere.  *See, e.g.*, MTD Order at 64.  And these scienter pleading deficiencies are "compounded by the fact that … plaintiffs have failed adequately to allege that defendants' representations regarding the Garrett loans were materially false or misleading."  *See id*. at 59-60.

## C.    The alleged GAAP and SEC violations do not support an inference of scienter.

As above, the alleged violations of GAAP and SEC accounting guidelines are conclusory and dependent upon the FAC's otherwise insufficient allegations. Moreover, the unsupported alleged violations (*e.g.*, FAC ¶¶ 49-86) of a "laundry list of generic GAAP requirements" are "inadequate to support a strong inference of scienter."  *In re Downey Sec. Litig.*, 2009 WL 736802, at *12 (C.D. Cal. Mar. 18, 2009); *see also In re Downey Sec. Litig.*, 2009 WL 2767670, at *12 (C.D. Cal. Aug. 21, 2009) ("Such violations … must be augmented by other specific allegations that

---

or communicated by any defendant, that (2) contradicts any public statement at the time it was made.") (cited by MTD Order at 59).  The allegations attributed to former Garrett employees about *internal* Garrett discussions (*e.g.*, FAC ¶¶ 35, 36) are similarly unavailing.

[22]    Similarly, another of the alleged former Garrett employee "confidential witnesses" also said that "CVB was trying to partner with Garrett in 2008 to 'help keep Garrett afloat.'"  FAC ¶ 36.  Moreover, that CW9 — a Garrett employee — allegedly considered Garrett a "house of cards" says nothing about CVB's judgment regarding Garrett's ability to meet its obligations.

1   defendants possessed the requisite mental state.").

2          Furthermore, CVB's independent auditor expressed an unqualified opinion on

3   CVB's financial statements, and has since reiterated those opinions, even after the

4   Garrett charge-offs and the commencement of this action.  Such opinions are

5   "highly probative" of the absence of scienter with respect to alleged GAAP violations.

6   *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1157-58 (C.D. Cal.

7   2007); *see also Metzler*, 540 F.3d at 1068-69 ("The TAC does not allege that

8   Corinthian's external auditors counseled against the practice."); *In re Wet Seal, Inc.*

9   *Sec. Litig.*, 518 F. Supp. 2d 1148, 1166 (C.D. Cal. 2007) ("[T]he Deloitte approval

10  weighs against scienter as well.").  Just as this Court found these and similar

11  allegations inadequate in the CAC, they remain so here.  *See* MTD Order at 53-54

12  ("Although plaintiffs have succeeded in pleading adequately at least one GAAP

13  violation, that allegation must be accompanied by facts probative of conscious

14  misbehavior or recklessness.") (citation and internal quotation marks omitted).

15          **D.     Like the CAC, the FAC offers no compelling theory of motive.**

16          Once again, plaintiffs offer two inadequate theories of motive for defendants'

17  alleged misstatements.  First, the FAC alleges that Myers and Biebrich engaged in

18  insider trading.  *E.g.*, FAC ¶¶ 168-171.  But these allegations have already been

19  rejected by the Court.  MTD Order at 60-62.  Specifically, this Court declared that the

20  "minimal trading activity" by Myers "fails to raise *any* inference of scienter."  *Id*. at

21  61.  And the Court found that the Ninth Circuit "has previously declined to hold that

22  stock sales approaching or larger than Biebrich's were adequate to show scienter" and

23  that "the fact that Myers, who appears to have made most of the public statements

24  regarding CVB's financial health … had little trading activity during the class period

25  weighs against a finding that Biebrich's actions are suspicious."  *Id*. at 62.[23]

26  _____

27  [23]     Moreover, as the FAC recognizes, Biebrich was to have retired near the end of

28  the purported class period.  FAC ¶ 21.  Thus, any stock sales in advance are hardly
    surprising and do not support an inference of scienter.  *See Ronconi*, 253 F.3d at 435
    ("A corporate insider may sell stock to fund major family expenses, diversify his

Second, the FAC alleges that CVB had a stated "growth strategy" through acquisitions. *E.g.*, FAC ¶ 9.  But the FAC does not allege even a single acquisition by CVB subsequent to the start of the alleged class period.  Moreover, the Court did not find this allegation in the CAC sufficient to plead scienter.  *See* MTD Order at 3, 64 (noting "growth strategy" and finding scienter inadequately pled); *see also Zucco Partners*, 552 F.3d at 1006 (no inference of fraud from general corporate aspirations).

