1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

BARRY R. LLOYD, individually and on
behalf of all others similarly situated,

             Plaintiff,

        vs.

CVB FINANCIAL CORP., et al.,

            Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. CV 10-06256 MMM (PJWx)

CLASS ACTION

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS

      This is a consolidated securities class action against defendants CVB Financial Corporation ("CVB"), Christopher D. Myers, CVB's President and Chief Executive Officer ("CEO"), and Edward J. Biebrich, Jr., CVB's former Executive Vice President and Chief Financial Officer ("CFO").  Lead plaintiff Jacksonville Police & Fire Pension Fund seeks to represent all persons who purchased the publicly traded securities of CVB Financial between October 21, 2009 and August 9, 2010 (the "class period").  The court previously entered an order dismissing plaintiffs' consolidated complaint with leave to amend.[1]  Plaintiff filed a first amended consolidated

_____

      [1]Order Granting Defendants' Motion to Dismiss ("MTD Order"), Docket No. 59 (Jan. 12, 2012).

complaint on February 27, 2012.[2]   Defendants have now moved to dismiss the amended complaint.[3]  Plaintiff opposes the motion.[4]

## I.  FACTUAL BACKGROUND

### A.    Background on CVB and Its Allegedly Fraudulent Scheme

In its SEC filings during the class period, CVB that stated its primary source of income was interest earned on loans and investments, primarily commercial real estate, construction, commercial and industrial, agribusiness, mortgage, consumer, lease and other real estate loans in the Inland Empire and Central Valley regions, and in Los Angeles and Orange Counties.[5] Plaintiffs allege that, by the start of the class period, land and developed real estate prices were plummeting in these regions, with delinquencies, defaults, and foreclosures increasing rapidly.[6] CVB's peer lenders, as well as other real estate-related businesses, were purportedly experiencing rapidly increasing losses in their loan portfolios, with many going out of business.[7]  Plaintiff alleges that, as was the case with these other businesses, CVB's commercial borrowers were facing severe financial difficulties and were not able to repay their loans on the original terms. Collateral on the loans was also purportedly decreasing in value.[8]

---

[2]First Amended Consolidated Class Action Complaint ("FAC"), Docket No. 61 (Feb. 27, 2012).

[3]Motion to Dismiss First Amended Consolidated Class Action Complaint ("Motion"), Docket No. 63 (Mar. 26, 2012).  See also Defendants' Reply in Further Support of Motion to Dismiss ("Reply"), Docket No. 68 (May 14, 2012).

[4]Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss the First Amended Consolidated Class Action Complaint ("Opp."), Docket No. 65 (Apr. 23, 2012).

[5]FAC, ¶ 23.

[6]*Id.*, ¶ 24.

[7]*Id.*, ¶ 25.

[8]*Id.*, ¶ 26.

Plaintiff asserts that had CVB revealed the truth regarding its portfolio, it would have had to increase its loan loss reserves and write-offs, reducing profits and lowering the price of its stock. CVB also allegedly would not have been able to continue its publicly-stated growth strategy of acquiring other banks.[9]  For these reasons, plaintiff asserts, the company represented publicly that it had strong capital, conservative lending practices, and low loan losses,[10] and defendants resorted to various fraudulent practices that misled investors regarding the company's financial viability.

Specifically, defendants purportedly made certain loans appear "current" for reporting purposes by extending loan due dates, using loan proceeds to keep other loans current, refinancing or restructuring payment terms, extending additional credit, and increasing borrowers' credit limits.[11]  Because defendants undertook these activities to accommodate borrowers' ability to pay existing loans, each allegedly constituted a loan "modification" for which defendants were required to account as a "troubled debt restructuring."[12]  Plaintiff asserts that the practices in which defendants engaged have variously been called "extend and pretend," "amend and pretend," and "delay and pray," since they involve altering a loan's terms to make it appear the loan is viable and a "sound" investment, in the hope that the borrower will be able to solve its financial problems and repay the loan at a later date.[13]

Garrett was allegedly CVB's largely borrower, with about $85 million in loans.[14]

---

[9]*Id.*, ¶ 27-28.

[10]*Id.*, ¶ 28.

[11]*Id.*, ¶ 30.

[12]*Id.*  Plaintiff contends that Generally Accepted Accounting Principles ("GAAP") has specific requirements concerning the reporting of such loans.  (*Id.*)

[13]*Id.*, ¶ 31.

[14]*Id.*, ¶ 32.  The loans made to Garrett were purportedly double those made to CVB's next largest borrower; the commitment represented about 14% of the bank's tangible common equity.  (*Id.*)

According to a confidential witness ("CW9"), Garrett's chief operating officer at the time, CVB knew that Garrett was in "perilous financial condition" in or about September 2008.[15]  Garrett executives purportedly met with defendant Myers and James Dowd, CVB's chief credit officer, and asked for additional funding, which it needed to meet existing obligations.[16]  CVB advanced the funds to Garrett, which the latter used to keep current on its existing CVB loans.[17]  Another confidential witness ("CW10") states that Garrett was on the verge of bankruptcy at the time of the meeting with Myers and Dowd.  Former Garrett employees were purportedly consistent in their view that CVB and defendants knew Garrett was in "serious trouble" at this time.[18]  A third confidential witness ("CW8") recalls that CVB was attempting to "partner" with Garrett in 2008 to "keep Garrett afloat."[19]

Plaintiff alleges that CVB knew or recklessly disregarded Garrett's perilous financial condition during this period, and failed to disclose and affirmatively concealed the true facts in its public filings.[20]  CW8 reports that properties financed by CVB sat vacant for years, generating no income, and that CVB executives met regularly with Garrett throughout 2009 to discuss the status of Garrett's loans.[21]

CVB's extension of additional credit to Garrett in 2008 merely delayed the company's ultimate default; in March 2009, CVB was forced to restructure more than $53 million of the Garrett loans.  Purportedly, it "secretly modified" the loans several additional times in 2009.[22]

---

[15]*Id.*, ¶ 33.

[16]*Id.*

[17]*Id.*

[18]*Id.*, ¶¶ 34-35.

[19]*Id.*, ¶ 36.

[20]*Id.*, ¶ 37.

[21]*Id.*

[22]*Id.*, ¶ 38.

In late 2009, when other lenders refused to extend additional credit to Garrett, CVB allegedly became the company's "lender of last resort."[23] In approximately January 2010, the founder of Garrett told defendant Myers, George Borba, and James Dowd that without additional credit and loan modifications, Garrett would have to file for bankruptcy.[24] Plaintiff asserts that CVB continued secretly to modify the Garrett loans, and that defendants failed to disclose the true condition of the impaired Garrett loans to investors.[25] It contends that CVB failed to disclose the loan modifications and record proper loan loss reserves in violation of GAAP and SEC regulations.[26]

Plaintiff also asserts that defendants consistently overvalued the properties that served as collateral for CVB's loans, concealing the fact that their market value was rapidly deteriorating. It maintains this practice was particularly misleading given CVB's repeated claim in periodic filings that it "strive[d] to have a maximum loan-to-value ratio of 65-75%."[27] By manipulating the value of collateral supporting its loans, CVB allegedly understated its reserves and overstated its profits. CVB's inflated collateral values purportedly also concealed the true risk of loss associated with its loan portfolio. A confidential witness ("CW1") states that CVB often obtained two different appraisal values for properties that were going to serve as collateral.[28] This practice permitted it to overstate the proceeds that would be obtained if it foreclosed on the collateral, and thus to reduce its recorded reserves and inflate its profits.[29]

---

[23]*Id.*, ¶ 39.

[24]*Id.*, ¶ 40.

[25]*Id.*

[26]*Id.*, ¶¶ 41-42. Plaintiff alleges that CVB also engaged in "extend and pretend" practices with other borrowers, such as Vintage Dairy. (*Id.*, ¶ 42.)

[27]*Id.*, ¶ 43.

[28]*Id.*, ¶ 45.

[29]*Id.* The complaint describes several specific instances of this practice, as reported by confidential witnesses. (*Id.*, ¶¶ 46-47.)

Defendants Myers and Biebrich also purportedly caused CVB to issue financial statements "that were materially misstated and not presented in accordance with GAAP at the time they were issued."[30]  The statements were allegedly misleading because they failed to reveal CVB's GAAP violations and "poor internal controls,"[31] and overstated net interest income, net earnings, earnings per share, stockholders' equity and loan values.[32]  Plaintiff identifies five types of "fraudulent accounting practices" in which defendants engaged:

- intentionally failing to disclose CVB's loan losses, loan loss reserves, and its restructured, past due, nonperforming and nonaccrual loans by loan type, making it difficult for investors to ascertain the true status of the company's loan portfolio;[33]

- failing to report CVB's its past due, restructured, and nonperforming assets accurately, and failing to report the losses caused by the nonperformance of those assets;[34]

- failing to record timely loan loss provisions as those losses were incurred;[35]

- fraudulently inflating the value of its reserves by declining to write off loan losses as they occurred;[36] and

- omitting financial statement disclosures in violation of GAAP and SEC disclosure requirements, including concentration of credit risk in the Garrett loans, risk elements involved in its lending activities, and the fact that its loan loss estimates were heavily dependent on actual losses during favorable historical periods, not readily adaptive to

---

[30]*Id.*, ¶ 49.

[31]*Id.*

[32]*id.*, ¶ 52.

[33]*Id.*, ¶¶ 54-61.

[34]*Id.*, ¶¶ 62-66.

[35]*Id.*, ¶¶ 67-76.

[36]*Id.*, ¶¶ 77-78.

changing circumstances, or both.[37]

Plaintiff asserts that after the class period and the commencement of an SEC investigation, CVB "effectively admitted" in its 2010 Form 10-K that its prior disclosures had been improper and deficient.[38]

**B.     Defendants' Allegedly Fraudulent Statements**

Plaintiff alleges that defendants' misrepresentations fall into four broad categories: (1) mischaracterizing the status of CVB's loan portfolio, particularly the Garrett loans, as "current" and "performing," when they were not;( 2) misrepresenting CVB's "credit" and "loan underwriting culture" as "strong," its "credit metrics [as] superior" to those of its peers, and the fact that "underwriting integrity remains paramount," when in fact the company's underwriting culture was anything but strong; (3) misrepresenting that the real estate market was a "risk factor" that "could" affect the ability of loan customers to remain current on their obligations, when, in fact, the risk had already materialized; and (4) violating GAAP in myriad ways that rendered CVB's financial statements materially misleading.[39]   Plaintiff contends that false statements were made at various points during the class period, including, *inter alia*:

- in the company's third quarter 2009 financial statements, which assured investors that "the overall credit quality of the loan portfolio is sound," when defendants knew that large portions of the portfolio were experiencing significant performance problems;[40]

- in the company's November 5, 2009, Form 10-Q, which stated that "we are not aware of any other loans as of September 30, 2009 for which known credit problems of the borrower would cause serious doubts as to the ability of such borrowers to comply with their loan repayment terms, or any known events that would result in the loan being

---

[37]*Id.*, ¶¶ 79-85.

[38]*Id.*, ¶ 86.

[39]*Id.*, ¶ 87.

[40]*Id.*, ¶ 89.

designated as non-performing at some future date," when in fact the company's largest borrower was at serious risk of bankruptcy;[41] and which also stated that it was "prepared in accordance with the rules and regulations of the Securities and Exchange Commission for Form lO-Q and conform[ed] to practices within the banking industry and include[d] all the information and disclosures required by accounting principles generally accepted in the United States of America for internal financial reporting," when defendants had actually committed violated GAAP and SEC rules and regulations in multiple ways;[42]

- during the company's November 9, 2009, investor presentation, at which defendants reiterated that CVB had experienced "record" financial results, that a "strong credit culture and underwriting integrity remain[ed] paramount at CVB," that "geographic diversification, a focus on relationship banking, and a strong credit culture ha[d] allowed CVB to mitigate loan losses through th[e] economic downturn," that on a peer comparison basis "CVB's credit metrics [were] superior," and that "CVB's strong loan underwriting culture has limited its exposure to problem credits," when in fact none of these things was true'[43]

- during a December 2, 2009, private analyst presentation, at which Myers stressed that the Garrett loans were "a fully performing asset in all respects," that CVB did not "have specific reserves against [the Garrett portfolio]," and that Garrett was "paying everything. It's performing as agreed," despite Myers' personal knowledge that Garrett was in dire financial straits;[44]

- in its March 4, 2010 Form 10-K, which disclosed as a "risk factor" the fact that CVB might "be required to make additional provisions for credit losses and charge off additional

---

[41]*Id.*, ¶ 91.

[42]*Id.*, ¶¶ 94-95.

[43]*Id.*, ¶ 99.