## E.    Plaintiffs' other efforts to bolster the deficient scienter allegations are futile.

To prop up the scienter allegations found deficient in the CAC, the FAC adds a few allegations that lack any significance and prove nothing about the defendants' state of mind at the time the allegedly false statements were made.  For example, the FAC alleges that the $34 million in losses on the Garrett loans that CVB wrote down after the class period amounted to "more than 80% of the $52 million in common stock net income that CVB reported for the entire year in 2009." *E.g.*, FAC ¶¶ 5, 12, 146 (emphasis omitted).[24]  This is somehow intended to demonstrate that CVB was "aware of the risk related to" Garrett. *E.g.*, FAC ¶ 146.  But this hindsight allegation says nothing about defendants' knowledge of the falsity of any of the alleged statements *at the time such statements were made*.

Likewise, the allegation repeated from the CAC that the Garrett relationship represented approximately 14% of CVB's tangible common equity (*see, e.g.*, *id.* ¶¶ 32, 146) does not indicate that defendants knew that their statements were false when made.  Moreover, this comparison of the size of a lending relationship to the tangible common equity metric is meaningless; by a parity of reasoning, any sizable

portfolio, or arrange his estate plan.").

[24]    The FAC's math is erroneous.  As the FAC recognizes, the charge-off was $34 million, approximately $25 million of which was already reserved for, thus a $9.3 million provision was added to the allowance to replenish the reserves for CVB's entire loan portfolio.  *See, e.g.*, FAC ¶ 12.  The FAC's attempt, in certain paragraphs, to double-count this $9.3 million as losses taken on the Garrett loans (*see, e.g.*, *id.* ¶ 146) makes no sense.

1   loan would be a substantial percentage of tangible common equity.[25]  But the alleged

2   $85 million Garrett relationship amounted to no more than *approximately 2.4%*

3   of CVB's loan portfolio.  FAC ¶¶ 2, 19.[26]  That this was CVB's largest lending

4   relationship — albeit still very small relative to its total loan portfolio — and that

5   CVB was working with Garrett does not mean that defendants knew that Garrett

6   would be unable to continue to perform.

7   **III.    The FAC does not adequately plead loss causation.**

8        In *Dura Pharmaceuticals, Inc.* v. *Broudo*, 544 U.S. 336, 342, 346-47 (2005),

9   the Supreme Court held that a plaintiff complaining of violations of Section 10(b) and

10   Rule 10b-5 must allege "'loss causation,' i.e., a causal connection between the

11   material misrepresentation and the loss."  And, as the Ninth Circuit has explained, a

12   contention that the market "understood" a statement precipitating a loss as "a coded

13   message revealing the fraud" is plainly insufficient.  *Metzler*, 540 F.3d at 1064.

14       **A.    The stock drop manifestly resulted from the announcement of an SEC
15            subpoena and not from any corrective disclosure.**

16        On August 9, 2010, after the close of the market, CVB announced that it had

17   received a subpoena from the SEC.  FAC ¶ 172.  CVB's disclosure summarized the

18   SEC's requests and also expressly disclosed that SEC correspondence accompanying

19   the subpoena stated that "[t]he investigation does not mean the [SEC has] concluded

20   that [CVB] or anyone else has broken the law."  *See supra* at p.5.  On August 10,

21   2010, CVB shares closed at $8.00 per share, down 22% from the previous close.  *Id.*

22        The FAC's allegations of loss causation are akin to — though significantly

23   _____

24   [25]     According to the FAC's allegations, CVB's total loan portfolio amounted to
    *nearly 600%* of tangible common equity (CVB's loan portfolio was, according to the
25   FAC, more than 40 times the size of the Garrett relationship).

26   [26]     Given that the FAC alleges that lending was responsible for only part of CVB's
    business operations (*see, e.g.*, FAC ¶ 19), it appears from the FAC that the Garrett
27   relationship represented *less than 2.4% of CVB's revenue*.  Thus, any comparison to
    *Berson* v. *Applied Signal Technology, Inc.*, 527 F.3d 982 (9th Cir. 2008), in which the
28   relevant customers accounted for more than 80% of the defendant company's revenue,
    is completely unwarranted.  *See* MTD Order at 57 (citing *Berson*).

weaker than — loss causation allegations rejected in *In re Maxim Integrated Products, Inc. Securities Litigation*, 639 F. Supp. 2d 1038, 1046-47 (N.D. Cal. 2009). In *Maxim*, the defendants were accused of fraudulently backdating stock options. *Id.* at 1042-43. The *Maxim* plaintiffs identified a number of allegedly corrective disclosures, including: (i) analyst reports highlighting the issue; (ii) an announcement of an SEC inquiry; (iii) a subsequent analyst report; (iv) an announcement of a U.S. Attorney subpoena; (v) an announcement of a board special committee investigation; and (vi) a disclosure regarding the inability to file a Form 10-K. *Id.* at 1046. The court found that, while these disclosures provide notice of the "risk" of "future corrective information," they do not themselves "reveal the alleged fraud." *Id.* at 1046-47. Thus, the court held the statements were not "corrective disclosures" sufficient to serve as the basis for loss causation. *Id.*