[44]*Id.*, ¶¶ 101-02.

loans in the future," and stated that the continuing deterioration of the commercial real estate market "could" affect the ability of its borrowers to service their debt, which "could" result in loan charge-offs and credit losses "in the future," and that declining real estate values "could be significantly reduced," when in fact these risks and possibilities had already come to fruition;[45]

- in the March 4, 2010 Form 10-K, which also stated that the company was "not aware of any other loans as of December 31,2009 for which known credit problems of the borrower would cause serious doubts as to the ability of such borrowers to comply with their loan repayment terms, or any known events that would result in the loan being designated as non-performing at some future date," when in fact CVB knew of serious credit problems with its borrowers, including Garrett;[46]

- during a May 21, 2010, investor presentation, at which Myers again emphasized that a "strong credit culture and underwriting integrity remain paramount at CVB," that "geographic diversification, a focus on relationship banking, and a strong credit culture ha[d] allowed CVB to mitigate loan losses through th[e] economic downturn," that "CVB's strong loan underwriting culture ha[d] limited its exposure to problem credits," and that CVB's "strategic focus" included making "[c]apital and strong [l]oan [l]oss [r]eserves . . . paramount," when in reality its credit culture and underwriting practices were far from strong.[47]

---

[45]*Id.*, ¶¶ 107-09.

[46]*Id.*, ¶¶ 112-14.  This statement was repeated on April 21, 2010, when CVB announced its first quarter 2010 earning results.  (*Id.*, ¶¶ 120-22.)

[47]*Id.*, ¶¶ 131-32.  These statements were repeated in two press releases issued July 21 and 22, 2010, announcing "record earnings" for the second quarter of 2010.  (*Id.*, ¶¶ 133-38.)

### C.   Scienter Allegations

Plaintiff alleges several facts that purportedly show these statements were made with scienter.  First, it asserts that Myers and other high-level CVB executives met personally and repeatedly with Garrett executives to negotiate loan terms and discuss the status of loans throughout the class period.  These discussions allegedly started in September 2008, when Garrett informed CVB that it needed the additional funds to meet ongoing obligations and stay in business.[48]  Another such meeting purportedly occurred in January 2010, when Garrett allegedly told Myers and other CVB representatives that without additional credit, the company would have to seek bankruptcy protection.[49]

Second, plaintiff alleges, the misleading statements concerned CVB's core operations, namely its lending and underwriting practices, credit metrics, and the condition of its loan portfolio, including the status of loans to its largest borrower, Garrett.[50]  In particular, plaintiff asserts, "[t]here was no single issue or relationship that was more important to CVB's profitability than its Garrett loans"; the importance of the lending relationship to the company's bottom line was significant.[51]  Plaintiff cites the size of the Garrett writeoffs in the first quarter of 2010, as well as Myers' statement during a December 2, 2009, presentation that Garrett "is by two-fold, the largest loan relationship in the bank" as further support for an inference that defendants were well aware of the Garrett relationship and the poor performance of that borrower throughout the class period.[52]

Third, plaintiff contends that Myers and Biebrich repeatedly stated that they "actively monitored CVB's commercial real estate portfolio," and that CVB's SEC filings reported that its

---

[48]*Id.*, ¶ 141.

[49]*Id.*, ¶ 142.

[50]*Id.*, ¶ 145.

[51]*Id.*, ¶ 146.

[52]*Id.*, ¶¶ 147-49.

management and Board of Directors reviewed and analyzed its loans and lending practices on a quarterly basis, including the character of the loan portfolio, current economic conditions, past credit loss experience, and other factors relevant in estimating inherent credit losses.[53] SEC filings also stated that the company's "major banking relationships," defined as relationships of $7 million or more, were "reviewed and approved/declined by the Loan Committee of [the] Board of Directors," and that the company "regularly review[ed]" its major banking relationships.[54] As participants in CVB's loan committee, Myers and Biebrich were allegedly part of this process of regular review and approval.[55]

Plaintiff's assertions are supported by confidential witnesses, who discuss the frequency, attendance, and subjects addressed at CVB's monthly loan committee meetings; these included reports regarding "problem loans" that were categorized as "substandard, watch, or doubtful."[56] The witnesses explain that the bank's executives paid "particular attention" to Garrett and regularly discussed the status of loans to that company at these meetings.[57] Myers allegedly had a "hands on" management style, and was a known "micromanager,"[58] which further supports the assertion that he knew the status of the Garrett loans.

Fourth, the complaint alleges that Garrett and CVB (and particularly Myers) had a "close, familiar relationship,"[59] and that Garrett and CVB executives were in regular contact with one another.[60] When a third party, Stratford Ranch Partners, requested Paul Garrett's personal

---

[53]*Id.*, ¶ 150.

[54]*Id.*, ¶ 151.

[55]*Id.*, ¶¶ 153-54 (

[56]*Id.*, ¶¶ 155-57.

[57]*Id.*, ¶ 159.

[58]*Id.*, ¶ 162.

[59]*Id.*, ¶ 163.

[60]*Id.*, ¶¶ 164-67.

financial statements before it entered into a transaction with him, Garrett's CEO proposed that Stratford instead speak to Myers regarding "Paul, his performance over the years, and his financial status."[61]

Fifth and finally, plaintiff alleges a motive for defendants' fraudulent conduct.  It contends that CVB's growth strategy was to transition from being a community bank to being a regional bank by acquiring failing banks that had favorable loss-sharing agreements with the FDIC. Defendants were allegedly loathe to disclose the troubled status of the Garrett loans lest it interfere with this strategy, and wanted instead to wait for a profitable quarter before writing the loans down in order to avoid reporting a substantial impact on CVB's profitability.[62]  Defendants Myers and Biebrich also allegedly reaped substantial profits from the inflated price of CVB stock, and allegedly began selling their stock holdings during the class period to avoid taking losses on the shares.[63]

### D.   Loss Causation

On August 9, 2010, CVB disclosed that two weeks earlier, on July 26, 2010, it had received a subpoena from the SEC seeking information concerning how CVB handled and disclosed troubled loans.   Specifically, the subpoena questioned CVB's loan underwriting guidelines, its allowance for credit losses, and its method of calculating the allowance for loan losses.[64]  Analysts reacted immediately to the announcement, stating that the SEC probe was notable because it revealed that CVB had not been fully disclosing potentially problematic loans and that CVB's largest exposure – Garrett – was backed by collateral whose market value was well below the loan amount.[65]  Immediately following the revelation and analyst reports, CVB

---

[61]*Id.*

[62]*Id.*, ¶ 167.

[63]*Id.*, ¶¶ 168-71.

[64]*Id.*, ¶ 172.

[65]*Id.*, ¶ 172-73.

stock fell $2.30 per share to close at $8.00 per share on August 10, 2010.  This was a one-day decline of more than 22% on extremely high volume of 13.25 million shares, and represented a market capitalization loss of approximately $245 million.[66]  In an attempt to stem the losses, CVB announced a repurchase plan and spun the declining stock price as "an opportunity . . . to repurchase [CVB] stock to enhance shareholder value."[67]

Credit Suisse reported that the SEC investigation revealed issues regarding the adequacy of CVB's reserves, including specifically reserves for the Garrett loans, and the adequacy of CVB's disclosures.[68]  FIG Partners similarly explained that "the SEC [was] looking into whether CVBF misled the Street by hiding the true performance of loans the company said were performing."  It noted that, "[i]n doing so, the SEC [was] also implying that company management hid the true nature of the loan portfolio from the FDIC and California Department of Financial Institutions (the bank's primary regulators). . . ."  It observed that "[t]he information sought [by the SEC subpoena was] very similar to [recent] stories in the press . . . that the company was overstating credit quality."[69]

On September 9, 2010, one month later, CVB disclosed that the Garrett loans were not "fully performing," and that Garrett was not "current" on its debt.  CVB charged off $34 million of Garrett's debt, and placed the remaining $48 million in its nonperforming. impaired loan category, conceding that its earlier reserves for the loans, which totaled only 30% of the loan amount, were insufficient.[70]  CVB also disclosed that it had inadequately reserved the Garrett loans, and had had to record an additional of $9.3 million in credit losses in the third quarter of

[66]*Id.*, ¶ 174.

[67]*Id.*, ¶ 177.

[68]*Id.*, ¶ 178.

[69]*Id.*, ¶ 179.

[70]*Id.*, ¶ 181.

1   2010.[71]  CVB acknowledged it had taken this step in response to information received from Garrett

2   that it would not be able to make principal and interest payments on the loans as scheduled, and

3   wished to negotiate an alternative repayment schedule.[72]   As respects the largest of the seven

4   Garrett loans, which had a $42.5 million loan balance, CVB disclosed that it had no direct liens

5   on the properties that were collateral for the loan, and that it was reducing the value of its UCC-1

6

7

8   _____

9   [71]*Id.*  The complaint alleges CVB made the following statement in a press release regarding the Garrett loans:

10      "The borrowing relationship is comprised of seven loans and totals  approximately $82 million in outstanding debt.  This is the largest borrowing relationship in the Bank.  In response to the information from our largest borrower, we have taken the following actions:

11

12

13   •   "On September 2, 2010 all of the loans were put on non-accrual ($48 million in loans after charging off $34 million).

14   •   "We charged-off $34 million in loans versus our June 30, 2010 reserve of $24.7 million.  Based on our charge-off of $34 million, we are recording an additional $9.3 million provision for credit losses in the third quarter.

15

16   •   "The $34 million charge-off figure was determined as follows: we currently hold first trust deed liens on different properties with an aggregate appraised value of $52.1 million.  Each of the 25 properties has been appraised by [ ]certified third party appraisers with the exception of two properties which were appraised by a third-party State Certified Real Estate appraiser.  The combined value of the two non-MAI appraised properties is $5.7 million.  All of the property appraisals were updated in 2010 with the exception of one property which was appraised in November 2009 and was valued at $3.0 million at that time.  The remaining $48 million in non-accrual loan balance represents 92% of the $52.1 million in aggregate appraised values.

17

18

19

20

21

22                                    . . .

23   •   "The Borrower sold a 26th property recently for $2.5 million.  The majority of the proceeds of this sale ($2 million) are held as payment collateral for our loans, which collateral is to be used to make all principal and interest payments scheduled through December 15, 2010.  The remaining $0.5 million in proceeds were used to pay past due property taxes, sales commissions and borrower cost reimbursements.   This is part of a Forbearance Agreement with the subject borrower.  The Agreement expires December 15, 2010."  (*Id.*, ¶ 182.)

24

25

26

27

28   [72]*Id.*

filings on the properties to zero.[73]

CVB stated that it expected its nonperforming loans to increase $59 million for the third quarter; most of that figure represented the balance of the Garrett loans after the $34 million charge-off.[74] Following this disclosure, CVB's stock price dropped from $7.05 to a low of $6.88, or 20.41%, before closing at $6.99, on volume of 4,379,983 shares.  This was more than five times the volume traded the previous day.[75]

On January 20, 2011, CVB further disclosed that Garrett had failed to comply with the forbearance agreements.[76]  CVB stated that it was

"continuing to explore all of [its] rights and remedies on a loan-by-loan basis, including without limitation the sale of certain notes, initiation of foreclosure proceedings against certain collateral and alternative repayment plans.  There can be no assurance as to the outcome of such efforts, which the borrower may oppose. The current aggregate balance after prior payments and charge-offs is $45.2 million.  Further charge-offs may need to be taken based on loan developments, borrower actions and/or reappraisals of collateral."[77]

Eventually, CVB recorded numerous Notices of Default on collateral that secured Garrett loans totaling $42,361,705.24.[78]

---

[73]*Id.*, ¶ 182-83.

[74]*Id.*, ¶ 184.

[75]*Id.*, ¶ 186.

[76]*Id.*, ¶ 188.  Plaintiff alleges that earlier, on September 9, 2010, CVB had characterized its arrangement with Garrett as a single "Forbearance Agreement."  It later stated that there were multiple forbearance agreements, however.  (*Id.*)

[77]*Id.*

[78]*Id.*, ¶ 189.

## II.  DISCUSSION

### A.     Legal Standard Governing Motions To Dismiss Under Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988).  In deciding a Rule 12(b)(6) motion, the court generally looks only to the face of the complaint and documents attached thereto. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n. 19 (9th Cir.1990).

The court must accept all factual allegations pleaded in the complaint as true, and construe them and draw all reasonable inferences from them in favor of the nonmoving party. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true"); see also *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996); *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir. 1995).  The court need not, however, accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations.  See *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" (citations omitted)).

**B.      Defendants' Request For Judicial Notice**

Defendants ask that the court take judicial notice of various documents.[79]  Because Rule 12(b)(6) review is confined to the complaint, the court may not typically consider material outside the pleading (e.g., facts presented in briefs, affidavits, or discovery materials).  *In re American Continental Corp./Lincoln Sav. & Loan Securities Litig.*, 102 F.3d 1524, 1537 (9th Cir. 1996). The court may, however, properly consider exhibits submitted with the complaint and documents whose contents are alleged in the complaint when their authenticity is not questioned and the complaint relies upon them.  *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).   In addition, the court may consider matters that can be judicially noticed under Rule 201 of the Federal Rules of Evidence.  *Id.* at 688-89; *Hal Roach Studios, Inc.*, 896 F.2d at1555 n. 19; *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), overruled on other grounds by *Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002); see also *Tellabs*, 551 U.S. at 322 ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice").[80]  The court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint."  *Steckman v. Hart Brewing Inc.*, 143 F.3d 1293, 1295 (9th Cir. 1998).