The holding in *Maxim* is consistent with Ninth Circuit pronouncements regarding the inadequacy, for loss causation pleading purposes, of disclosures that are not corrective, but rather merely "reveal[] a 'risk' or 'potential' for … fraudulent conduct." *See Metzler*, 540 F.3d at 1064 (holding loss causation not adequately alleged). And several courts have held that the announcement of an investigation, such as by the SEC, is not a corrective disclosure. *See, e.g.*, *In re Almost Family, Inc. Sec. Litig.*, 2012 WL 443461, at *13 (W.D. Ky. Feb. 10, 2012) ("Numerous federal district courts have held that a disclosure of an investigation, absent an actual revelation of fraud, is not a corrective disclosure."); *Meyer*, 2012 WL 94584, at *6 ("[A]nnouncements of SEC investigations are not corrective disclosures for which Plaintiff can plead loss causation."); *In re Immersion Corp. Sec. Litig.*, 2011 WL 871650, at *8 (N.D. Cal. Mar. 11, 2011); *Hansen*, 527 F. Supp. 2d at 1162.[27]

Here, the FAC alleges that (i) CVB announced the receipt of an SEC subpoena

---

[27] An SEC subpoena operates very differently from the FDA "Warning Letter" described in *In re Gilead Sciences Securities Litigation*, which reflected a *finding* of illegal marketing practices by defendant and "chastised" defendant for the same. 536 F.3d 1049, 1052 (9th Cir. 2008). Thus, *Gilead* is inapposite.

requesting information on its handling and disclosure of troubled loans, and (ii) analyst and news reports on the SEC subpoena discussed the possibility that previous disclosures were inadequate.  FAC ¶¶ 172-80.  But, as in *Maxim*, none of these "goes beyond speculation" and none can be a corrective disclosure sufficient to plead loss causation.  639 F. Supp. 2d at 1046-47.[28]  Indeed, the text of the subpoena notice itself, as disclosed, included a disclaimer from the SEC about drawing conclusions from the fact of the investigation.[29]

### B.  Other disclosures did not result in any alleged significant stock drop.

The absence of any alleged significant stock drop in response to certain disclosures further undermines the FAC's loss causation allegations.  For example, the alleged misstatement by Myers regarding CVB's collateral interest in a set of ten buildings, one of which allegedly partially served as collateral for a Garrett loan (e.g., FAC ¶¶ 105-06), was already expressly corrected by the media in January 2010, eight

---

[28]   Moreover, the analyst and news reports are even less relevant here, as all evidently postdate the August 10, 2010 stock drop.  *See* FAC ¶¶ 175-80; Ex. V; Ex. U; *see also Metzler*, 540 F.3d at 1063 ("losses suffered before the revelation" are irrelevant to loss causation).  Furthermore, as these and other reports demonstrate, CVB's Garrett-related risk was already receiving public attention well in advance of the August 9, 2010 SEC subpoena announcement.  *See, e.g.*, FAC ¶ 175 (quoting August 10 article referring to preexisting "skeptics" and discussion of Garrett exposure), ¶ 176 (quoting August 10 analyst report referring to "lingering concerns").  At most, the FAC has shown only the "negative characterization of already-public information," a showing insufficient to demonstrate loss causation.  *In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501, 512-14 (2d Cir. 2010).

[29]   Analyst speculation (post-stock drop) about what the SEC subpoena might mean fails to satisfy the loss causation pleading requirements for yet another reason.  While the FAC tries to characterize speculation by a few analysts as "confirming … that CVB was not fully disclosing potentially problematic loans" (FAC ¶ 174), on their face, the reports do not do that.  For example, after citing to speculation about the SEC subpoena by FIG Partners (*id*. ¶¶ 179-80), the CAC conspicuously fails to disclose (much less quote) the analyst's ultimate conclusion about the issue in the same report:  "[W]e see no reason to treat the [subpoena] as an impending action against the company, much less an admission of guilt."  Ex. W.  Worse yet, the report goes on to state that there is "doubt as to the validity of the subpoena and the ultimate outcome of the action."  *Id*.  Surely the stringent *Dura* standard is not satisfied by speculation, innuendo and mischaracterizations of analyst reports published after the alleged stock drop.