Defendants seek judicial notice of many of the same documents the court concluded were proper subjects of judicial notice when deciding defendants' earlier motion to dismiss.  These documents include SEC filings, *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n. 7 (9th Cir. 2008) ("Defendants sought judicial notice for Corinthian's reported stock price history and other publicly available financial documents, including a number of Corinthian's SEC filings.  In its dismissal order, the court granted Defendants' unopposed requests for judicial

---

[79]Defendants' Request for Judicial Notice ("RJN"), Docket No. 63 (Mar. 26, 2012).

[80]Taking judicial notice of matters of public record does not convert a motion to dismiss into a motion for summary judgment. *MGIC Indemnity Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986).

notice.  Metzler does not contest the propriety of the noticing of these documents on appeal, which in any event was proper"); analyst reports, *In re Amgen Inc. Securities Litigation*, 544 F.Supp.2d 1009 (C.D. Cal. 2008)  (taking judicial notice of "analyst reports when they are submitted to establish 'whether and when certain information was provided to the market,' not the truth of the matters asserted in the reports"); news reports regarding CVB's financial performance, *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n. 18 (9th Cir. 1999); CVB's historical stock prices, publicly available SEC, GAAP and FDIC financial reporting requirements and publications, *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 561 (N.D. Cal. 2009) (taking judicial notice of FASB documents because they are "publicly available from the FASB's website"); and the fact that CVB did not file a financial restatement during or after the putative class period, *In re LDK Solar Securities Litigation*, 584 F.Supp.2d 1230, 1240 (N.D. Cal. 2008). Many of these documents are also incorporated by reference in the complaint.  See, e.g., *In re Silicon Graphics, Inc. Securities Litigation*, 183 F.3d 970, 986 (9th Cir. 1999) (holding that the district court properly considered SEC filings under the incorporation by reference doctrine because their contents were alleged in the complaint).

To the extent defendants seek judicial notice of documents other than those the court previously noticed, they are of the same type as those noticed earlier.  Plaintiff does not object to defendants' request or question the authenticity of any of the proffered documents.

Consequently, the court grants defendants' request for judicial notice, emphasizing that it takes notice of the existence and contents of the documents, but not the truth of the matters stated therein.  See *In re Foundry Networks, Inc.*, C 00-4823 MMC, 2003 WL 23211577, *10 n. 11 (N.D. Cal. Feb. 14, 2003) ("Plaintiffs 'object to the request to the extent defendants seek to establish the truth of the contents in the noticed documents,' but raise no objection to the extent the request asks the Court to take notice of the contents of the documents.  Defendants' request is hereby GRANTED to the extent it requests that the Court take judicial notice of the content of such documents"); *Del Puerto Water Dist. v. U.S. Bureau of Reclamation*, 271 F.Supp.2d 1224, 1234 (E.D. Cal. 2003) ("Judicial Notice is taken of the existence and authenticity of the public and quasi public documents listed.  To the extent their contents are in dispute, such matters of

1    controversy are not appropriate subjects for judicial notice").

2           C.      **Legal Standard Governing the Pleading of Securities Fraud Claims**

3           Rule 9(b) of the Federal Rules of Civil Procedure provides that the "circumstances

4    constituting fraud or mistake shall be stated with particularity." FED.R.CIV.PROC. 9(b).   A

5    securities fraud claim cannot survive a motion to dismiss under this rule merely by alleging that

6    certain statements were false. *Metzler*, 540 F.3d at 1070 ("A litany of alleged false statements,

7    unaccompanied by the pleading of specific facts indicating why those statements were false, does

8    not meet this standard"); see also *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir.

9    2010) ("Plaintiffs must "demonstrate that a particular statement, when read in light of all the

10   information then available to the market, or a failure to disclose particular information, conveyed

11   a false or misleading impression," quoting *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512

12   (9th Cir. 1991)).   Rather, the complaint must allege "why the disputed statement was untrue or

13   misleading *when made*."   *In re Glenfed, Inc. Securities Litigation*, 42 F.3d 1541, 1549 (9th Cir.

14   1994) (en banc) (emphasis added).

15          In 1995, Congress passed the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4,

16   which amended the Securities Exchange Act of 1934.   The PSLRA modifies Rule 9(b)'s

17   particularity requirement, "providing that a securities fraud complaint [must] identify: (1) each

18   statement alleged to have been misleading; (2) the reason or reasons why the statement is

19   misleading; and (3) all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); see *Silicon*

20   *Graphics*, 183 F.3d at 996.   Under the statute, in order to plead that each allegedly misleading

21   statement or omission was made with scienter, a plaintiff must "state with particularity . . . facts

22   giving rise to a strong inference that the defendant acted with the required state of mind."   15

23   U.S.C. § 78u-4(b)(2).   If the complaint does not contain such allegations, it must be dismissed.

24   15 U.S.C. § 78u- 4(b)(3)(A).[81]

25

26          [81]The PSLRA creates a "safe harbor" for "forward-looking" statements that are immaterial,
     are limited by "meaningful cautionary statements," or are made without actual knowledge of their
27   falsity.   15 U.S.C. §§ 77z-2(c), 78u-5(c).   Such statements include, but are not limited to,
     statements of future economic performance and management plans and objectives. 15 U.S.C.
28   §§ 77z-2(i), 78u-5(i).   This "safe harbor" has much the same effect as the "bespeaks caution"

In enacting the PSLRA, "Congress 'impose[d] heightened pleading requirements in actions brought pursuant to § 10(b) and Rule 10b-5.'" *Tellabs*, 551 U.S. at 320 (citing *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006)). The PSLRA's heightened standard "prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating why the defendant's alleged statements or omissions are deceitful." *Metzler*, 540 F.3d at 1061 (citing *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1133 (9th Cir. 2002)).

D.      **Sufficiency of Count I: Violation of Section 10(b) of the 1934 Act and Rule 10b-5**

1.      **Legal Standards Governing Section 10(b) and Rule 10b-5**

Rule 10b-5, promulgated by the Securities and Exchange Commission pursuant to section 10(b) of the 1934 Act, makes it unlawful for any person to use "manipulative or deceptive device[s]" in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b). Specifically, one cannot "(a) . . . employ any device, scheme, or artifice to defraud; (b) . . . make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) . . . engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

The elements of a section 10(b) or Rule 10b-5 violation are (1) the misrepresentation or omission of a material fact, (2) scienter, (3) reliance (4) in connection with the purchase or sale of a security, (5) economic loss, and (6) loss causation. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341 (2005); see also *Paracor Finance, Inc. v. General Electric Capital Corp.*, 96 F.3d 1151, 1157 (9th Cir. 1996) (en banc); *McCormick v. Fund American Companies, Inc.*, 26 F.3d 869, 875 (9th Cir. 1994).

---

doctrine, which provides that forward-looking representations that contain adequate cautionary language or risk disclosure protect a defendant from securities liability. See, e.g., *Plevy v. Haggerty*, 38 F.Supp.2d 816, 830 (C.D. Cal. 1998).

As noted, the complaint must specify "each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). In addition to pleading falsity adequately, the pleading must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §§ 78u-4(b)(2). "Scienter" refers to "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976). The Ninth Circuit has articulated a "two-part inquiry for scienter: first, [the court must] determine whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegation is sufficient, . . . the court [must] conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *New Mexico State Investment Council v. Ernst & Young*, 641 F.3d 1089, 1095 (9th Cir. 2011) (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991–92 (9th Cir. 2009)).[82]

The Ninth Circuit has emphasized that "plaintiffs 'must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct.'" *Middlesex Retirement System v. Quest Software Inc.*, 527 F.Supp.2d 1164, 1179 (C.D. Cal. 2007) (quoting *Silicon Graphics*, 183 F.3d at 974); see also *Silicon Graphics*, 183 F.3d at 977 ("recklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct"). The requisite state of mind must be a "'departure from the standards of ordinary care [that] presents a danger of misleading buyers that is either known to the defendant or so obvious that the actor must have been aware of it.'" *Zucco Partners*, 552 F.3d at 991 (quoting *Silicon Graphics*, 183 F.3d at 984). If plaintiffs rely on allegations of recklessness, the pleading standard requires that they "state specific facts indicating no less than

---

[82]The court's prior order on defendants' motion to dismiss the consolidated class action complaint explained in detail that Ninth Circuit precedent requires the court to engage in this two-step analysis. (See MTD Order at 51-52 n. 164; see also *In re American Apparel, Inc.*, ___ F.Supp.2d ___, 2012 WL 1131684 at *22 n. 192 (C.D. Cal. Jan. 13, 2012).) For the reasons stated therein, the court first addresses each allegation individually, and thereafter as necessary, analyzes them in combination.

1    a degree of recklessness that strongly suggests actual intent." *Silicon Graphics*, 183 F.3d at 979.

2    Allegations of mere negligence are insufficient. *Glazer Capital Management, LP v. Magistri*, 549

3    F.3d 736, 748 (9th Cir. 2008) ("At most, it creates the inference that he *should have known* of

4    the violations. This is not sufficient to meet the stringent scienter pleading requirements of the

5    PSLRA"); *Police Retirement Systems of St. Louis v. Intuitive Surgical, Inc.*, No.

6    10-CV-03451-LHK, 2011 WL 3501733, *7 (N.D. Cal. Aug. 10, 2011) ("[T]he Ninth Circuit

7    defines 'recklessness' as a highly unreasonable omission [or misrepresentation], involving not

8    merely simple, or even inexcusable negligence, but an extreme departure from the standards of

9    ordinary care, and which presents a danger of misleading buyers or sellers that is either known

10    to the defendant or is so obvious that the actor must have been aware of it").

11        "To qualify as 'strong' within the intendment of § 21D(b)(2) . . . an inference of scienter

12    must be more than merely plausible or reasonable – it must be cogent and *at least as compelling*

13    *as any opposing inference of nonfraudulent intent*." *Tellabs*, 551 U.S. at 314 (2007) (emphasis

14    added). "[C]ourts must consider the complaint in its entirety, as well as other sources courts

15    ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss. . . .  The inquiry . . . is

16    whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not

17    whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23

18    (emphasis original). In determining whether plaintiff has alleged facts showing a strong inference

19    of scienter, the court must draw all reasonable inferences from the allegations presented, including

20    inferences unfavorable to plaintiff. *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002).

21    "However, the 'inference that the defendant acted with scienter need not be irrefutable, i.e., of

22    the "smoking-gun" genre, or even the "most plausible of competing inferences." . . .  [T]he

23    inference of scienter must be more than merely "reasonable" or "permissible[,]" [however] – it

24    must be cogent and compelling . . . in light of other explanations.'" *Middlesex Retirement System*,

25    527 F.Supp.2d at 1179 (quoting *Tellabs*, 551 U.S. at 314).

26        The allegations in the first amended complaint rely heavily on the statements of confidential

27    witnesses. Before those witnesses' statements can support a strong inference of scienter, they

28    must meet two requirements. First, "the confidential witnesses whose statements are introduced

to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge." *Zucco Partners*, 552 F.3d at 995; see also *In re Siebel Systems, Inc. Sec. Litig.*, No. 04-0983, 2005 WL 3555718,*8-9 (N.D. Cal. Dec. 28, 2005) (allegations attributed to a confidential witness "'must be accompanied by enough particularized detail to support a reasonable conviction in the informant's basis of knowledge,'" quoting *In re Metawave Communications Corp.*, 298 F.Supp.2d 1056, 1068 (W.D. Wash. 2003)). Second, the statements "[that] are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Zucco Partners*, 552 F.3d at 995.

The Ninth Circuit often treats the falsity and scienter analyses as "a single inquiry, because falsity and scienter are generally inferred from the same set of facts." *In re New Century*, 588 F.Supp.2d 1206, 1227 (C.D. Cal. 2008) (citing *In re Read–Rite Corp.*, 335 F.3d 843, 846 (9th Cir. 2003), abrogated by *Tellabs* on other grounds, as recognized in *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008), and *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001)). The court therefore analyzes plaintiff's falsity and scienter allegations in tandem below.

### 2. Whether Plaintiffs Have Adequately Pled Defendants' Alleged Material Misrepresentations and Scienter

In analyzing the sufficiency of plaintiff's pleading, the first question the court must examine is whether it has specified "each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). There are four central allegations of falsity and scienter in the first amended complaint, for the most part identical to those pled in the original consolidated class action complaint, but with some modifications, additional allegations, and shifts in emphasis.

Plaintiff alleges first that defendants misrepresented the status of CVB's loan portfolio, specifically the Garrett loans, repeatedly characterizing them as "current" and consistently performing, when in reality there was a real risk Garrett would default on its obligations. It asserts second that defendants characterized the deterioration of the real estate market as a "risk factor" that "could" affect the ability of borrowers to remain current on their obligations, when, in fact, the risk had already materialized. Third, plaintiff contends that defendants overstated the

strength of CVB's loan loss reserves and inflated the value of collateral securing the Garrett loans in particular, which suggested that CVB could recover a greater percentage of the loans in the event of default than was actually the case. Plaintiff asserts that these statements were repeatedly buttressed by defendants' assurances regarding CVB's strong credit and underwriting culture. Fourth, plaintiff alleges that defendants used deceptive accounting practices and violated GAAP in numerous ways to mask the effect these practices were having on CVB's profitability.