---

months before the end of the purported class period.  Alistair Barr, *California Bank is Put to Test on Commercial Real Estate*, MarketWatch, Jan. 7, 2010 (Ex. AA).  Yet the FAC alleges no stock drop in response.[30]  To the contrary, on the first trading day following the article correcting this alleged mistake, CVB shares closed nearly 5% higher than the previous day.  Ex. BB (shares closing at $9.09 on January 7, 2010 and at $9.52 on January 8, 2010).  Thus, loss causation has not been alleged.

Similarly, as to the September 9, 2010 announcement, plaintiffs' argument is makeweight.  The FAC ends the purported class period on August 9, strongly implying that plaintiffs do not believe that any purchasers between that date and the September 9 announcement suffered any relevant loss.  *See* FAC ¶ 1.  The facts make this conclusion obvious:  The September 9, 2010 disclosure of a charge-off of the Garrett loans was not a corrective disclosure; there was nothing in the September 9 announcement that indicated that CVB's previous disclosures were misleading.  *See id.* ¶¶ 181-85.  The September 9 announcement indicated that CVB had to charge off a loss on the Garrett relationship and that its reserves allocable to the relationship were *sufficient to cover 72%* of that loss (CVB had reserved $24.7 million and the loss was $34 million).  *Id.* ¶¶ 181-82.  That the Garrett loans needed to be charged off in September does not even suggest that any previous charge-off was necessary and improperly avoided.  *Id.*  Moreover, the 2.4% intraday stock drop was within a normal volatility range and ephemeral; the stock quickly recovered and closed down less than 1% that same day.  Ex. BB.  And by the following week, the stock was above the pre-announcement stock price and never again fell below it.  *Id.*

Furthermore, the FAC itself substantially undermines its own loss causation allegations.  The FAC alleges that CVB "effectively admitted" in its 2010 Form 10-K that its prior disclosures were improper and deficient.  FAC ¶ 86.[31]  But this alleged

---

[30]   Even if Myers did misspeak, as alleged, the FAC, as regarding all alleged misstatements, does not adequately allege scienter with the requisite particularity.
[31]   Of course, the FAC fails to adequately allege that such prior disclosures were materially false or misleading or made with scienter.

admission was made, according to the FAC, "for the first time" on March 1, 2011 (*id.*) — *nearly seven months after the alleged stock drop and close of the class period.*

**IV.    The Section 20(a) claim also fails.**

The Section 20(a) claim should be dismissed summarily because the FAC has failed to adequately plead a primary violation of Section 10(b).  MTD Order at 65-66 (citing *Zucco Partners*, 552 F.3d at 990); *see also N.Y.S. Teachers' Ret. Sys.* v. *Fremont Gen. Corp.*, 2011 WL 5930459, at *1 (9th Cir. Nov. 29, 2011).

**V.    The FAC should be dismissed with prejudice.**

This is plaintiffs' third attempt to plead their best case (including (1) the two original complaints, (2) the CAC and (3) the FAC).  And this Court thoroughly detailed the various deficiencies in the CAC.  Yet plaintiffs have once again failed to satisfy their burden.  After empty allegations from 12 so-called "confidential witnesses," what more is left?  This Court should exercise its discretion and deny leave to amend.  *See Vantive*, 283 F.3d at 1097-98; *Alaska Elec. Pension Fund*, 434 F. Supp. 2d at 835 ("The Amended Complaint's allegations are not significantly different ... The Court finds further leave to amend is not warranted under these circumstances.").

<strong>CONCLUSION</strong>

For the foregoing reasons, defendants respectfully request that the Court dismiss the FAC with prejudice.

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS THE FAC                    Case No. 10-CV-06256-MMM (PJWx)

DATED:  March 26, 2012          Respectfully submitted,


                                By:   /s/  Scott Vick
                                _____

                                VICK LAW GROUP, APC
                                  Scott Vick (No. 171944)
                                  Jason T. Riddick (No. 235980)
                                  Rachelle S. Torres (No. 243392)
                                  Lital Gilboa (No. 263372)

                                WACHTELL, LIPTON, ROSEN & KATZ
                                  David M. Murphy (*pro hac vice*)
                                  Warren R. Stern (*pro hac vice*)
                                  Wayne M. Carlin (*pro hac vice*)
                                  Jeffrey D. Hoschander (*pro hac vice*)

                                Attorneys for Defendants
                                CVB FINANCIAL CORP., CHRISTOPHER D.
                                MYERS AND EDWARD J. BIEBRICH, JR.