          **a.**     **The Status of Defendants' Loan Portfolio, Including the Garrett Loans**

The first and most serious set of allegations concerns defendants' purported misrepresentations regarding the status of CVB's loan portfolio – i.e., the fact that they asserted that CVB's loans were "current" and "performing," when in fact many were not. These allegations focus specifically on defendants' representations regarding the Garrett loans, which comprised a significant percentage of CVB's lending portfolio.

Plaintiff asserts that Myers and other top CVB executives knew as early as September 2008 that Garrett was having financial difficulties. As support for this assertion, it relies heavily on the testimony of CW9 and CW10. CW9 was Garrett's COO from April 2005 to March 2011.[83] He "interacted directly and regularly with the executive staff at Garrett [and] was deposed by the SEC in connection with its investigation of CVB."[84] He reports that "Garrett executives" met with Myers and Dowd to ask for additional funding needed to meet ongoing obligations.[85] The additional loans were used to bring Garrett current on its existing CVB loans; CW9 asserts that "CVB was trying to keep the house of cards standing."[86]

CW10 worked as a senior analyst and asset manager for Garrett from September 2004 to February 2009, and was "familiar with properties serving as collateral for loans from CVB to

---

[83]FAC, ¶ 22(i).

[84]*Id.*

[85]*Id.*, ¶ 33.

[86]*Id.*

Garrett."[87]   He states that Garrett "was on the verge of bankruptcy" and recalled meetings between CVB and Garrett in approximately September 2008 regarding Garrett's need for additional funding.  He reports that Garrett employees received no raises or bonuses during this period, and that "everybody knew" of the company's perilous financial condition as of September 2008.[88] He asserts that Garrett's CEO, Kirk Wright, presided over a meeting of 30 to 35 Garrett employees in which he informed them that their salaries would be cut by 10%.[89]  Wright stated at the meeting that "Garrett was trying to save the company," that it was in a "dire situation," and that it needed to secure additional funding from CVB or would not survive.[90]  Wright had previously laid off "a number" of employees.[91]

Other confidential witnesses offer similar testimony regarding Garrett's financial position. CW8, another Garrett employee, states that the company's executives "discussed bankruptcy and met with bankruptcy attorneys" to discuss a potential bankruptcy filing "during 2008 and 2009."[92] He reports that even after he left the company in February 2009, he continued to hear talk of the possibility that Garrett would seek bankruptcy protection.[93] CW11 states that Garret was "hanging on by a thread," and that "CVB was trying to partner with Garrett in 2008 to 'help keep Garrett afloat.'"[94]

While the testimony of the CWs assists plaintiff to some extent in meeting his pleading burden, the allegations are nonetheless deficient in a number of ways.  As noted, the Ninth Circuit

---

[87]*Id.*, ¶ 22(j).

[88]*Id.*, ¶ 34-35.

[89]*Id.*, ¶ 35.

[90]*Id.*, ¶ 36.

[91]*Id.*

[92]*Id.*, ¶ 36.

[93]*Id.*

[94]*Id.*

25

requires that confidential witnesses be "described with sufficient particularity to establish their reliability and personal knowledge," and that "those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Zucco Partners*, 552 F.3d at 995.  The most compelling of the witnesses is CW9, who, as Garrett's COO, would reasonably have been in a position to know personally the company's financial status and plans for any impending bankruptcy.  While CW9 reports what supposedly transpired at a meeting of Garrett and CVB executives in September 2008, the complaint does not allege that CW9 attended this meeting.[95]  It thus does not show that he has personal knowledge of the statements made during the meeting or the information that was exchanged at that time.  While hearsay testimony need not automatically be discounted when assessing falsity and scienter allegations, *id.* at 998 n. 4, as presented, CW9's statements are clearly hearsay, since he describes information exchanged at a meeting he did not attend.  Additionally, the complaint does not allege exactly what Garrett officials told CVB at the meeting, stating only in general terms that "Garrett executives met with [CVB officers] and asked for additional funding," and "informed CVB that [Garrett] needed the additional funds just to meet its ongoing obligations."[96] If the complaint were able to describe these statements in greater detail, and discuss more explicitly how CW9 knew that the statements were made, it might well adequately allege that Garrett communicated the depth of its financial difficulties to CVB as early as September 2008.  This, in turn, would support an inference that CVB had contemporaneous knowledge of Garrett's problems at the time it was making representations concerning the relationship's viability.  As there are no allegations concerning the manner in which CW9 learned of the information communicated at the meeting, however, and no allegations that describe the information in any detail, at best CW9's statements minimally support plaintiff's assertion that CVB executives knew of Garrett's financial condition.

---

[95]*Id.*, ¶ 33.  Although the complaint implies that CW9 was present at the meeting, plaintiff does not dispute defendants' interpretation of the allegation.  (Opp. at 15 (stating that CW9 sat in on meetings with Garrett executive staff "*before* and *after* Garrett's meetings with Defendant Myers and other CVB executives. . .").)

[96]FAC, ¶ 33.

CW8's, CW10's, and CW11's testimony is substantially weaker than CW9's. Although these witnesses assert that Garrett was experiencing financial problems during late 2008 and 2009, their statements are vague and lacking in any real detail. See *Zucco Partners*, 552 F.3d at 996 ("Some of the confidential witnesses were simply not positioned to know the information alleged, many report only unreliable hearsay, and others allege conclusory assertions of scienter. These allegations are not sufficient to raise a strong inference of scienter because they demonstrate that the confidential witnesses are not reliable"). More fundamentally, their statements in no way suggest that they were in a position to know what information Garrett communicated to CVB executives; the most they can offer is that Garrett CEO Wright said the company would seek additional funding from CVB, and conclusorily, that CVB was trying to "partner" with Garrett to save the company. Even if the statements of these witnesses are credited, the most they establish is that Garrett was having serious financial difficulties during the fall of 2008. What they do not (and likely cannot) say is whether this information was conveyed to *CVB* and its executives, who are the defendants in this case. Consequently, even accepting the confidential witness statements as true, they do not give rise to a strong inference of scienter.

Plaintiff's allegations regarding Garrett's financial condition throughout 2009 and into early 2010 similarly do not give rise to a strong inference of scienter. In its earlier order granting defendants' motion to dismiss the consolidated complaint, the court observed that while defendants' repeated extension of "refinancing" packages to Garrett might be indicative of scienter, plaintiff had not pled sufficient facts regarding the nature of Garrett's and CVB's lending relationship to give rise to a strong inference that defendants knew Garrett would eventually default on the loans and extended additional credit to conceal this fact.[97] Plaintiff's attempt to cure this problem is entirely reliant on deficient allegations concerning CWs and conclusory assertions that CVB knew of or recklessly disregarded the status of the Garrett loans. As noted, however, these allegations assertions are unavailing. See *In re Accuray, Inc. Sec. Litig.*, 757 F.Supp.2d 936, 945 (N.D. Cal. 2010) ("It is difficult to prove falsity by questioning whether certain deals

---

[97]MTD Order at 36-38.

should have been included in backlog based on the later removal of contracts from backlog. Hindsight and the former opinions of former employees do not generally rise to the level of falsity"); *New York State Teachers' Retirement Systems v. Fremont Gen. Corp.*, CV No. 07–5756 FMC (FFMx), 2009 WL 3112574, *7 (C.D. Cal. Sept. 25, 2009) ("[E]ven taking all the factual allegations in the SAC as true, they are less likely to support an inference of securities fraud than they are to support an inference of profoundly misguided corporate mismanagement").

Plaintiff alleges that Garrett and CVB executives met again in or about January 2010. Once again, it relies on the statements of CW9, who states that he met with other Garrett executives "before and after" Garrett himself met with Myers and CVB executives.[98] CW9 assert that at this meeting, Garrett stated that his company was on the verge of bankruptcy and would be unable to meet its loan obligations without the extension of additional credit or modification of the loans.[99] CW9 contends that Garrett communicated this as either a threat or promise, telling CVB that "unless [it] extended additional credit or modified loan terms, Garrett would file for bankruptcy."[100]

Although CW9 does not explicitly state how he knows this information, the complaint alleges that he "sat in meetings with Paul and Diane Garret, [Wright], Bill Whinna and Marty Weiss before and after these meetings . . . ," at which, presumably, the specifics of Garrett's meeting with CVB were discussed.[101] The allegations suggest that Garrett framed his company's

---

[98]*Id.*, ¶ 40. As pled, the complaint alleges that Garrett met with CVB executives alone, and that no other Garrett employees were present.

[99]*Id.*, ¶ 40. The complaint also alleges that CVB "continued to engage in secret loan modifications with Garrett" around the time of the January 2010 meeting. As defendants observe, however, plaintiff does not "allege any specific modification of the loans [that purportedly occurred] following the . . . meeting." (*Id.*; Motion at 13.) It would appear that plaintiff wishes the court to infer that because Garrett proposed loan modifications at the January 2010 meeting, modifications were made. Under the PSLRA's rigorous pleading standards, the court cannot simply assume such a fact in the absence of allegations concerning the "secret" modifications and how they were deceptive.

[100]FAC, ¶ 40.

[101]*Id.*

precarious position in stark terms, placing CVB executives on notice that one of their biggest

relationships was about to founder.  Had the contents of the meeting been pled in greater detail,

they would have added substantial weight to allegations that CVB severely underplayed its

ignorance of Garrett's financial difficulties.  CW9's statements alone are insufficient, however,

to give rise to the necessary inferences.  Like the information CW9 provides concerning the

September 2008 meeting, his statements concerning the January 2010 meeting are hearsay, as it

appears he was not present.  Since it is not clear that he was present at the meeting, the context

of Garrett's purported statements is not clear; as defendants note, Garrett's threat of bankruptcy

could have been a negotiating tactic rather than a serious threat.  Without more information

concerning the content and context of the meeting, the pleading does not raise plausible inferences

regarding the fact that CVB recklessly disregarded serious problems in its relationship with its

largest borrower.  Plaintiff cannot meet the demanding requirements of the PSLRA by repeatedly

mentioning bankruptcy; rather, he must plead concrete facts indicating that defendants knew or

recklessly disregarded the possibility that Garrett was truly on the verge of bankruptcy.[102]  While

---

[102]The amended complaint repeats allegations in the original consolidated complaint concerning CVB's relationship with Vintage Dairy; it contends that when this company failed to make timely payments, the bank "borrowed from the credit line of a related entity" to give the appearance that Vintage was current on its obligations.  (*Id.*, ¶ 42.)  This assertion is based on the statement of CW4, who worked for CVB's agribusiness department from 2002 to 2010 as the executive assistant to Larry Zivelonghi, vice president of CVB's diary and livestock industries group.  (*Id.*, ¶ 22(d)).  Zivelonghi allegedly reported directly to Myers, and allegedly "held internal staff meetings in which he openly discussed the practice of granting additional funds in order to conceal delinquencies."

As noted in the court's prior order, these allegations lack sufficient detail to allege either falsity or scienter adequately.  (MTD Order at 38 n. 126.)  Assuming this practice occurred regularly, the complaint does not disclose why it was inappropriate for Vintage to draw down on the credit line of a "related entity," which may have been a subsidiary, to keep its debt service payments current.  Nor does the complaint allege that the practice was widespread.  At best, CW4 offers vague hearsay testimony concerning Zivelonghi's discussion of the "practice."  CW4 does not recount specifically what Zivelonghi said, how many other CVB customers were drawing down on related entities' lines of credit to pay their debts, nor even how often Vintage Dairy did so.  Finally, the complaint does not allege that Myers knew of the practice; rather, it seeks to have the court infer that he knew because he supervised Zivelonghi.  The first amended complaint thus fails to cure the deficiencies in the original complaint's allegations regarding the purportedly deceptive business practices of CVB's agribusiness department.

plaintiff's allegations, buttressed by CW9's statements, come close to meeting this standard, the complaint in its present form does not state a viable claim.

Plaintiff also selectively quotes analyst reports and SEC disclosures in an effort to plead falsity.  As one example, the complaint excerpts a January 25, 2010 analyst report, asserting it reported that "management noted that the $84 million Garrett Group credit [was] performing as expected."[103]  Plaintiff omits the end of the sentence, however, which stated that the credit "remain[ed] on classified status (substandard)."[104]  A "substandard" loan is one for which there is a "distinct possibility that the institution will sustain some loss if the deficiencies are not corrected."[105]  Rather than misrepresenting the status of the Garrett loans, the disclosure supports an inference that when concerns arose regarding the status of the Garrett loan portfolio, defendants made efforts to disclose the situation in a timely manner.

> **b.**     **The Strength of the Bank's Loan Loss Reserves and Credit and Underwriting Culture**

Plaintiff next alleges that defendants made numerous false statements regarding CVB's loan underwriting practices and the adequacy of its loan loss reserves.  It cites CVB's repeated statements concerning its "conservative" and "strong" underwriting culture.[106]  Plaintiff alleges that in contrast to these public statements, CVB's underwriting practices were unsound and that its books did not properly reflect the weakness of the loan portfolio.  Specifically, it asserts that CVB used false appraised values for collateral, failed properly to account for CVB's loans and customers' likelihood of default,[107] and did not maintain adequate loan loss reserves.

---

[103]*Id.*, ¶ 115.

[104]RJN, Exh. S (1/25/10 Macquarie Report (emphasis added)).

[105]RJN, Exh. SS (Interagency Policy on Classification of Assets and Appraisal of Securities (June 15, 2004)) at 13.

[106]See, e.g., *id.*, ¶¶ 118-22.

[107]This allegation is more appropriately addressed in the discussion of defendants' alleged GAAP violations that follows in Part D.2.d, *infra*.

The amended complaint repeats allegations in the original pleading that CVB improperly used higher appraised values for the collateral securing its loans to make it appear that it would be able to recover more than would be possible in the event of a default.[108]   15 U.S.C. § 78u-4(b)(1)(1) requires a plaintiff to describe in detail "the reason or reasons why the statement is misleading."  See also *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) ("Averments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged").  The court's prior order explained in some detail that while using higher appraised values might have left the impression that CVB had more protection against default than was actually the case, plaintiff had not alleged that its valuation method was necessarily improper, particularly given that appraisal methods are, to some extent, matters of business judgment.[109]  The court also observed that plaintiff had offered but one example of the allegedly deceptive practice, which involved a single appraisal of the collateral for a non-Garrett loan.[110]

Plaintiff has attempted to cure this deficiency by alleging that the practice "had a direct impact on the Bank's bottom line . . . because any difference between the principal loan balance and estimated proceeds from sale . . . had to be written off or reserved for."[111]  Using the higher appraisal values therefore overstated the expected proceeds from foreclosing on distressed loan collateral, artificially reducing CVB's reserves and overstating its profits.[112]  The complaint also alleges that CVB overvalued a property that served as collateral for some of the Garrett loans,

---

[108]Specifically, CW1 stated that CVB typically obtained two different appraised values for loan collateral.  (Complaint, ¶ 83.)  The first value was used if the property was "stabilized with market rent," meaning that no deferred maintenance was required and the property was fully leased at market rent.  The second was an "as-is" value, a lower estimate used when the property had deferred maintenance and was not fully occupied.  (*Id.*)

[109]MTD Order at 42-43.

[110]*Id.*

[111]FAC, ¶ 45.

[112]*Id.*

namely, the Empire Corporate Center in Ontario, Canada.[113]  CW8 states that the property was
originally carried on Garrett's books at approximately $21 million, but that its value was lowered
to $16 million for purposes of the loan.[114]  When the property was put on the market in 2007-
2008, offers were in the $12-13 million range; the property was eventually sold in June 2011 for
$9.25 million.[115]  The complaint alleges that this property evidences the fact that CVB was not
properly valuing the collateral backing its loans.  As additional support for this contention,
plaintiff asserts that Garrett was delinquent in paying property taxes on at least 32 CVB-financed
properties from 2008 through the first installment in 2010.[116]

These allegations are insufficient to cure the problems in the earlier complaint.  The
amended complaint adds little information as to why using one appraisal rather than another is
probative of falsity or scienter; it simply repeats the assertion in the original that using the higher
valuation overstated the likely return to CVB from foreclosing on the collateral.  While plaintiff
may take issue with CVB's accounting decision, it bears the burden of pleading facts showing that
it was inherently deceptive or fraudulent.  While plaintiff implies the existence of an accounting
standard that uses a lower valuation when properties have deferred maintenance and generate no
income, it does not cite such a standard or identify its source.  Consequently, these allegations
are once again deficient.  Compare *In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*,
694 F.Supp.2d 1192, 1210 (W.D. Wash. 2009) (holding that plaintiffs had successfully stated a
claim based on defendants' appraisal process by "provid[ing] substantial detail [in approximately
70 paragraphs] as to this secret effort, relying on CW testimony from various branch level loan
officers and underwriters up to regional managers in WaMu's Appraisal Department," as well as
"expert data analysis reinforcing their claim that WaMu's appraisal process was corrupt").

As respects plaintiff's new factual allegations concerning the Empire Corporate Center and

---

[113]*Id.*, ¶ 47.

[114]*Id.*, ¶ 47.

[115]*Id.*

[116]*Id.*, ¶ 48.

Garrett's property tax delinquencies, the complaint does not identify any connection between *Garrett's* purportedly improper valuation practices and *CVB's* valuation of the collateral backing its loans. While these allegations suggest mismanagement or malfeasance on Garrett's part, that entity is not a defendant in this action. Plaintiff repeatedly appears to confuse Garrett's poor financial management practices with CVB's alleged fraud on the market. Allegations regarding Garrett's failures or misdeeds, however, will not save its complaint from dismissal.

Finally, the court sees no reason to revisit its prior conclusion that CVB's general statements comparing its credit culture and loan quality favorably to those of peer institutions were mere puffery and did not constitute actionable representations. See *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) ("When valuing corporations, however, investors do not rely on vague statements of optimism like "good," "well-regarded," or other feel good monikers. This mildly optimistic, subjective assessment hardly amounts to a securities violation"); *Glen Holly Entertainment, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003) ("We agree with the district court that these statements – generally describing the "high priority" Tektronix placed on product development and alluding to marketing efforts – do not state an actionable fraud or negligent misrepresentation claim. The statements were generalized, vague and unspecific assertions, constituting mere 'puffery' upon which a reasonable consumer could not rely"); *In re Verifone Sec. Litig.*, 784 F.Supp.2d 1471, 1481 (N.D. Cal. 1992) ("Professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives, who have a personal stake in the future success of the company").

          **c.**        **Characterization of the Real Estate Market as a "Risk Factor"**

Plaintiff also asserts that CVB's public filings mischaracterized the deterioration of the real estate market as a future "risk factor."[117] It argues that the real estate market had already deteriorated and had already had a negative effect on its loan portfolio.[118] See *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985-87 (9th Cir. 2008) ("The passage, moreover, speaks

---

[117]See, e.g., *id.*, ¶¶ 36, 58.

[118]Opp. at 9.

entirely of as-yet-unrealized risks and contingencies.  Nothing alerts the reader that some of these risks may already have come to fruition, and that what the company refers to as backlog includes work that is substantially delayed and at serious risk of being cancelled altogether"); see also *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) ("Similar to *Berson*, the passage in the Form 10–Q speaks about the risks of product liability claims in the abstract, with no indication that the risk 'may already have come to fruition'"), aff'd, *Matrixx Initiatives, Inc. v. Siracusano*, 131 S.Ct. 1309 (2011) .

The court previously concluded that defendants' "risk factor" statements were not actionable because the original complaint lacked factual allegations showing that CVB knew or recklessly disregarded the fact the "risk" had already materialized.[119]  The amended complaint fails to suggest otherwise.  Although the amended complaint repeatedly alleges that "[a]t least eight confidential witnesses corroborate that Defendants knew by this time, but failed to disclose, that an increasing number of the Bank's loans were facing delinquency,"[120] most of these confidential witnesses cannot offer reliable testimony regarding the falsity of defendants' allegedly fraudulent statements or their scienter, or regarding CVB's knowledge of Garrett's difficulties, as opposed to Garrett's awareness of its financial problems.

Moreover, some of CVB's public filings show that it was warning of both present problems and future risks resulting from the market downturn.  CVB's FY09 Form 10-K reported, for example: "We can anticipate that there will be some losses in the loan portfolio given the current state of the economy.  However, we cannot predict the extent to which the deterioration in general economic conditions, real estate values, increase in general rates of interest, change in the financial conditions or business of a borrower may adversely affect a borrower's ability to pay."[121] The filing noted that CVB's annual charge-offs had increased significantly, and that "[t]he

---

[119]MTD Order at 39-40.

[120]See, e.g., FAC, ¶ 93.

[121]RJN, Exh. E at 49.

economic downturn ha[d] had an impact on [its] market area and [its] loan portfolio."[122]

One factual assertion in the Form 10-K bears some mention, however.  It states that CVB was "not aware of any other loans . . . for which known credit problems of the borrower would cause [there to be] serious doubts [concerning] the ability of [the] borrower[ ] to comply with [its] present loan repayment terms, or any known events that would result in the loan being designated as nonperforming at some future date."[123]  The report was filed in March 2010, after CVB had extended additional credit to Garrett and refinanced its loans multiple times.  The court's prior order dismissing the consolidated complaint suggested that there ought to have been "serious doubts" concerning Garrett's ability to comply with loan repayment terms and the likelihood that the loans might have to be categorized as nonperforming at some future date.  It concluded, however, that the complaint pled insufficient facts to show that defendants had contemporaneous knowledge that the statement was false.[124]  The only new allegations in the amended complaint concerning this subject are CW9's statements, which the court has concluded are not adequate to establish CVB's and Myers's knowledge of Garrett's allegedly impending bankruptcy.  Consequently, as pled, this statement once again is not actionable.

### d.  GAAP Violations

Finally, plaintiffs allege multiple violation of GAAP and SEC regulations.  "'[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter.'"  *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002) (quoting *In re Software Toolworks Inc.*, 50 F.3d 615, 627 (9th Cir. 1994)); see also *Hockey v. Medheker*, 30 F.Supp.2d 1209, 1224 (N.D. Cal. 1998) ("Merely alleging that fraudulent accounting practices have occurred, without more, does not create a strong inference of scienter").

"Rather, to plead fraudulent intent based on GAAP violations, plaintiffs must allege facts

---

[122]*Id.*

[123]*Id.*

[124]MTD Order at 40.

showing that: (1) specific accounting decisions were improper; and (2) the defendants knew specific facts at the time that rendered their accounting determinations fraudulent." *Morgan v. AXT, Inc.*, No. C 04-4362 MJJ, C 05-5106 MJJ, 2005 WL 2347125, * 14 (N.D. Cal. Sept. 23, 2005) (citing *DSAM Global Value Fund*, 288 F.3d at 390–391).

The amended complaint alleges four general categories of GAAP violations:[125] (1) defendants' failure to disclose loan losses, loss reserves, and various underperforming or nonperforming loans by type; (2) defendants' failure accurately to report past due, restructured, and nonperforming assets and realized losses; (3) defendants' failure to record loan losses in a timely fashion as losses were incurred; and (4) defendants' failure to make financial statement disclosures CVB should have made in various filings. The court's prior order stated that allegations regarding these purported violations were, for the most part, simply too conclusory to support a claim that violations occurred, and that they were inadequate to show scienter as well.[126] It noted that the one allegation of falsity that was successfully pled was defendants' failure to disclose CVB's concentration of risk in the Garrett loans, which was admittedly its largest lending relationship.[127]

The first, second and third categories of violations variously assert that defendants concealed the fact that loan loss reserves and allowances for credit losses were inadequate by providing an aggregate loan loss amount rather than disclosing the loss in each of eight loan portfolios. They purportedly did this to "conceal the impairment in its loan portfolio,"[128] and the "impairment in the Garrett loans."[129] Similarly, they provided inaccurate and understated figures

---

[125]While the complaint divides the alleged GAAP violations into five types, two concern the effects of defendants' failure to write off loan losses as they occurred. (FAC, ¶¶ 67-78.) The court therefore discusses these allegations in tandem.

[126]MTD Order at 45-47.

[127]*Id.* at 47.

[128]FAC, ¶ 54.

[129]*Id.*, ¶ 58.

for CVB's "delinquent and non–performing loans,"[130] and failed to account for the Garrett loans as a "troubled debt restructuring,"[131] which purportedly caused material misstatements in their financial statements.[132]   Plaintiff also alleges that defendants failed to "record timely loan loss provisions on 'impaired' and 'nonperforming' loans,"[133] instead using inflated appraisal values for loan collateral.  This purportedly enabled defendants to conceal the fact that the market value of the collateral had deteriorated, and was well below the value used when CVB originated the loan.[134]   Finally, plaintiff asserts that CVB inflated loan loss reserves and suggested they were stronger than they actually were by failing to write off losses as they were incurred.[135]

The court's prior order noted that the original complaint did not adequately plead how defendants' accounting violated GAAP.  While to some extent this deficiency has been corrected, the court also concluded that allegations that defendants' GAAP violations constituted actionable misrepresentations were conclusory, and that plaintiff had failed to plead facts suggesting that the purported GAAP violations had rendered defendants' statements false when made.[136]   The amended complaint more clearly links the GAAP violations to the purported falsity of defendants' statements.  Unfortunately for plaintiff, however, the additional clarity reveals that most of its allegations regarding GAAP violations assume that CVB knew Garrett was in serious financial trouble as early as September 2008, and knew that it was considering bankruptcy in January 2010. The allegations assume that, despite this knowledge, CVB decided not to categorize the Garrett loans as underperforming or nonperforming, and not to write off the loans in an appropriate or

---

[130]*Id.*, ¶ 65.

[131]*Id.*, ¶ 66.

[132]*Id.*

[133]*Id.*, ¶ 74.

[134]*Id.*, ¶ 75.

[135]*Id.*, ¶¶ 77-78.

[136]MTD Order at 45-47.

37

1    timely manner.[137]  As the court has noted, plaintiff has failed to plead either falsity or scienter

2    regarding defendants' knowledge or disclosure of the status of the Garrett loans; this compels the

3    conclusion that plaintiff has failed to plead facts "probative of conscious misbehavior or

4    recklessness" as respects the majority of the purported GAAP violations.  *Stevelman v. Alias*

5    *Research Inc.,* 174 F.3d 79, 84 (2d Cir. 1999); see also *In re Downey Sec. Litig.*, No. CV

6    08–3261 JFW (RZx), 2009 WL 2767670, *12 (C.D. Cal. Aug. 21, 2009) ("Such [GAAP]

7    violations, even significant ones requiring large or multiple restatements, must be augmented by

8    other specific allegations that defendants possessed the requisite mental state.  See *In re*

9    *Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F.Supp.2d 1069, 1091 (N.D. Cal. 2005)

10   ("Allegations of GAAP violations thus provide some measure of support for the present plaintiffs'

11   ultimate allegation of scienter, but they must be underpinned by other particularized allegations

12   that defendants possessed the requisite mental state")).

13        Other alleged GAAP violations, such as those related to the recording of loan loss reserves,

14   concern defendants' valuation of the collateral underlying CVB's loans.[138]  These allegations

15   depend heavily on the assumption that defendants knew of problems in CVB's loan portfolio

16   during the early months of the class period, as well on plaintiff's contention that the fact that the

---

18   [137]The amended complaint alleges that each Gareete loan "modification" was "made to
19   accommodate [the] borrower['s] existing loans" and "because" of this, each should have been
     accounted for as a 'troubled debt restructuring.'" (FAC, ¶ 30.)  Before a transaction need be
20   classified as a "troubled debt restructuring," however, two elements must be present: (1) the
     debtor must be experiencing financial difficulties, and (2) the lender must grant the debtor a
21   "concession" that the lender "would not otherwise consider."  (RJN, Exh. TT(ASC 310-
     40-15-5).)  The amended complaint fails to allege that CVB made a "concession."  Rather than,
22   for example, alleging with particularity that Garrett negotiated a forgiveness of principal or a
23   substantial reduction in interest rates, plaintiff pleads that CVB obtained additional collateral for
     certain modifications.  (See, e.g., FAC ¶ 38.)  Similarly, the amended complaint alleges that to
24   be "a 'troubled debt restructuring,'" CVB's Garrett loans had to have "suffered a collective loss
     in value and thus, [have been] 'impaired.'"  (*Id.*, ¶ 41.)  Theh pleading does not adequately allege
25   that these elements of a "troubled debt restructuring" were satisfied, however.

26        In any event, the amended complaint does not allege that CVB had determined at the time
27   it made any of the alleged misstatements that Garrett would be unable to repay both principal and
     interest on its loans in full.

28        [138]See. e.g., *id.*, ¶ 75.

real estate market was a "risk factor" was already apparent and it was clear it would have a significant negative effect on the value of defendants' collateral.  The court concluded above that these allegations were insufficient to show that defendants' representations were false or made with scienter.  Thus, allegations of falsity based on purported GAAP violations that depend on these allegations fail as well.  Some allegations assert that CVB "should have" reviewed nonperforming loans prior to foreclosure, and evaluated the current market value of the underlying collateral to estimate more accurate losses.  Under the applicable case law, however, scienter is "a mental state embracing intent to deceive, manipulate, or defraud."  It is not mere negligence. *Ernst & Ernst*, 425 U.S. at 193 n. 12.  Even ordinary recklessness is not sufficient under the case law; recklessness "satisfies scienter under § 10(b)" only if it "reflects some degree of intentional or conscious misconduct."  *Silicon Graphics*, 183 F.3d at 977.  As a result, conclusory assertions that defendants "should have" acted differently do not satisfy the PSLRA.     Plaintiff alleges CVB violated GAAP and SEC disclosure requirements by making insufficient disclosures; the purportedly inadequate disclosures include a failure to disclose "material changes in financial condition and results of operations"[139] and "critical accounting estimates."[140]  The allegations rest on plaintiff's assertion that Garrett disclosed to CVB executives the full extent of its problems early in the class period and repeatedly threatened bankruptcy unless CVB modified its loans.[141] For reasons explained *supra*, plaintiff cannot rely on these factual contentions to plead GAAP violations.

The one potential GAAP violation the court found had been adequately pled in the prior complaint was defendants' alleged failure to comply with SEC Financial Reporting Release No. 13 and GAAP standards regarding concentrations of credit risk and risk elements involved in

---

[139]*Id.*, ¶ 83.

[140]*Id.*, ¶ 84.

[141]E.g., *id.*, ¶ 83 (contending that SEC regulation requiring disclosure of "unusual or infrequent transactions" required disclosure of Garrett's financial status during each reporting period), ¶ 84 (alleging that CVB failed to make "critical accounting estimates" with respect to Garrett loans).

lending activities.[142]   The court concluded that plaintiff had successfully pled violations of these requirements because the amount of the Garrett loans required defendants to discuss those loans in greater detail in its financial statements and public disclosures.[143]   This conclusion was based, in part, on the consolidated complaint's allegation that the $85 million Garrett relationship comprised 14% of the bank's total loan portfolio.[144]   This allegation appears to have been somewhat misleading – while the Garrett loans comprised approximately 14% of CVB's tangible common equity – the amended complaint clearly states that CVB's total loan portfolio "had grown to more than $3.5 billion . . ." by the time the conduct at issue took place.[145]   Consequently, based on the first amended complaint, it appears that the $85 million in loans CVB made to Garrett actually comprised something closer to 2.4% of its total loan portfolio, not the 14% the court accepted as true based on the allegations in the original consolidated complaint.   This clarification substantially alters the court's view as to whether defendants violated SEC regulations and GAAP by failing to disclose their transactions with Garrett in greater detail.   None of the regulations or GAAP requirements cited in the complaint appears to require specific disclosure of a "concentration of credit risk" at such a low level.   The complaint cites SEC Regulation S-X Rule 9-03, ¶ 7(a), FRR T.401 (also known as SEC Financial Reporting Release No. 13), and ASC 825-10-50-20.   SEC Regulation S-X Rule 9-03, ¶ 7(a) concerns the disclosure of loan "categories," while ¶ 7(a)(7) concerns "any other loan category."   17 C.F.R. § 210.9-03.   The relationship between this requirement and the necessity of providing more detailed disclosure of the Garrett loans is not pled in the complaint, and the court cannot discern the relationship from reading the regulation.   Similarly, the complaint does not allege why additional disclosures concerning a relationship that constituted 2.4% of a loan portfolio – even if it was CVB's largest lending

---

[142]MTD Order at 48-49.

[143]FAC, ¶¶ 81-82.

[144]MTD Order at 57 (citing consolidated complaint, ¶ 2).

[145]FAC, ¶ 19.

relationship – was required under ASC 825-10-50-20 or ASC 825-10-50-21.[146]  Thus, plaintiff's conclusory allegations of GAAP violations are insufficient to plead either falsity or scienter.[147]

### e.     The Remaining Scienter Allegations

#### i.     CVB's, Myers' and Biebrich's Motive to Commit Fraud

The court has addressed many of the allegations of scienter, particularly those that concern CVB's handling of the Garrett relationship and Myers's personal negotiations with Garrett executives regarding loan modifications.  The court has concluded that the allegations supporting plaintiff assertion that defendants made false statements concerning the Garrett loans with scienter are inadequate.  It addresses here only the remaining allegations of scienter, and then conducts the required holistic review.

Plaintiff repleads an allegation found in the original consolidated complaint that Myers's and Biebrich's alleged "insider trading" shows they had a personal motive to deceive the market.  Plaintiff asserts that Biebrich sold approximately 57,000 shares of stock in six separate transactions during the class period.[148]  By contrast, in the year prior to the start of the class period, he sold only 1,608 shares.[149]  Similarly, Myers sold no shares during the year preceding

---

[146]Plaintiff concedes that FRR.T.401 did not mandate specific disclosure of the Garrett relationship.  (Opp. at 13 n. 12 ("CVB's failure to disclose details about Garrett's $85 million in undisclosed loans is supported by ASC 825-10-50-20, ASC 825-10-50-21 and Reg. S-X Rule 9-03 ¶7(a)(7) rather than FRR No. 13").)

[147]Like the consolidated complaint, the amended complaint alleges that the fact that CVB made additional disclosures regarding its loan portfolio and its delinquent and nonperforming loans following the SEC investigation shows that its prior disclosures were false and misleading.  (See FAC, ¶ 86.)  Defendants assert that the more detailed disclosures were directly linked to a change in GAAP that required a specific breakdown of loan portfolios.  Whether CVB's increased disclosures were motivated by a change in GAAP is a question of fact the court cannot resolve in deciding a motion to dismiss.  Given the PSLRA's heightened pleading standards, however, the allegation that CVB changed its disclosure policies does not adequately plead falsity.

[148]Id., ¶ 169.

[149]Id.

41

the class period, but sold 18,500 shares, in two separate transactions, during the class period.[150]

Myers also instituted a 10b5-1 trading plan for the purpose of paying income taxes generated by the vesting of his restricted stock grants.[151]   The court previously observed that Myers's fairly minuscule trading activity during the class period was insufficient to give rise to an inference of scienter, given that he sold less than six percent of his stock holdings.[152]   See *Metzler*, 540 F.3d at 1067 ("Digiovanni made no sales during the Class Period; Moore sold only 37% of his total stock holdings during the Class Period.   We typically require larger sales amounts – and corroborative sales by other defendants – to allow insider trading to support scienter"); *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002) ("[Defendant's] sale of 10,000 shares constituted only 1.4% of his total . . . holdings.   The sale of such a small percentage of total holdings does not give rise to the strong inference of scienter required by the PSLRA").

While Biebrich's sales were more substantial, the court previously found that, standing alone, his stock sales did not give rise to a strong inference of scienter, and that any suggestion of such a motive for Biebrich's acts was undercut by Myers's small stock sales.[153]   The amended complaint pleads no new facts that compel a different conclusion.   See *Metzler*, 540 F.3d at 1067 (stating that total stock sales of $33 million, constituting 100% of one defendant's, and 37% of another defendant's, holdings, did not give rise to an inference of scienter); cf. *Silicon Graphics*, 183 F.3d at 987 (holding, where a defendant had previously been prohibited from selling stock, that a sale of 65% of his shares did not raise inference of scienter).

ii.   **Plaintiff's "Core Operations" Argument and Myers's and Biebrich's Alleged Review of Problem Loans**

Plaintiff also alleges, as it did in the original consolidated complaint, that the size of the

---

[150]*Id.*, ¶ 170.

[151]*Id.* Plaintiffs do not allege that Myers and Biebrich are guilty of insider trading under § 20A of the 1934 Act, 15 U.S.C. § 78t-1(a).

[152]MTD Order at 60-61.

[153]*Id.*

Garrett loans, coupled with Myers's and Biebrich's repeated declarations that they carefully monitored CVB's real estate portfolio, supports an inference of scienter. In *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008), the Ninth Circuit noted its earlier rejection of the concept that "facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers' under the PSLRA." *Id.* at 783 (citing *Read–Rite*, 335 F.3d at 848-49). "Where a complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the PSLRA standard." *South Ferry*, 542 F.3d at 784. Thus, a pleading that relies "exclusively" on a core operations argument to show scienter will ordinarily fail. *Id.* at 783. The are, however, two exceptions to this rule. The first is generally outlined in *Berson*, 527 F.3d 982, which involved the "unusual circumstance" of managers who allegedly failed to disclose stop-work orders received from a company's largest customers even though the orders had a devastating effect on revenues. *South Ferry*, 542 F.3d at 785 n. 3 (describing the facts of *Berson*). Together, the customers represented more than 80% of the defendant company's revenue and the court concluded that the relationships were "prominent enough that it would be 'absurd to suggest' that top management was unaware of them." *Berson*, 527 F.3d at 989 (quoting *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 941 n. 21 (9th Cir. 2003)); see also *Zucco Partners*, 552 F.3d at 1001 ("reporting false information will only be indicative of scienter where the falsity is patently obvious").

Accepting the allegations of the original consolidated complaint as true, the court's dismissal order relied on the mistaken notion that the Garrett loans comprised 14% of CVB's total loan portfolio. A careful reading of the amended complaint reveals, however, that the Garrett loans were only 2.5% of CVB's portfolio, far below the 80% of revenue that was at issue in *Berson*. There is no allegation that managing the Garrett relationship required the reallocation of significant resources within CVB, nor could such an inference arise, given the relatively small size of the Garrett loans in comparison to the bank's total lending activity. See *Berson*, 527 F.3d at

984, 988 n. 5 (noting that the two customers accounted for 80% of the company's revenue and that one of the stop-work orders "caused the company to reassign '50–75 employees,' with the result that one of the company's facilities became a 'ghost town.'  The magnitude of this reallocation of personnel raises a strong inference that defendants were aware of it, and thus also aware of the stop-work order that caused it" (internal citations omitted)).  Even if the Garrett relationship comprised CVB's largest account, a relationship that constituted such a minuscule portion of its total operations cannot, as a matter of law, bring this case within the "exceedingly rare category of cases in which the core operations inference, without more, is sufficient under the PSLRA." *South Ferry*, 542 F.3d at 785 n. 3; *see also Zucco Partners*, 552 F.3d at 1000 (describing the exception articulated in *Berson* as "narrow").

The second instance in which a core operations argument can give rise to an inference of scienter is where the plaintiff's allegations regarding core operations are accompanied by "detailed and specific allegations about management's exposure to factual information within the company." *South Ferry*, 542 F.3d at 785; *see also Zucco Partners*, 552 F.3d at 1000 ("To satisfy this standard, plaintiffs might include in their complaint '"specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database,"' a specific admission by a top executive that '"[w]e know exactly how much we have sold in the last hour around the world,"' or other particular "details about the defendants' access to information within the company" (internal citations omitted)).

Plaintiff attempts to meet bring its complaint within this exception by pleading various facts regarding Myers's and Biebrich's exposure to and awareness of the Garrett loans.   Since significant customer relationships were regularly discussed at Loan Committee meetings attended by top-level management,[154] plaintiff argues it was likely that the Garrett loans were discussed at some or all of the meetings.  CW2 and CW6 state that "top executives" had access to daily information regarding delinquencies, and that information on problem loans was given to CVB's

---

[154]*Id.*, ¶¶ 150-52.

1   board of directors at least quarterly.[155]   Plaintiff asserts that Myers admitted he knew Garrett was

2   CVB's largest loan relationship, and offers details concerning the Loan Committee and Board of

3   Directors meetings to suggest Myers had detailed information about Garrett's financial

4   condition.[156]   Finally, plaintiff contends that defendants "were in regular contact" with Garrett

5   executives, and that top CVB executives had "numerous meetings and discussions" with their

6   counterparts at Garrett throughout 2008 and 2009.

7          Plaintiff nonetheless fails to plead facts regarding the information that was provided to

8   CVB's executives at the Loan Committee and Board of Directors meetings, and alleges no new

9   facts regarding the contents of the Problem Loan Reports.   The mere fact that top management

10  may have participated in discussions regarding the Garrett loans or met "regularly" with Garrett

11  executives does not raise a "strong inference" of scienter.  See *Zucco Partners*, 552 F.3d at 1000-

12  01 ("Allegations that Digimarc's management had access to the purportedly manipulated quarterly

13  accounting numbers, or that the management analyzed the inventory numbers closely, do not

14  support the inference that management was in a position to know that such data was being

15  manipulated"); *South Ferry*, 542 F.3d at 785 (requiring "detailed and specific allegations about

16  management's exposure to factual information within the company").   The vague testimony of

17  confidential witnesses, such as CW1,[157] regarding the frequency of the Loan Committee meetings

18  is not a substitute for concrete factual allegations describing the subjects discussed at these

19  meetings and the information that was exchanged between Garrett and CVB.  See *McCasland v.*

20  *FormFactor, Inc.*, No. C 07–5545 SI, 2009 WL 2086168 (N.D. Cal. Jul. 14, 2009) ("Although

21  plaintiffs now have 14 confidential witnesses, the complaint still does not (1) identify any specific

22  information that was either received or communicated by any defendant, that (2) contradicts any

23  public statement at the time it was made"); compare *In re Daou Systems, Inc.*, 411 F.3d 1006,

24  1021 (9th Cir. 2005) (noting that "specific admissions from top executives that they are involved

25

26          [155]*Id.*, ¶¶ 91-92.

27          [156]See, e.g., *id.*, ¶ 153.

28          [157]*Id.*, ¶¶ 155-58.

1  in every detail of the company and that they monitored portions of the company's database are

2  factors in favor of inferring scienter in light of improper accounting reports").

3         Similarly unavailing is plaintiff's allegation that Myers received regular reports regarding

4  the status of CVB's loan portfolio, without any description of the contents of the reports or any

5  information regarding what they disclosed.[158]  See *Silicon Graphics*, 183 F.3d at 985 ("[A] proper

6  complaint which purports to rely on the existence of internal reports would contain at least some

7  specifics from those reports as well as such facts as may indicate their reliability"); see also

8  *Kuehbeck v. Genesis Microchip Inc.*, C 02-5344 JSW, 2005 WL 1787426, *10 (N.D. Cal. July

9  27, 2005) ("[U]nlike in *Oracle*, Ms. Kuehbeck has not identified specific internal reports that

10 would have provided Defendants with particularized and detailed information about Genesis' sales

11 and whether they were declining, as a result of the alleged problems"); *In re Autodesk, Inc.*

12 *Securities Litigation*, 132 F.Supp.2d 833, 844 (N.D. Cal. 2000) ("Plaintiffs refer generally to

13 reports generated on a weekly basis by Autodesk's finance department. . . .  Plaintiffs make no

14 specific allegations, however, about the contents of the reports or about how the contents

15 contradicted defendants' public statements.  Moreover, plaintiffs do not explain how they know

16 what was in the reports.  Nor do they quote from the reports or provide any factual basis for their

17 claim that such reports were issued.  They merely allege that sales were declining, and that there

18 were reports – implying that information regarding declining sales must have been contained in

19 those reports.  The allegations in the CAC are insufficient in this regard because Rule 9 and the

20 PSLRA require that plaintiffs provide details regarding how they obtained the reports, who

21 produced the reports, and specifically what information the reports contained").

22        Most fundamentally, plaintiff alleges no facts from which it can be inferred that

23 management knew during the class period that the Garrett relationship had passed the point of

24 repair.  See *Metzler*, 540 F.3d at 1068 ("As this court has noted on more than one occasion,

25 corporate management's general awareness of the day-to-day workings of the company's business

26 does not establish scienter – at least absent some additional allegation of specific information

27

28    [158]See, e.g., *id.*, ¶¶ 157-58.

conveyed to management and related to the fraud," citing *In re Vantive Corp. Securities Litigation*, 283 F.3d 1079, 1087-88 (9th Cir. 2002) ("[P]laintiffs have failed to cite to any specific report, to mention any dates or contents of reports, or to allege their sources of information about any reports"); *Silicon Graphics*, 183 F.3d at 988 (allowing a plaintiff "to go forward with a case based on general allegations of 'negative internal reports' would expose all those companies to securities litigation whenever their stock prices dropped"). In sum, the amended complaint has failed to cure the deficiencies in plaintiff's prior pleading, and allegations concerning plaintiff's core operations theory remain inadequate.

### iii.   Holistic Review of Plaintiff's Scienter Allegations

As Ninth Circuit precedent requires, the court now turns to a holistic examination of the scienter allegations. *New Mexico State Investment Council*, 641 F.3d at 1095; *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004) ("We find that the totality of the allegations does create a strong inference that Oracle acted with scienter, and we reverse the District Court"). Under this standard, "[v]ague or ambiguous allegations are . . . considered as a part of [the] holistic review . . . [because] the federal courts . . . need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *South Ferry*, 542 F.3d at 784.

In conducting a holistic review, however, "[e]ven if a set of allegations may create an inference of scienter greater than the sum of its parts, it must still be at least as compelling as an alternative innocent explanation." *Zucco Partners*, 552 F.3d at 1006. The analysis is a comparative one, and requires that "a court . . . consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 310.

The court's prior order granting defendants' motion to dismiss observed that while the facts alleged gave rise to an inference of scienter, they suggested an alternative narrative that was even more compelling.[159] Specifically, the allegations in the consolidated complaint suggested that rather than deceiving the market about the nature of the Garrett relationship and using potentially

---

[159]MTD Order at 62-64.

misleading accounting to mask the riskiness of CVB's loan portfolio, the magnitude of Garrett's financial problems was not apparent to defendants throughout the class period, and CVB made the rational and justifiable choice to work with one of its largest borrowers to help it meet its obligations, rather than write off the loans and take significant losses.

As the preceding discussion indicates, the allegations in the amended complaint do not equal out the balance between plaintiff's narrative and the competing one.  The most significant factual addition is CW9's statements concerning meetings that took place in September 2008 and January 2010, at which Garrett allegedly disclosed its financial difficulties to CVB executives and threatened to seek bankruptcy protection.  The court has explained, however, that CW9's statements do not show that CVB executives knew the extent of Garrett's financial difficulties, since, at least based on the allegations in the complaint, CW9 was not present at the meetings and does not know what information was exchanged or discussed.  The more difficult question is whether CW9's statements, even if not adequate on their own to establish falsity or scienter, adds sufficiently to the total mix of allegations that the pleading passes the PSLRA's threshold.

CW9's position as Garrett's COO suggests that even if he was not present at the meetings in question, he was in a position to know *something* of the discussions that took place at them.  His assertions are corroborated, to some extent, by other confidential witnesses, including CW8, CW10, and CW11, who had firsthand knowledge of Garrett's troubled financial condition.  Even when the allegations of these witnesses are considered in tandem, however, the most they establish is that Garrett was experiencing significant financial difficulties during the class period, difficulties that were the subject of much internal debate and conversation within the company.  The amended complaint appears to make the unwarranted assumption that simply because people within Garrett knew of its financial difficulties, the company was candid with CVB about its status.  While there are seemingly strong indications that Garrett, on at least one occasion, threatened CVB that the company would declare bankruptcy absent an additional infusion of capital, the critical communications took place outside CW9's presence, and the complaint does not clearly plead the nature, content, extent, and tone of Garrett's communications with defendants concerning problems as they arose.  Plaintiff's factual allegations thus do not support a conclusion that CVB

1    engaged in fraud, since the court cannot draw inferences that have no basis in the facts alleged.

2        While the amended pleading goes a long way toward curing the inconsistencies and flaws

3    the court noted in the original complaint, at its core, it suffers from the same deficiency as its

4    predecessor.  Simply put, the inference of scienter is not as compelling as the competing, and

5    more likely, inference that lenders frequently engage in ongoing discussions with important

6    borrowers that are having difficulty meeting, or that cannot meet, loan obligations.  Typically,

7    they seek to renegotiate loan terms in the hope that they will ultimately receive full payment.  In

8    assessing plaintiff's pleading of scienter, it is relevant to ask whether the facts suggest that CVB's

9    management concluded Garrett could and would continue to service and pay down its debt.

10   Plaintiff concedes that Garrett continued to pay interest and amortize principal, and never filed for

11   bankruptcy at any time during the class period.  While the amended complaint comes close to

12   meeting plaintiff's pleading burden – especially when the allegations of falsity and scienter are

13   considered in totality – it does not contain a sufficiently particularized allegation that CVB

14   management knew, during the class period, that Garrett lacked the funds to satisfy its loan

15   obligations, and that CVB recklessly or intentionally disregarded the warning signs and tried to

16   portray its largest loan relationship in a deceptively positive light.  The most plausible and

17   strongest inference that arises from the facts alleged is that, assuming Garrett's bankruptcy threat

18   was communicated to CVB's management, it did not credit it, and believed that Garrett would

19   continue to pay its debts on regular commercial terms.

20       For these reasons, a holistic review of plaintiff's scienter allegations does not mandate a

21   different result than individual examination of each of the facts.

22       **E.    Whether Plaintiff Has Successfully Pled Loss Causation**

23       The parties have briefed the issue of loss causation extensively, suggesting that it is a

24   dispute of some importance.  Although the amended complaint's failure to plead either falsity or

25   scienter is a sufficient basis for dismissal, the court briefly addresses loss causation to provide

26   guidance for any future amended pleading.

27       Key to the loss causation analysis are the Supreme Court's decision in *Dura*

28   *Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005), and the Ninth Circuit's subsequent

decision in *In re Daou*, 411 F.3d 1006 (9th Cir. 2005).[160]  "Under Rule 10b-5, a plaintiff shows

loss causation by illustrating a 'causal connection between the material misrepresentation and the

loss.'"  *McGuire v. Dendreon Corp.*, C 07-800 MJP, 2008 WL 1791381, *10 (W.D. Wash. Apr.

18, 2008) (quoting *Dura Pharmaceuticals*, 544 U.S. at 342).  The Supreme Court in *Dura* "swept

away precedent holding that it is enough to show causation if the alleged misrepresentation

'touches upon' the economic loss."  *Weiss v. Amkor Technology, Inc.*, 527 F.Supp.2d 938, 946

(D. Ariz. 2007) (citing *Dura Pharmaceuticals*, 544 U.S at 343).  Instead, a plaintiff must "plead

loss causation by alleging that the stock price fell after the truth of a misrepresentation about the

stocks was revealed."  *Id.* (citing *Dura Pharmaceuticals*, 544 U.S. at 342; *Glaser v. Enzo

Biochem, Inc.*, 464 F.3d 474, 479 (4th Cir. 2006)); see also *Tricontinental Industries, Ltd. v.

PricewaterhouseCoopers, LLP*, 475 F.3d 824, 843 (7th Cir. 2007) ("*Dura* stresses that the

complaint must 'specify each misleading statement,' and that there must be 'a causal connection

between the material misrepresentation and the loss,' not simply that the misrepresentation

'touches upon a later economic loss,'" quoting *Dura Pharmaceuticals*, 544 U.S. at 342-43, 345).

     In *Daou*, the Ninth Circuit clarified that "to prove loss causation, the plaintiff must

demonstrate a causal connection between the deceptive acts that form the basis for the claim of

securities fraud and the injury suffered by the plaintiff."  411 F.3d at 1025.  The deceptive acts

---

[160]The Supreme Court in *Dura* assumed without deciding that Rule 8's more forgiving
pleading standard applied to allegations of loss causation, and a majority of district courts in the
Ninth Circuit have so held.  See *In re Juniper Networks, Inc. Sec. Litig.*, 542 F.Supp.2d 1037,
1049 (N.D. Cal. 2008) ("While it appears that a plaintiff's allegations of loss causation need only
meet the pleading requirements of Rule 8(a)(2), the allegations must still provide the defendant
fair notice of the grounds upon which the plaintiff's claim rests"); *Anschutz Corp. v. Merrill Lynch
and Co.*, No. C09-03780-SI, 2011 WL 1134321, *20 (N.D. Cal. Mar. 27, 2011) ("[A]llegations
regarding 'loss causation' are subject only to Rule 8(a)'s more lenient standards"); *Construction
Laborers Pension Trust of Greater St. Louis v. Neurocrine Biosciences, Inc.*, No.
07CV1111-IEG-RBB, 2008 WL 2053733,*11 (S.D. Cal. May 13, 2008) ("Ninth Circuit courts
interpreting *Dura* have not required plaintiffs to plead loss causation with particularity"); see also
*In re Immune Response Sec. Litig.*, 375 F.Supp.2d 895, 1025 (S.D. Cal. 2005) (noting that Rule
8 applies to loss causation).  Defendants' reply concedes this point.  (Reply at 14 ("The
inapplicability of the PSLRA's heightened pleading standard does not save a loss causation theory
that is manifestly unwarranted by the facts").  The court thus follows the weight of authority in
this circuit and concludes that loss causation allegations need not be pled with particularity.

and misrepresentations need not be the sole cause of the plaintiff's loss, however; "as long as the
misrepresentation is one substantial cause of the investment's decline in value, other contributing
forces will not bar recovery under the loss causation requirement but will play a role in
determining recoverable damages." *Id.* (citing *Robbins v. Koger Props., Inc.*, 116 F.3d 1441,
1447 n. 5 (11th Cir. 1997)). Consequently, "[p]leading loss causation under the fraud on market
theory requires a plaintiff to (1) identify the fraudulent statement that causes the stock price to
increase, (2) identify the statements or acts which revealed to the market that the statement was
fraudulent, and (3) show a decline in stock price after the revelation." *In re Juniper Networks,
Inc.*, 542 F.Supp.2d at 1049.

"Loss causation may be alleged through a series of partial disclosures." *In re Maxim
Integrated Products, Inc. Sec. Litig.*, 639 F.Supp.2d 1038, 1048 (N.D. Cal. 2009) (citing *In re
Daou*, 411 F.3d at 1026); *In re Juniper Networks, Inc.*, 542 F.Supp.2d at 1050. A disclosure
that "does not reveal anything new to the market is, by definition, not corrective," however. *In
re Apollo Group, Inc. Sec. Litig.*, No. C 04–2147 PHX, 2008 WL 3072731, at *2 (D. Ariz. Aug.
4, 2008). The Ninth Circuit has cautioned that "neither *Daou* nor *Dura* support[s] the notion that
loss causation is pled where a defendant's disclosure reveals a 'risk' or 'potential' for widespread
fraudulent conduct." *Metzler*, 540 F.3d at 1064. Specifically,

> "a plaintiff [cannot] plead loss causation through 'euphemism' and thereby avoid
> alleging the necessary connection between defendant's fraud and the actual loss.
> So long as there is a drop in a stock's price, a plaintiff will always be able to
> contend that the market 'understood' a defendant's statement precipitating a loss as
> a coded message revealing the fraud. Enabling a plaintiff to proceed on such a
> theory would effectively resurrect what *Dura* discredited – that loss causation is
> established through an allegation that a stock was purchased at an inflated price."

*Metzler*, 540 F.3d at 1064.

In this case, the class period ended on August 9, 2010, with what plaintiff terms a "partial
corrective disclosure." This disclosure was CVB's announcement that it was the subject of a
pending SEC investigation and that it had received a subpoena seeking information regarding its

loan underwriting practices, provision for credit losses, and methods of calculating loan loss allowances, as well as certain communications with investors and analysts.[161]  Plaintiff argues that "the SEC investigation and subpoena targeted precisely the . . . topics"[162] at issue in this case, and that investors' immediate reaction caused CVB's stock to fall more than 22%, on trading volume of 13.25 million shares, on August 10, 2010.[163]   It asserts that the announcement of the investigation

> "validated what until then Defendants had publicly denied – namely, whether the
> Bank was (i) fully disclosing potentially problematic loans, in particular, loans to
> its largest customer, Garrett; (ii) whether the market value of the collateral was
> below the loan amounts; and (iii) whether CVB extended new loans to borrowers
> to keep their existing loans current."[164]

The gravamen of the parties' loss causation dispute is whether the announcement of an SEC investigation concerning the subjects of the alleged fraud, unaccompanied by any disclosure by the company suggesting that the investigation had merit, constitutes a corrective disclosure. District courts in the Ninth Circuit appear to be somewhat divided on this question.  Defendants cite *In re Maxim Integrated Products, Inc.*, 639 F.Supp.2d at 1047, which held that a company's "disclosures regarding compliance with an SEC investigation, subpoenas from the United States Attorney's office, and the formation of its own Special Committee to investigate options granting practices do not reveal the alleged fraud."   The *Maxim* court thus declined to deem disclosure of an SEC investigation a corrective disclosure sufficient to establish loss causation.  Other courts have reached similar conclusions, while some have disagreed.  See *In re Immersion Corp. Sec. Litig.*, Master File No. C–09 4073 MMC, 2011 WL 871650, *8 (N.D. Cal. Mar. 11, 2011) ("Although the final disclosure, on July 1, 2009, is at least conceptually tied to the purported fraud

---

[161]FAC, ¶ 172.

[162]Opp. at 23.

[163]FAC, ¶ 174.

[164]*Id.*, ¶ 175.

in that it announced an Audit Committee investigation into previous Medical line transactions, the announcement of an investigation, standing alone, does not give rise to a viable loss causation allegation"); *In re Hansen Natural Corp. Sec. Litig.*, 527 F.Supp.2d 1142, 1162 (C.D. Cal. 2007) ("[T]he 8-K noted that the SEC letter specifically stated that the request for documents 'should not be construed as an indication by the SEC or its staff [that] any violations of law have occurred.' In addition, the November 6, 2006, press release simply stated that Hansen had formed a Special Committee to conduct an investigation into the same matters the SEC was investigating, and the November 9, 2006, press release announced that Hansen would not be able to file its 10-Q for the third quarter of 2006 on time due to the Special Committee's investigation. However, 'the mere existence of [an] investigation cannot support any inferences of wrongdoing or fraudulent scienter on the part of [a] company or its senior management.'" (quoting *City of Austin Police Ret. Sys. v. ITT Educ. Serv., Inc.*, 388 F.Supp.2d 932, 942 (S.D. Ind.2005)); see also *Janbay v. Canadian Solar, Inc.*,No. 10 Civ. 4430(RWS), 2012 WL 1080306, *15 (S.D.N.Y. Mar. 30, 2012) ("The announcement of an SEC subpoena . . . itself is insufficient to plead loss causation").  But see *Rudolph v. UTStarcom*, No. C 07–04578 SI, 2008 WL 4002855, *4 (N.D. Cal. Aug. 21, 2008) (concluding, five days before *Metzler*, that loss causation had been adequately pled, and noting that "[w]hile it is true that the press release did not definitively state that backdating had occurred or that UTStarcom would adjust its prior financial statements as they related to equity grants, the press release did, for the first time, put the market on notice that such disclosures might be forthcoming.  Moreover, plaintiff alleges that the market reacted, at least in part, to this news, as UTStarcom's share price dropped 9%, from a closing price of $10.23 on November 7 to a closing price of $9.32 on November 9").

The question is a difficult one.  On the one hand, defendants' August 9, 2010, disclosure clearly did not reveal the existence of fraud, or expose CVB's alleged misrepresentations to the public.  The disclosure stated that "[a]ccording to the correspondence that accompanied the subpoena, '[t]he investigation does not mean the [SEC has] concluded that you or anyone else has broken the law.  Also, the investigation does not mean that we have a negative opinion of any

person, entity or security.'"[165] The release is therefore inconsistent with any inference that the
SEC's investigation clearly indicated there had been a fraud on the market.  Heeding *Metzler*'s
admonition that the mere "risk" or "possibility" of future loss is insufficient, as a matter of law,
to establish loss causation, *Maxim* and the other cases concluding that disclosing the existence of
a government investigation does not constitute a revelation that the company has, in fact, engaged
in fraudulent acts have the better of the argument.  This is because, while "[a] reasonable investor
may view these disclosures as indicators of risk because they reveal the potential existence of
future corrective information . . . they do not themselves indicate anything more than a 'risk' or
'potential' that Defendants engaged in widespread fraudulent conduct."  *In re Maxim Integrated
Products, Inc.*, 639 F.Supp.2d at 1047.

The complicating element here is that loss causation, to some extent, relies not only on the
nature of the disclosure in question, but also the public's reaction to it.  Stated differently, what
a statement "reveals" depends on more than the words it communicates; it also depends on how
others interpret those words.  The fact that CVB's stock dropped 22% following announcement
of the SEC investigation suggests that a large percentage of investors concluded that the disclosure
suggested more than the mere possibility of fraud.  The amended complaint cites statements by
market analysts, which suggest that they viewed the disclosure as something more concrete than
a hypothetical future possibility of fraud.[166]  See *In re Daou*, 411 F.3d at 1026 (discussing a range
of factual allegations relevant to loss causation, including a quotation from an anonymous market
analyst suggesting that company was "manufacturing earnings").  Despite the August 9, 2010,
statement's cautionary language and express disavowal of any wrongdoing, the market, for a
variety of reasons, appears simply to have concluded that fire accompanied the smoke.

These considerations notwithstanding, the court believes that the facts alleged are
insufficient to plead loss causation under *Dura*, *Daou*, and *Metzler*.  Plaintiff's loss causation
allegations depend almost entirely on CVB's disclosure of the SEC investigation; the class period

---

[165]RJN, Exh. I ("August 9, 2010 10-Q").

[166]FAC, ¶¶ 179-81.

ends immediately following the August 9, 2010 announcement and subsequent stock drop. Although the complaint pleads post-class period facts concerning other market announcements by CVB that are related to the August 9, 2010, disclosure, plaintiff does not explain why the purported class period ends a month earlier.   Nor does plaintiff explain why the September 9, 2010 disclosure of a charge-off of the Garrett loans was not a "corrective disclosure," when CVB announced that it had written off a significant portion of the Garrett loans, and recategorized them as impaired and nonperforming. [167]   It is unclear how CVB's post-class period revelations can support a finding of loss causation, since, as alleged by plaintiff, the class period ended a month earlier.

The court is reluctant to conclude at this stage of the litigation that disclosure of the existence of an SEC investigation *never* suffices to show loss causation as a matter of law. Mindful that the mere risk of future loss is not a sufficient factual basis, however, *Metzler*, 540 F.3d at 1064, the court concludes that plaintiff has not adequately pled loss causation.  This serves as yet another basis for dismissing plaintiff's complaint.

### F.    Sufficiency of Count II: Violation of Section 20(a) of the 1934 Act

Section 20(a) imposes joint and several liability on persons who directly or indirectly control a violator of the securities laws.  The section provides:

"Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person . . . is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."  15 U.S.C. § 78t(a).

A *prima facie* case of control person liability requires evidence (1) that a primary violation of the securities laws occurred and (2) that defendant directly or indirectly controlled the person or entity committing the primary violation. See, e.g., *Howard v. Everex Systems, Inc.*, 228 F.3d

---

[167]*Id.*, ¶ 181.

1057, 1065 (9th Cir. 2000); *Paracor Finance*, 96 F.3d at 1161.  Plaintiff need not prove the individual defendant's scienter or "culpable participation" in the alleged wrongdoing.  *Id.* (quoting *Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1396 (9th Cir. 1993)).

"Section 20(a) claims may be dismissed summarily . . .[however,] if a plaintiff fails to adequately plead a primary violation of section 10(b)."  *Zucco Partners*, 552 F.3d at 990.  Because the court s dismissed plaintiff's section 10(b) and Rule 10b-5 claims, there is no primary violation on which to predicate section 20(a) liability.  Consequently, the court dismisses plaintiff's Section 20(a) claim as well.

### III.  CONCLUSION

For the reasons stated, defendants' motion to dismiss is granted.  Plaintiffs may file an amended complaint within thirty (30) days of the date of this order.

DATED: August 21, 2012

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

56